**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF SOUTH DAKOTA

**JUL 1 1 2013**

CLERK

| | |
|---|---|
| CHAD MARTIN HELDT, CHRISTI W. JONES, SONJA CURTIS, and CHERYL A. MARTIN, individually and on behalf of all similarly situated individuals,<br><br>               Plaintiffs,<br><br>-v-<br><br>PAYDAY FINANCIAL, LLC, d/b/a Lakota Cash and Big Sky Cash;<br>WESTERN SKY FINANCIAL, LLC, d/b/a Western Sky Funding, Western Sky, and Westernsky.com;<br>MARTIN A. ("Butch") WEBB; and CASHCALL, INC.,<br><br>               Defendants. | Court File No. _CV 13-3023_<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR TRIAL BY JURY**<br><br>(EQUITABLE RELIEF SOUGHT) |

Plaintiffs, on behalf of themselves and other similarly situated individuals, by and through their undersigned counsel, file this Class and Collective Action Complaint and aver as follows:

## NATURE OF ACTION

1.     This is a Class Action Complaint brought to obtain declaratory, injunctive and monetary relief on behalf of a class of individuals who responded to advertisements made by a group of affiliated South Dakota business entities offering consumer loans via the Internet. The lenders conspired to charge illegal interest rates and defraud consumers by stating that the lenders and collectors are exempt from United States laws because of an affiliation with the Cheyenne River Sioux Tribe ("Tribe"). The loans had a minimum annual percentage rate (APR) of 89.68 %—ten times the legal limit—and up to 342.86 %. The usurious nature of the interest rates renders them void; similarly, the deceptive and misleading nature of the groups' marketing materials and loan documents violate state consumer protection laws. Upon information and

1

belief, Defendant Webb owns and controls Defendant PayDay Financial, LLC and Western Sky, LLP (hereinafter all three entities will be referred to as "the Lending Defendants").

2.      Usury laws are intended to protect the weak and necessitous from being taken advantage of by lenders who can unilaterally establish the terms of the loan transaction.

3.      The Lending Defendants marketed fast, accessible, low-barrier loans to Plaintiffs and members of the class; in doing so, they preyed upon individuals who needed access to money as quickly as possible in order to meet their most basic human needs. The Lending Defendants took advantage of the weak and necessitous position of their target consumers by charging astonishingly high interest rates knowing that people will do whatever it takes to provide food for their family or keep their home out of foreclosure—even if the measure would only last a short time. The Lending Defendants provided the proverbial "desperate measure" for the desperate times in which Plaintiffs and members of the class found themselves. Loan fees and interest rates were lower, but still usurious, for higher dollar amount loans thus incentivizing borrowers to take more money than they needed.

4.      The Lending Defendants know that their interest rates are usurious, so they developed what they, upon information and belief, believe is a "legal loop hole"—requiring Plaintiff and members of the class to agree to an exculpatory clause that purportedly extinguishes any right the consumer has to apply United States law to the relationship. The loan agreements state that only the Tribe's law will apply to the relationship between consumers and the Lending Defendants and the consumer may not sue in any court of the United States or any state. But the loan agreement has *nothing* to do with Tribal law. The Lending Defendants are South Dakota limited liability companies marketing and providing services to consumers throughout the United States using web servers located in the State of California.

2

5.      The Lending Defendants cannot avoid the courts and laws of South Dakota, Minnesota, Virginia, or Texas—or the courts and laws of any other state or the United States by the mere fact that its controlling owner is a member of an American Indian tribe. Employees are mostly tribal members and their primary place of business is on tribal land. Similarly, Defendants cannot contract away their duty to follow the laws of each and every state in which they do business. This lawsuit seeks to end the Lending Defendants' illegal scheme to skirt the law and make consumers whole by returning Defendants' ill-gotten profits to consumers they have harmed.

PARTIES

6.      Plaintiff Chad Martin Heldt is a resident of Minnesota and applied for a loan from Western Sky in that state. Mr. Heldt borrowed $9,925 from Western Sky on April 24, 2013. The loan carried an APR of 89.68 % and a fee of $75.00. Finance charges on the loan are $52,676.49 for a total payment of $62,601.49 on a $9,925 loan. He has paid approximately $891.82 in interest and principal to Defendants to date.

7.      Plaintiff Christi W. Jones (née Trusevich) is a resident of Texas and applied for a loan from WesternSky in that state. Ms. Jones borrowed $2,525 from Western Sky on July 19, 2011. The loan carried an APR of 139.13 % and a fee of $75.00. Finance charges on the loan are $11,441.37 for a total payment of $13,966.37 on a $2,525 loan. She has paid approximately $3,635.07 in interest and $45.20 in principal to Defendants to date.

8.      Plaintiff Sonja Curtis is a resident of Texas and applied for a loan from Western Sky in that state. Ms. Curtis borrowed $5,000 from Western Sky on August 8, 2011. The loan carried an APR of 116.73 % and a fee of $75.00. Finance charges on the loan are $36,172.61 for a total payment of $41,172.61 on a $5,000 loan. She has paid approximately $5,737.34 in interest and $4.12 in principal to Defendants to date.

3

9.      Plaintiff Cheryl Annette Martin is a resident of Virginia and applied for a loan from Western Sky in that state. Ms. Martin borrowed $1,500 from Western Sky on December 30, 2011. The fee on the loan was $500, and so Ms. Martin received $1,000. The loan carried an APR of 233.91 %. Finance charges on the loan are $3,768.98 for a total payment of $4,768.98 on a $1,000 loan. She has paid approximately $1,616.47 in interest and $179.53 in principal to Defendants to date.

10.     Defendant Payday Financial, LLC ("Payday Financial") does business as Lakota Cash and Big Sky Cash. It is a limited liability company chartered under the law of the state of South Dakota as an ordinary business entity. Its principal place of business is 612 E Street, Timber Lake, South Dakota. Upon information and belief, Payday Financial caused the State of South Dakota to charter defendant Western Sky Financial and has served as the managing member of the entity. Payday Financial advertises and offers its loans to Minnesota, Texas, Virginia and other consumers through Internet websites including www.lakotacash.com. Payday Financial transacts business in South Dakota, Minnesota, Texas, and all other states in which it offers consumer loan products. The Lakota Cash website describes the company as follows:



http://www.lakotacash.com (accessed June 12, 2013). The typical visitor to the website is an African American female between the ages of 18 and 34, with children, and income of less than $50,000 per year, and no college education. *See* https://www.quantcast.com/lakotacash.com (accessed June 24, 2013). On February 9, 2011, Defendant Webb filed a Statement of Dissociation stating that Defendant PayDay Financial, LLC is dissociated from Defendant Western Sky Financial, LLC.

11.     Defendant Western Sky Financial, LLC, is a South Dakota limited liability company with its principal place of business at 612 E Street, Timber Lake, South Dakota. Western Sky advertises and offers loans to consumers by television advertisement and through a website accessible at www.westernsky.com. The company describes itself on its website as follows:



12.     Defendant Martin A. "Butch" Webb resides in South Dakota. Webb is the owner and president of Payday Financial and the owner of Western Sky. He is the registered agent of Payday Financial, Great Sky, Western Sky, Red Stone, Management Systems, 24-7 Cash, Red River, and High Country. Webb is the organizer, managing member, and registered agent of Financial Solutions.

13.     Defendant CashCall is a California corporation with principal place of business at 1600 S. Douglass Road, Anaheim, California. CashCall is engaged in the business of making or arranging high-interest loans to consumers over the Internet and then servicing the loans it made or arranged. On information and belief, CashCall has arranged with the Lending Defendants (or entities affiliated with them) to process the loans from their inception or otherwise purchase

6

loans made by the Lending Defendants shortly after they are made, or to receive the loans for collection or servicing. Upon information and belief, CashCall is aware of the terms of the loan agreements, including its exculpatory clause, and approved of those terms. Defendant CashCall owns or operates the webservers used by the Lending Defendants to market and form the loan agreements. Upon information and belief, CashCall operates and/or funds WS Funding, which is the entity that provides the money the Lending Defendants use to fund consumer loans.

14. The relationship between the Lending Defendants and defendant CashCall is close. All three entities host their public websites on TW Telecom servers based in Corona, California. Both websites became active on the TW Telecom servers within one day of each other. The servers run the same operating system and web serving software.

15. The websites cross-market each other. The site located at www.westernsky.com (which is owned by defendant Payday Financial, Inc.) includes keywords "Gary Coleman cash call" and "Gary Coleman cash loans"—referring to a 2007 ad-campaign run by defendant Cash Call that featured actor Gary Coleman.

16. The Lending Defendants use a website application co-developed by defendant CashCall and Cogility Software to manage the loan process. Upon information and belief, the CashCall system used by the Lending Defendants is comprehensive and includes: underwriting and decision-making, employment verification process, management of incoming voided checks and pay stub faxes through a fax queue, digital certificate generation, document creation, web-based tools for loan agents and administrator[s], access to loan account information, security services, e-mail generation, loan servicing, and phone system configuration and interface requirements.

17. None of the Defendants is owned, operated, or chartered by the Tribe.

7

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because the vast majority of class members are citizens of a state different from the home state of Defendants, and, upon information and belief, the amount in controversy exceeds five million dollars ($5,000,000.00).

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1961 *et seq.* because the Lending Defendants' principal place of United States business operations is located in South Dakota, and as such resides within the district.

20.     Venue is proper in this Court under 28 U.S.C §§ 1391(b)(2) and 1391(c) because a substantial part of the events giving rise to the claim occurred in this district.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this Complaint as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a National Class and three subclasses: a Minnesota sub-class, a Texas sub-class, and a Virginia sub-class. The National Class is defined as follows:

> All individuals whose loan agreement with Western Sky was made or formed using Defendants webservers located in the State of California and collected on a loan at more than 8 % interest at any time in the two years prior to the filing of this lawsuit.

Plaintiffs reserve the right to redefine the National Class prior to class certification.

The "Minnesota Sub-Class" is defined as follows:

> All individuals to whom the Lending Defendants made or collected on a loan at more than 8 % interest at any time in the two years prior to the filing of this lawsuit and who had a Minnesota address at the time the loan or collection was made.

Plaintiffs reserve the right to redefine the Minnesota Sub-Class prior to class certification.

Plaintiffs also bring this Complaint as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a "Texas Sub-Class" defined as follows:

8

> All individuals to whom the Lending Defendants made or collected on a loan at more than 10 % interest at any time in the two years prior to the filing of this lawsuit and who had a Texas address at the time the loan or collection was made.

Plaintiffs reserve the right to redefine the Texas Sub-Class prior to class certification.

Additionally, Plaintiffs bring this Complaint as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of a "Virginia Sub-Class" defined as follows:

> All individuals to whom the Lending Defendants made or collected on a loan at more than 8 % interest at any time in the two years prior to the filing of this lawsuit and who had a Virginia address at the time the loan or collection was made.

Plaintiffs reserve the right to redefine the Virginia Sub-Class prior to class certification.

Collectively, the classes may be referred to as the "class."

22.     Numerosity: Members of the Class are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiffs. However, upon information and belief, each sub-class is in excess of 100 individuals. The true number of class members is, however, likely to be known by the Defendants, and thus, class members may be notified of the pendency of this action by first class mail, electronic, and published notice.

23.     Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class; those questions predominate over any questions that may affect individual Class members, and include the following:

> a)      whether Defendants made and collected loans that violated Minnesota, Texas, or Virginia usury laws;

> b)      whether Plaintiffs and members of the Class are entitled to injunctive relief prohibiting Defendants from making automatic electronic transfers of funds to and from Plaintiffs and members of the class for their usurious loans;

9

c)      whether Plaintiffs and members of the Class are entitled to declaratory relief declaring that Defendants loans are usurious;

d)      whether the Defendants conspired to violate the law;

e)      whether Plaintiffs and members of the Class are entitled to injunctive relief requiring Defendants to cease their illegal business practices.

24.     Typicality: Plaintiffs' claims are typical of the other members of the Class. Plaintiffs are informed and believe that, like other consumers, Plaintiffs paid the same usurious interest rates as posted on the Defendants' various websites and the material terms of their loan documents are substantially similar.

25.     Adequacy: The named Plaintiffs will adequately represent the interests of the Class. They have been treated in the same manner as other class members by Defendants and have been damaged by this treatment in the same manner as other class members by their overpayment of interest. Plaintiffs are committed to vigorously prosecuting this action. Plaintiffs have retained attorneys who are well qualified to handle lawsuits of this type. Plaintiffs have no interests that are adverse to those of the Class.

26.     Predominance: This case should be certified as a class action because the common questions of law or fact concerning Defendants' liability predominate over any individual questions, including the amount of damages incurred by each person.

27.     Superiority: A class action is the only realistic method available for the fair and efficient adjudication of the claims of the classes. The expense and burden of individual litigation makes it impracticable for members of the Class to seek redress individually for the wrongful conduct alleged in this Complaint. Were each individual member required to bring a separate lawsuit, the resulting multiplicity of proceedings would cause undue hardship and

expense for the litigants and the Court, and create the risk of inconsistent rulings, which would be contrary to the interest of justice and equity. Litigating these claims in a single action will streamline discovery and avoid needless repetition of evidence at trial.

FACTUAL BASIS

28.     The Lending Defendants offer high interest rate unsecured consumer loans of $300 to $10,000 through Internet websites, including to individuals throughout Minnesota, Texas, and Virginia. The APR on the loans range from approximately 89.68 % to 342.86 %. The Lending Defendants have offered such loans since at least mid-2007. Upon information and belief, Defendant CashCall has entered into agreements with the Lending Defendants to collect debts and service the loans made by the Lending Defendants.

29.     Consumers who require a payday loan from Defendants visit one of several websites run by the Lending Defendants. Consumers apply for a loan through an online form or by calling a toll-free telephone number.

30.     Defendants quickly provide money to the consumer. Shortly thereafter the Lending Defendants transfer the loan note to Defendant CashCall. In essence, the Lending Defendants act as a broker of CashCall loans under the guise of an American Indian Internet loan company.

31.     If a consumer does not pay back a loan on time, Defendants attempt to collect the debt. Among other things, Defendants make negative reports to credit bureaus, call consumers multiple times per day, contact consumers' employers, and engage in other aggressive—and often intimidating—tactics.

32.     All Defendants knew or should have known that the loans they made to Plaintiffs and the class contained interest rates that are unenforceable because they violate Minnesota, Texas, and Virginia usury statutes.

11

33.     Defendants inform consumers—including Plaintiffs and members of the class—
that the Indian Commerce Clause of the United States Constitution bars application of their
states' laws. But the Indian Commerce Clause provides no such immunity—it narrowly grants
the United States Congress the authority to "regulate Commerce … with the Indian tribes." U.S.
Const. Art.I § 8. It does not state, as Defendants would have consumers believe, that American
Indians are free to violate state laws without repercussion.

34.     Notably, the Lending Defendants refuse to offer loans to members of the Tribe or
to residents of South Dakota where the tribe is located.

35.     All consumers must sign a loan agreement form to indicate they accept the terms
of the loan. There is a reasonable question of whether a consumer sees the entire term of the loan
or arbitration clause before they accept the loan.

36.     The loan agreement includes, among other things, the following statements:

> **This Loan Contract is subject solely to the exclusive laws and
> jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne
> River Indian Reservation.** By executing this Loan Agreement,
> you, the borrower, hereby acknowledge and consent to be bound to
> the terms of this Loan Agreement, consent to the sole subject
> matter and personal jurisdiction of the Cheyenne River Sioux
> Tribal Court, and that no other state or federal law or regulation
> shall apply to this Loan Agreement, its enforcement or its
> interpretation.
>
> …
>
> **Governing Law.** This Agreement is governed by the Indian
> Commerce Clause of the Constitution of the United States of
> America and the laws of the Cheyenne River Sioux Tribe. We do
> not have a presence in South Dakota or any other states of the
> United States. Neither this Agreement nor Lender is subject to the
> laws of any state of the United States of America.

37.    The loan agreement takes a "belt and suspenders" approach to depriving consumers of their state law rights. The agreement also contains an arbitration provision that requires, among other things:

> "Arbitration shall be conducted in the Cheyenne River Sioux Tribal Nation by a panel of three Tribal Elders and shall be conducted in accordance with the Cheyenne River Sioux Tribal Nation's consumer rules and the terms of this Agreement."

The document continues:

> "THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSITITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE."

Further, "The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement."

38.    Contrary to the representations of the Lending Defendants in the loan agreement, there is no such thing as arbitration in the Cheyenne River Sioux judicial system. Further, "Cheyenne River Sioux Tribal Nation's consumer rules" do not exist. In response to a request for information regarding the Tribe's arbitration procedure, a Tribal Mediator/Magistrate stated, "the Cheyenne River Sioux Tribe, the governing authority does not authorize Arbitration as defined by the American Arbitration Association (AAA) here on the Cheyenne River Sioux Reservation located in Eagle Butte, SD 57625." (Exhibit A.)

39.    The "belt and suspender approach" of placing exclusive jurisdiction of disputes with the Cheyenne River Sioux Tribe, but at the same time, requiring arbitration pursuant to nonexistent arbitration rules, creates a conflict within the loan agreement. This dispute cannot simultaneously be subject to the jurisdiction of the Cheyenne River Sioux Tribe judicial system

*and* a panel of non-judicial arbitrators who are chosen solely by the Defendants and who are members of the Tribe. This violates the Federal Arbitration Act. (Exhibit B.)

## COUNT I
### CIVIL CONSPIRACY
(On behalf of All Plaintiffs and the National Class)

40.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

41.     As set forth above, the four named defendants engaged in a civil conspiracy to conduct business as an Internet consumer loan lender. They agreed with one another to engage in a fraud that violated state statutory law. That conduct constitutes an agreement to accomplish an unlawful objective, which is a conspiracy. Plaintiffs have suffered and will suffer actual financial damage as a result of Defendants' conspiracy.

## COUNT II
### USURY IN VIOLATION OF STATE LAW
Minn. Stat. §§ 334.01, *et seq.*
Tex. Fin. Code § 342.001, *et seq.*
Va. Code § 6.2-306, *et seq.*
Calif. Const. Art. 15.
(On behalf of All Plaintiffs and the National Class)

42.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

43.     The loans provided to Plaintiffs by the Lending Defendants are not secured by a lien on real property.

44.     None of the Lending Defendants are registered as a bank, credit union, finance company, or pawnbroker in any state in which they transact business.

45.     Minnesota's usury laws are intended to protect the weak and necessitous from being taken advantage of by lenders who can unilaterally establish the terms of the loan transaction.

46.     Minnesota statute limits the interest rate for personal or consumer loans to 8% for loans under $100,000. Minn. Stat. § 334.01.

47.     The Lending Defendants charged Plaintiff Heldt and all members of the Minnesota Sub-Class interest calculated at a rate of 89% or more.

48.     Minnesota law permits Plaintiff and members of the Minnesota Sub-Class to file a lawsuit to recover "the full amount of interest or premium so paid, with costs … ." Minn. Stat. § 334.02.

49.     Texas law specifies, "Except as otherwise fixed by law, the maximum rate of interest is 10 percent a year." Tex. Fin. Code § 342.004.

50.     The Lending Defendants charged Plaintiffs Jones and Curtis an interest rate nearly nine times greater than the legal limit. There are no exceptions at law that apply to the Lending Defendants or the loans it issued to Plaintiffs.

51.     The Lending Defendants' effort to apply Tribal law to the loan is void.

> A person who is a party to a deferred presentment transaction may not evade the application of this subtitle or a rule adopted under this subchapter by use of any device, subterfuge, or pretense.

Tex. Fin. Code § 342.008.

52.     In Virginia, the maximum rate of interest on a consumer loan is 8% and:

> Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void.

Va. Code § 6.2-306.

53.     California, the place of contract formation of the loan agreements, imposes similar restrictions on lenders. The California Constitution, Article 15, allows parties to contract for interest on a loan primarily for personal, family or household purposes at a rate not exceeding

10% per year. California statutes further define usurious interest rates and remedies available to consumers.

54.     Plaintiffs Jones and Curtis, on behalf of themselves and Texas sub-class members, seek recovery of twice the amount of interest contracted for, charged, or received; their attorneys' fees and costs, as provided by the Texas Finance Code § 349.001.

55.     Plaintiff Heldt on behalf of himself and the Minnesota sub-class, seeks to recover all interest paid to Defendants plus costs, together with any other relief to which he or members of the class are entitled or the court may deem appropriate.

56.     Plaintiff Martin on behalf of herself and the Virginia sub-class, seeks to recover twice the usurious interest paid to Defendants plus costs and reasonable attorney fees, together with any other relief to which she or members of the class are entitled or the court may deem appropriate.

57.     All Plaintiffs on behalf of the Nationwide Class seek money damages for all money previously paid on the loans, damages equal to three times the interest paid during the 12 months prior to the filing of this lawsuit and after filing this lawsuit, a declaration to cancel all future interest, punitive damages in an amount to be requested at trial, attorneys fees and costs, and any other relief to which Plaintiffs or members of the class are entitled or the court may deem appropriate.

COUNT III
VIOLATION OF MINNESOTA REGULATED LOAN ACT
Minn. Stat. §§ 56.0001, *et seq.*
(On behalf of Plaintiff Heldt and the Minnesota Sub-Class)

58.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

59.     The Minnesota Regulated Loan Act provides,

> no person shall engage in the business of making loans of money,
> credit, goods, or things in action, in an amount or of a value not
> exceeding [$100,000], and charge, contract for or receive on the
> loan a greater rate of interest, discovery or consideration than the
> lender would be permitted by law to charge if not a licensee under
> this chapter.

Minn. Stat. §§ 56.01, 56.131, subdiv. 1.

60.    Upon information and belief, none of the Lending Defendants have obtained a

license from the Commissioner of Commerce to engage in the business of making loans of any

kind.

61.    Minnesota statute limits the interest rate for personal or consumer loans to 8% for

loans under $100,000. Minn. Stat. § 334.01.

62.    With respect to unlicensed persons making loans, such as the Lending

Defendants, the Minnesota Regulated Loan Act further provides,

> No person, except as authorized in this chapter, shall, directly or
> indirectly, charge, contract for, or receive any interest, discount, or
> consideration greater than the lender would be permitted by law to
> charge if that person were not authorized hereunder upon the loan,
> use, or forbearance of money, goods, or things in action, or upon
> the loan, use, or sale of credit of the amount regulated by this
> chapter.
>
> The foregoing prohibition shall apply to any person who, by any
> device, subterfuge, or pretense, shall charge, contract for, or
> receive greater interest, consideration, or charges than is authorized
> by this chapter for any such loan, use or forbearance of money,
> goods, or things in action, or for any such loan, use or sale of
> credit.

Minn. Stat. Ann. § 56.18.

63.    Defendant CashCall has conspired with the Lending Defendants to enforce and

collect upon the illegal consumer loans made by the Lending Defendants. The loans are

unenforceable under Minnesota law.

17

64. Plaintiff Heldt on behalf of himself and the Minnesota sub-class, seeks to recover all amounts paid to Defendants and all other remedies provided by Minn. Stat. § 56.19, together with any other relief to which he or members of the class are entitled or the court may deem appropriate.

COUNT IV
FALSE ADVERTISING
Minn. Stat. §§ 325F.67, *et seq.*
(On behalf of Plaintiff Heldt and the Minnesota Sub-Class)

65. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

66. Minnesota's False Statement in Advertising Act ("FSAA"), Minn. Stat. § 325F.67, provides a cause of action to "any person, firm, corporation, or association" who purchases goods or services through advertising that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

67. Where, as here, plaintiffs' claims inure to the public benefit, Minnesota's private-attorney general statute, Minn. Stat. § 8.31, subdiv. 3a, allows individuals who have been injured through a violation of the FSAA to bring a civil action.

68. By engaging in the conduct herein, Defendants violated and continue to violate Minn. Stat. § 325F.67.

69. Defendants' misrepresentations, knowing omissions, and use of other sharp business practices include attempting to create a situation where its loan interest rates were not subject to state law, but only Tribal law; and averring that its practices are permitted by the Indian Commerce Clause.

70. As a result of Defendants' conduct, Plaintiff Heldt has suffered actual damages in that he entered into a loan agreement with Defendants under false pretenses. There is an

association between Defendants' acts and omissions as alleged herein and the damages suffered by Plaintiff.

71.     As a result of Defendants' untrue, deceptive, and misleading assertions and representations about their affiliation with the Tribe and its right to charge usurious interest, Plaintiff has and will continue to suffer damages in the form of usurious interest rates, damaged credit, harassment, embarrassment, and other damages.

COUNT V
Violation of the Virginia Consumer Protection Act, § 59.1-200(A)(5)
(On behalf of Plaintiff Martin and the Virginia Sub-Class)

72.     Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

73.     The Virginia Consumer Protection Act, Va. Code. §59.1-200(A)(5), prohibits "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits."

74.     Defendants made the misrepresentation that the Indian Commerce Clause of the United States Constitution governed the loan agreement.

75.     Defendants also misrepresented the fact that the Tribe administered consumer arbitrations and has consumer arbitration rules.

76.     Plaintiff and putative class have suffered actual damages, caused by Defendants' misrepresentations, in that they entered into loan agreement with the Lending Defendants under the mistaken belief that due process would be available to them in the event of a dispute.  As such, a causal nexus exists between Defendants' actions and the damages suffered by the Plaintiff and the Virginia Sub-Class.

77.     As a direct, proximate and foreseeable result of Defendants' violation of the Virginia Consumer Protection Act, Plaintiff and putative class members have sustained damages.

19

78.     Plaintiff Martin, on behalf of herself and the Virginia Sub-Class, demands

judgment against Defendants for an amount to be determined at trial and pray for judgment as set

forth below.

COUNT VI
Violation of the Texas Deceptive Trades Practices Act
Tex. Bus. & Com. Code § 17.46, *et seq*.
(On behalf of Plaintiffs Jones and Curtis and the Texas Sub-Class)

79.     Plaintiffs incorporate by reference each of the allegations contained in the

preceding paragraphs of this Complaint.

80.     The Texas Business and Commercial Code section 17.46, Deceptive Trade

Practices Unlawful, states in part:

> (a) False, misleading, or deceptive acts or practices in the conduct
> of any trade or commerce are hereby declared unlawful and are
> subject to action by the consumer protection division under
> Sections 17.47, 17.58, 17.60, and 17.61 of this code.
> (b) Except as provided in Subsection (d) of this section, the term
> "false, misleading, or deceptive acts or practices" includes, but is
> not limited to, the following acts:
>
> ...
>
> (12) representing that an agreement confers or involves rights,
> remedies, or obligations which it does not have or involve, or
> which are prohibited by law;
>
> ...
>
> (24) failing to disclose information concerning goods or services
> which was known at the time of the transaction if such failure to
> disclose such information was intended to induce the consumer
> into a transaction into which the consumer would not have entered
> had the information been disclosed; ... .

*Id.*

81.     Defendants represented that the loan agreement conferred rights and remedies of

tribal law arbitration; however, the reality is that Tribal arbitration did not exist at the time the

20

Plaintiffs received the loan agreements and the Tribe's consumer arbitration rules are similarly illusive.

82.     Plaintiff and putative class have suffered actual damages, caused by Defendants' misrepresentations, in that they entered into loan agreement with the Lending Defendants under the mistaken belief that due process would be available to them in the event of a dispute. As such, a causal nexus exists between Defendants' actions and the damages suffered by the Plaintiff and the Texas Sub-Class.

83.     As a direct, proximate and foreseeable result of Defendants' violation of the Texas Deceptive Trade Practices statute, Plaintiff and putative class members sustained damages.

84.     Plaintiffs Jones and Curtis, on behalf of themselves and the Texas Sub-Class demands judgment against Defendants for all relief available to them pursuant to Tex. Bus. & Com. Code § 17.50 in an amount to be determined at trial and pray for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request of this Court the following relief on behalf of themselves, all members of the Class and all other similarly situated individuals:

a.     An Order certifying the Class and sub-classes, and appointing the undersigned counsel of record as Class Counsel;

b.     An Order for declaratory and injunctive relief designating the Lending Defendants' interest rates illegal and enjoining Defendants from pursuing collection activities for such interest, and enjoining other acts and practices described in this Complaint;

      c.      An Order requiring Defendants to correct any reports made to credit bureaus or reporting agencies regarding the loans at issue to completely remove the loans from each bureau or agencies databases or to reflect the illegal nature of the loans;

      d.      An Order requiring Defendants to compensate Plaintiffs and the other members of the Class for the reasonable value of the overpaid interest Plaintiffs provided to Defendants;

      e.      Payment of any penalties or other amounts under any applicable laws, statutes or regulations, including but not limited to liquidated and exemplary damages;

      f.      Judgment in favor of each Class member for damages suffered as a result of the conduct alleged herein, to include pre-judgment interest;

      g.      Award Plaintiffs reasonable attorneys' fees and costs;

      h.      Award Plaintiffs and the other members of the Class punitive damages in an amount to be determined at trial; and

      i.      Grant such other and further legal and equitable relief as this Court deems just and necessary.

      j.      Declaration that the arbitration provisions and tribal jurisdiction names in loans is void.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so properly triable thereby.

Dated: July 11, 2013

TIESZEN LAW OFFICE, PROF. LLC
**FOR THE FIRM**

Wade L. Fischer
306 East Capitol, Suite 300
P.O. Box 550
Pierre, SD 57501-0550

22

Telephone: (605) 224-1500
Facsimile: (605) 224-1600
office@tieszenlaw.com

- and –

BAILLON THOME JOZWIAK & WANTA LLP

Shawn J. Wanta (*pro hac* pending)
Christopher D. Jozwiak (*pro hac* pending)
222 South Ninth Street, Suite 2955
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571

*Attorneys for Plaintiffs*