UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| CHAD MARTIN HELDT, CHRISTI W. JONES, SONJA CURTIS, and CHERYL A. MARTIN, individually and on behalf of all similarly situated individuals | * * * * | |
| | * | Case No. 3:13-cv-3023-RAL |
| Plaintiffs, | * * | |
| | * | Hon. Roberto A. Lange |
| v. | * * | |
| PAYDAY FINANCIAL, LLC, d/b/a Lakota Cash and Big Sky Cash; WESTERN SKY FINANCIAL, LLC, d/b/a Western Sky Funding, Western Sky, and Westernsky.com; MARTIN A. ("Butch") WEBB; and CASHCALL, INC, | * * * * * * | |
| Defendants. | * | |

DEFENDANTS' MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Payday Financial, LLC, Western Sky Financial, LLC, Martin A. Webb, and CashCall, Inc. (together, "Defendants") submit this Motion to Dismiss and Memorandum of Points and Authorities, and respectfully request that this Court enter an Order dismissing the Class Action Complaint filed by Plaintiffs Chad Martin Heldt, Christi W. Jones, Sonja Curtis, and Cheryl Martin (together, "Plaintiffs").

## I.    Introduction

Plaintiffs bring this putative class action against their consumer installment lender Western Sky Financial, LLC ("Western Sky"); its owner Martin A. Webb ("Webb"); the loan servicer CashCall, Inc. ("CashCall"); and Payday Financial, LLC ("Payday Financial"), whose only link to this suit is that it is also owned by Webb. Plaintiffs applied for, and received,

installment loans from Western Sky and now seek to recover damages for receiving exactly what they bargained for. And despite the plain notice in each loan contract stating that it was subject to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Plaintiffs brought this case in South Dakota federal court contending that various and sundry Minnesota, Texas, Virginia, and California laws and constitutional provisions entitle Plaintiffs to actual and punitive damages, declaratory relief, restitution, attorneys' fees, and other as yet undefined relief.

As demonstrated below, Plaintiffs' Class Action Complaint (the "Complaint") should be dismissed for four independent reasons: (1) it was filed in an improper venue; (2) the tribal exhaustion doctrine requires the Cheyenne River Sioux Tribal Court to determine the scope of its own jurisdiction; [1] (3) this Court lacks personal jurisdiction over Defendant CashCall, Inc., and (4) Plaintiffs' allegations fail to state a claim on which relief can be granted.

## II.     Procedural History And Summary Of Plaintiffs' Allegations

On July 11, 2013, Plaintiffs filed a Complaint requesting certification of a nationwide consumer class, a Minnesota sub-class, a Texas sub-class, and a Virginia sub-class, asserting six claims for relief: (1) civil conspiracy on behalf of all Plaintiffs and the putative national class; (2) usury in violation Minnesota, Texas, and Virginia state statutes and the California Constitution, on behalf of all Plaintiffs and the putative national class; (3) a violation of Minnesota's Regulated Loan Act on behalf of Plaintiff Heldt and the putative Minnesota sub-class; (4) false advertising in violation of Minn. Stat. §§ 325F.67 *et seq* on behalf of Plaintiff Heldt and the putative Minnesota sub-class; (5) a violation of the Virginia Consumer Protection Act on behalf

---

[1] Should the Court find venue to be proper (which it is not) and the tribal exhaustion doctrine inapplicable, Defendants' respectfully request that the Court reserve ruling on the two other grounds until it rules upon Defendants' Motion to Stay and Compel Arbitration filed concurrently herewith.

of Plaintiff Martin and the putative Virginia sub-class; and (6) a violation of the Texas Deceptive Trade Practices Act on behalf of Plaintiffs Jones and Curtis and the putative Texas sub-class. [2]

Plaintiffs attempt to support these claims by alleging that the "lenders conspired to charge illegal interest rates and defraud consumers by stating that the lenders and collectors are exempt from United States laws because of an affiliation with the Cheyenne River Sioux Tribe ("Tribe.") Compl. ¶ 1.[3] Plaintiffs allege that they each obtained loans from Western Sky. And despite clear choice of law provisions in Plaintiffs' loan agreements (the "Loan Agreements"), Plaintiffs allege that "[a]ll Defendants knew or should have known that the loans they made to Plaintiffs and the class contained interest rates that are unenforceable because they violate Minnesota, Texas, and Virginia usury statutes." ¶ 32. Each Loan Agreement, however, unambiguously states that Western Sky is a enrolled tribal member owned and operated lender, and provides that it is governed by the laws of the Cheyenne River Sioux Tribe. *See* ¶ 36; *see also* Heldt Loan Agreement, attached as Ex. A at 1; Jones (*née* Trusevich) Loan Agreement, attached as Ex. B at 1; Curtis Loan Agreement, attached as Exhibit C at 1; Martin Loan Agreement, attached as Exhibit D at 1.[4] And along with providing comprehensive arbitration clauses, each Loan Agreement unequivocally sets forth a judicial venue clause requiring that the courts of the

---

[2] Defendants expressly reserve the right to seek arbitration of these claims. *See* p.2 n.1, *supra*.

[3] All references in this Brief preceded by a paragraph symbol are citations to the Complaint [Docket No. 1].

[4] Though "matters outside the pleading" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint" are not matters outside the pleading. *Enervations, Inc. v. Minnesota Mining and Mft. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (citations omitted). Because the Loan Agreements are "necessarily embraced by the pleadings" and "incorporated by reference" they can be considered on a Rule 12 Motion to Dismiss without converting it to a Motion for Summary Judgment. *See id.; Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

Cheyenne River Sioux Tribe must be the exclusive venue for any court proceedings.[5] *See id.* Plaintiffs' claims arise solely from their Loan Agreements with Western Sky.

### III.     Argument

**A.     Plaintiffs' Complaint Should Be Dismissed Because It Was Filed In An Improper Venue.**

Federal Rule of Civil Procedure 12(b)(3) warrants dismissal of this case because Plaintiffs filed the Complaint in an improper venue. Plaintiffs explicitly agreed to express contract provisions (the "Forum Selection Clauses") which provide that, to the extent Plaintiffs' claims cannot be arbitrated, the Cheyenne River Sioux Tribal Courts are the exclusive forum in which Plaintiffs may assert claims arising from their Loan Agreements. At the outset, it must be noted that the Eighth Circuit has not yet adopted a definitive position on whether to apply state or federal law in determining the enforceability of a forum selection clause. *See Servewell Plumbing, LLC v. Federal Ins. Co.*, 439 F.3d 786, 789 (8th Cir. 2006). This question will not impact the analysis here, however, because South Dakota follows the federal standard announced by the Supreme Court in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). *See Bell Inc. v. Drent Goebel USA, Inc.*, No. 08-4192, 2009 WL 2634036, at *2 (D.S.D. Aug. 24, 2009) (citing *Baldwin v. Heinhold* Commodities, 363 N.W.2d 191, 195 (S.D. 1985)).

Under *Bremen*, "[f]orum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching." *M.B. Restaurants, Inc. v. CKE Restaurants, Inc.*, 183 F.3d 750, 752 (8th Cir. 1999) (citing *Bremen*, 407 U.S. at 15)). Further, "[t]hey are enforceable unless they would actually deprive the

---

[5] Each Loan Agreement refers to the venue of Cheyenne River Sioux Tribal Courts in the first paragraph of the Loan Agreement. In addition, Tribal Court venue is also mentioned in paragraphs entitled: (a) Applicable Law and Judicial Review; and (b) Small Claims Exception.

opposing party of his fair day in court," *id.* (citations omitted), or unless "enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision." *Bremen*, 407 U.S. at 15. To overcome the presumption of validity, Plaintiffs must make a "strong showing" that the Forum Provisions are unreasonable. *Id.* "A party resisting consideration and enforcement of a forum selection clause bears the burden of demonstrating unreasonableness or overreaching." *Bell Inc.*, 2009 WL 2634036, at *2. At least one federal court has enforced Western Sky consumer loan venue provisions. *See Jackson v. Payday Financial, LLC*, No. 11-09288, 2012 WL 2722024 (N.D. Ill. July 9, 2012).

Plaintiffs' Loan Agreements contain clear and undeniable Forum Selection Clauses, that are not unjust, unreasonable, or otherwise invalid. Rather, the Clauses simply specify *which* court must hear Plaintiffs' claims. The Loan Agreements provide:

> **This Loan Contract is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or its interpretation.

¶ 36 (bold in original). Because Plaintiffs cannot make a strong showing that this Forum Selection Clause is unreasonable, this action should be dismissed for improper venue.

### 1.     The Forum Provisions Are Valid And Enforceable.

The forum selection clause contained in the Loan Agreements should be enforced because Plaintiffs cannot show that they are "invalid for reasons such as fraud or overreaching." *M.B. Restaurants*, 183 F.3d at 752 (citing *Bremen*, 407 U.S. at 15). It is not sufficient to allege merely that the *contract* was procured by fraud; rather, Plaintiffs' must show that "the forum selection clause was *itself* a product of fraud." *See M.B. Restaurants*, 183 F.3d at 752 (emphasis

added); *cf. Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974). Although Plaintiffs—conveniently ignoring that they expressly agreed to the Forum Selection Clauses—proffer vague arguments suggesting that the contract was a fraud (or a least that a conspiracy existed to commit fraud), Plaintiffs do not—and cannot—allege that the Forum Provisions themselves, which were unmistakably set out in the first paragraph of the Loan Agreements (and reiterated in two other places in the contracts), were procured by fraud or overreaching. *See* ¶¶ 40-41; *see also Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 595 (1991) (explaining that a forum-selection clause was not fraudulent or overreaching when it selected Carnival's principal place of business as a forum and the parties seeking the avoid the clause were given notice of it and "presumably retained the option of rejecting the contract with impunity").

Absent evidence of fraud or overreaching, forum selection clauses are enforceable even when they have not been specifically bargained for or "negotiated." *See Carnival Cruise Lines*, 499 U.S. at 595. Plaintiffs were not forced into an agreement with Western Sky. Indeed, Plaintiffs sought out, applied for, and signed the Western Sky Loan Agreements, which specified venue in the Loan Agreements' first paragraph (and two other places within the contract). Plaintiffs, like those in *Carnival Cruise Lines*, were free to walk away at any time. Instead, they voluntarily entered into an Agreement that contained a valid and enforceable Forum Selection Clause.

Moreover, because there is a close relationship between substance and procedure in forum selection clause analysis and enforcement, consideration must be given to the public policy of the forum state. *See Union Elec. Co. v. Energy Ins. Mutual Ltd.*, 689 F.3d 968, 974 (8th Cir. 2012). Forum selection clauses will be enforced unless their enforcement would "contravene a strong public policy of the forum in which suit is brought, whether declared by statute or

judicial decision." *Bremen*, 407 U.S. at 15. At this point, however, it is crucial to note that this Court has already concluded (in a separate action) that similar Western Sky consumer loan contracts were made on the Reservation. *See FTC v. Payday Fin.,* LLC, No. 11-3017, 2013 WL 1309437, at *10 (D. S.D. Mar. 28, 2013).

In fact, South Dakota's public policy is not implicated here at all. None of the parties to this dispute are South Dakota residents, and none of the activity complained of by Plaintiffs takes place in South Dakota. Even assuming that South Dakota has an interest in applying its own laws, that consideration is not applicable here. First, the Loan Agreements contains a presumptively valid "Governing Law" provision that specifies application of Cheyenne River Sioux tribal law. Second, Counts II-VI specifically allege violations of *other states'* laws, namely Virginia, Minnesota, Texas and California. Consequently, South Dakota has no cognizable interest in this case, and the state's public policy is not involved or impugned. This factor weighs heavily in favor of enforcing the Forum Provisions.

Under the *Bremen* analysis, and considering the facts relevant to this assessment, Plaintiffs cannot possibly make a strong showing that the Forum Selection Clauses are unreasonable. *See Bremen*, 407 U.S. at 15. Rule 12(b)(3) requires this case to be dismissed.

### 2. The Forum Provisions Should Be Enforced Because They Are Reasonable Under the Circumstances.

While mere "inconvenience to a party is an insufficient basis to defeat an otherwise enforceable forum selection clause," *M.B. Restaurants*, 183 F.3d at 753 (citations omitted), absent a showing "that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court . . . there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain."

*Bremen*, 407 U.S. at 17-18; *see M.B. Restaurants*, 183 F.3d at 752 ("They are enforceable unless they would actually deprive the opposing party of his fair day in court.") (citing *Carnival Cruise Lines*, 499 U.S. at 590-95). Plaintiffs make no attempt to allege that applying this forum selection clause would deprive them of their day in court. Rather, they baldly conclude that the forum selection clause and arbitration clause operate as "belt and suspenders approach to depriving consumers of their state law rights." ¶ 37. Plaintiffs do not explain, however, why the Tribal Court *forum itself* would deprive them of their rights. The South Dakota Supreme Court, citing U.S. Supreme Court doctrine, reiterated this concept in plain terms: "Personal dissatisfaction with using a tribal court as the jurisdiction of legal dispute has been rejected as a valid basis to proceed in another court system." *Risse v. Meeks*, 585 S.D. 875, 879 (1998) (citing *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18-19 (1987)).

This anemic (and unsupported) criticism of the tribal courts is insufficient to demonstrate that litigation in the Cheyenne River Sioux Tribal Courts could be so gravely expensive or inconvenient as to prevent Plaintiffs from having their day in court, especially where the agreed upon forum (the Cheyenne River Sioux Tribal Court) is physically near the forum selected by Plaintiffs (at least considering Plaintiffs reside in Minnesota, Texas, and Virginia). And even if Plaintiffs could allege that litigation would be too expensive, the expense of litigating in a foreign jurisdiction is insufficient to invalidate a forum selection clause. *See Servewell*, 439 F.3d at 790 (alleged "great expense" of litigation "falls well short of depriving [plaintiff] of its day in court"); *compare McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 345-46 (8th Cir. 1985) (holding that chaotic post-revolutionary conditions in Iran, including an ongoing war with Iraq, excused enforcement of forum selection clause requiring litigation in Iran) *with M.B. Restaurants*, 183 F.3d at 753 (enforcing forum selection clause specifying Utah over

plaintiff's objection that he could not afford to litigate in that state).

Nor is it enough that the Loan Agreements require that the Plaintiffs' disputes be litigated or arbitrated in a foreign court. The Eighth Circuit has even enforced forum selection clauses requiring a Missouri company to litigate in Germany. *See, e.g. Sun World Lines v. March Shipping Corp,* 801 F.2d 1066, 1068 (8th Cir. 1986) *receded from on other grounds by Farmland Indus., Inc. v. Frazier-Parrott Commodities, Inc*, 806 F.2d 848 (8th Cir. 1986). Here, the forum selection clause only requires Plaintiffs to litigate in Dewey County instead of Hughes County. And contrary to Plaintiffs' implications, the Cheyenne River Sioux Tribal Courts exist and provide Plaintiffs a viable forum to assert their consumer claims. *See, e.g., Plains Commerce Bank v. Long Family Land & Cattle Co*., 554 U.S. 316 (2008) (deciding an appeal from the Cheyenne River Sioux Tribal Courts in a lawsuit involving consumer claims) (*Plains Commerce I*). Thus, Plaintiffs can have their day in court—the Cheyenne River Sioux Tribal Court.

**B.    The Tribal Exhaustion Doctrine Requires That The Cheyenne River Sioux Tribal Court Must First Determine Its Own Jurisdiction Before This Court Can Hear This Case.**

The U.S. Supreme Court requires that when an action implicates tribal court jurisdiction, the first examination of that jurisdiction must take place in the tribal court. *See National Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985). This is known as the tribal exhaustion doctrine. *See id.* "Allowing tribal courts to make an initial evaluation of jurisdictional questions serves several important functions, such as assisting in the orderly administration of justice, providing federal courts with the benefit of tribal expertise, and clarifying the factual and legal issues that are under dispute and relevant for jurisdictional evaluation." *DISH Network Service LLC v. Laducer*, __ F.3d __, 2013 WL 3970245, at *4 (8th Cir. Aug. 5, 2013) (citing *Nat'l Farmers Union*, 471 U.S. at 856-57). The purpose of the

exhaustion of tribal remedies "is to provide for the 'orderly administration of justice in the federal court . . . by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.'" *Id.* (quoting *Nat'l Farmers Union*, 471 U.S. at 856). "By requiring parties to exhaust their tribal court remedies before seeking relief in federal court, the tribal exhaustion rule allows tribal courts to assert authority over reservation affairs without having to 'compete' against federal courts for the right to do so." *Colombe v. Rosebud Sioux Tribe*, 835 F. Supp. 2d 736, 747 (D.S.D. 2011). Because Plaintiffs have specifically implicated tribal court jurisdiction by filing suit against entities wholly owned by a member of the Cheyenne River Sioux Tribe (and against their owner Webb[6]), *see* ¶ 10-12, the Tribal Court should determine whether it has jurisdiction before the Court can hear the case.[7]

Here, Plaintiffs are non-Indians doing business over the internet with an entity (Western Sky) that is wholly owned by an enrolled member of the Cheyenne River Sioux Tribe, and all of Plaintiffs' claims arise from the Loan Agreements with that entity. *See* ¶ 5-9; 11-12. It is well settled that tribal courts may exercise jurisdiction over non-Indians who enter into consensual relationships with tribal members through commercial dealing or contracts. *See Montana v.*

---

[6] Plaintiffs' allegations against Webb personally raise particular concerns. Webb is an enrolled member of the Cheyenne River Sioux Tribe, and his companies Western Sky and Payday Financial are located within the Tribe's Reservation. *See* ¶ 10-12; *see also* Exs. A-D. Plaintiffs' claims against Webb plainly implicate tribal court jurisdiction.

[7] This tribal exhaustion doctrine is not jurisdictional in nature, but rather is a matter of comity, *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31-32 (1st Cir. 2000), and applies regardless of whether an action is currently pending in the tribal court, *United States v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996), or is subject to arbitration. *See Bank One, N.A. v. Shumake*, 281 F.3d 507, 510-514; 515 (5th Cir. 2002). The doctrine supports the belief that tribal courts are vital to tribal self-government and recognizes that a tribal court's authority is diminished by a federal court's exercise of jurisdiction over reservation affairs. *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 813 (7th Cir. 1993) (citing *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14-17 (1987); *National Farmers*, 471 U.S. at 856.

*United States*, 450 U.S. 544, 565 (1981) (citations omitted) ("[A] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."). Regulation through "other means" includes adjudication of disputes in tribal courts. *See Strate v. A-1 Contractors*, 520 U.S. 438, 451-533 (1997) ("Civil jurisdiction over [disputes] arising out of such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute . . . ."). Even off-reservation activity is subject to tribal exhaustion if, "at a bare minimum," it impacts directly upon tribal affairs. *Ninigret*, 207 F.3d at 32 (citations omitted); *see also Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.*, 910 F. Supp. 2d 1188, 1198 (D.S.D. 2012) (concluding that Cheyenne River Sioux Tribal Court had jurisdiction to determine validity of Tribal Court judgment and appellate bond in dispute between enrolled tribal members and non-Indian bank) (*Plains Commerce II*).

The Cheyenne River Sioux Tribal Court has subject matter jurisdiction over the claims at issue here; thus, the tribal exhaustion doctrine compels this Court to stay or dismiss the action. This is especially true where, as here, Plaintiffs directly attack tribal court jurisdiction without first bringing the claim in the tribal court itself. ¶ 5 ("The Lending Defendants cannot avoid the courts and laws of South Dakota, Minnesota, Virginia, or Texas—or the courts and laws of any other state or the United States by the mere fact that its controlling owner is a member of an American Indian tribe."); *see also Altheimer*, 983 F.2d at 814 (favoring application of tribal exhaustion doctrine when there is a direct attack on a tribal court's jurisdiction). As Plaintiffs acknowledge, Western Sky is owned wholly by an individual Tribal Member of the Cheyenne River Sioux Tribe, s*ee* ¶ 5, 12, and the Loan Agreement specifies that it is "subject solely to the

exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." ¶ 36. And recently, this Court concluded that nearly identical Western Sky contracts were made on the Tribe's Reservation. *FTC v. Payday Fin.,* 2013 WL 1309437, at \*10; *see also Bruce H. Lein v. Three Affiliated Tribes*, 93 F.3d 1412, at 1419 (8th Cir. 1996) ("[C]ivil jurisdiction over the activities of non-Indians on reservations lands presumptively lies in tribal courts, unless affirmatively limited by a specific treaty provision or federal statute.") (citations omitted). To be sure, the Cheyenne River Sioux Tribal Court has exercised subject matter jurisdiction over claims of this type.

Because the Cheyenne River Sioux Tribal Court jurisdiction is clearly implicated in Plaintiffs' Complaint, the Tribal Court must be given "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction. *Nat'l Farmers Union*, 471 U.S. at 856. Hence, Plaintiffs' attack on Cheyenne River Sioux Tribal Court jurisdiction compels this Court to stay or dismiss this action to permit the Cheyenne River Sioux Tribal Court to assess the limits of its own jurisdiction.

## C.   The Exercise Of Personal Jurisdiction Over CashCall Violates Due Process Protections.

Rule 12(b)(2) mandates dismissal where a court lacks personal jurisdiction over a defendant. "To allege personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within the state." *Wells Dairy, Inc. v. Food Movers Int'l Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). Personal jurisdiction can be specific or general: "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's action within the forum state . . . ," *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citations and

quotation omitted), whereas general jurisdiction "refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose," requires examination of whether the defendant's contacts with the forum are "continuous and systematic." *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996); *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Because CashCall is a California corporation without any physical presence in South Dakota, this Court's inquiry extends only to specific jurisdiction.

Specific jurisdiction can only be exercised by a federal court sitting in diversity if (a) authorized by the forum state's long-arm statute; and (b) permitted by the Due Process Clause of the Fourteenth Amendment. *Id.* South Dakota construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the Due Process Clause, and thus the analysis collapse into one step: the due process analysis. *Dakota Indus. v. Ever Best Ltd.,* 28 F.3d 910, 915 (8th Cir. 1994).

To comport with Due Process, the exercise of personal jurisdiction requires "sufficient contacts or ties with the state of the forum to make [bringing suit] reasonable and just, according to our traditional conception of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). Further, there must be some showing that a defendant personally availed himself of the privilege of conducting activities in a forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The Eighth Circuit applies a five-factor test to evaluate personal jurisdiction: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of the defendant's contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 746 n.4 (8th Cir. 2011). The first three factors are primary and the remaining two are

secondary, but all five and the totality of the circumstances determine whether personal jurisdiction exists. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592-93 (8th Cir. 2011).

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within the state. Once jurisdiction has been controverted or denied, the plaintiff has the burden of proving such facts." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070 (internal quotations and citations omitted). Because Plaintiffs cannot show that the Court has personal jurisdiction over CashCall, the Due Process Clause mandates dismissal of all claims against that Defendant.

1.      **Each Of The First Three Primary Factors Considered By Eighth Circuit Courts Weighs Against Exercising Personal Jurisdiction Over CashCall.**

CashCall has minimal contacts, if any, to the state of South Dakota, and could not reasonably foresee being hauled into South Dakota federal court to litigate Plaintiffs' claims. Because the first three factors analyzed by Eighth Circuit courts are closely interrelated, a court may consider them together. *Larson Manufacturing Co. of South Dakota v. Connecticut Greenstar, Inc.*, __ F. Supp. 2d __, 2013 WL 842518, at *4 (D.S.D. Mar. 6, 2013) (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983)). "Where the Court considers whether it has specific jurisdiction over nonresident defendants, due process is satisfied if the defendants purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Kooima v. Zacklift Int'l, Inc.,* No. 01-4078, 2001 WL 34458064, at *5 (D.S.D. Aug. 22, 2002). Plaintiffs' claims do not arise out of any contacts CashCall directed at residents of South Dakota; CashCall

does not make or service consumer installment loans to South Dakota residents; nor does Western Sky make loans to South Dakota residents. *See* ¶ 34. Notably, none of the Plaintiffs are South Dakota residents. *See* ¶ 6-9. In fact, CashCall's contacts with respect to Western Sky occur on the Cheyenne River Indian Reservation, and not in South Dakota proper. For these reasons and the reasons stated below, specific jurisdiction over CashCall does not exist.

Plaintiffs' Complaint offers little in the way of allegations of CashCall's contacts with South Dakota. Plaintiffs state only the following paltry activities by CashCall, notably without placing any of the activities in the forum state of South Dakota:

- "CashCall has arranged with the Lending Defendants (or entities affiliated with them) to process the loans from their inception or otherwise purchase loans shortly after they are made, or to receive the loans for collection or servicing." ¶ 13.

- "CashCall operates and/or funds WS Funding, which is the entity that provides the money the Lending Defendants use to fund consumer loans." ¶ 13.

- "Defendant CashCall has entered into agreement with the Lending Defendants to collect debts and service the loans made by the Lending Defendants." ¶ 28.

- "Lending Defendants transfer the loan note to Defendant CashCall. In essence, the Lending Defendants act as a broker of CashCall loans under the guise of an American Indian Internet loan company." ¶ 30.

- "If a consumer does not pay back a loan on time, Defendants attempt to collect the debt. Among other things, Defendants make negative reports to credit bureaus, call consumers multiple times per day, contact consumers' employers, and engage in other aggressive— and often intimidating—tactics." ¶ 31.

Thus, it is apparent on the face of the Complaint that Plaintiffs have alleged <u>no</u> contacts between

CashCall and South Dakota. Stated plainly, the only *possible* contacts between CashCall and South Dakota arise out of CashCall's contractual relationship with *Western Sky*, not *Plaintiffs*. And this contractual relationship is between CashCall in California, and Western Sky on the Reservation. Presumably, Plaintiffs hope to impute personal jurisdiction on CashCall simply because a loan contract entered into between Western Sky and a Plaintiff was subsequently assigned by Western Sky to CashCall.

First, concerning "the nature and quality of contacts with the forum state," CashCall's only connection to South Dakota is a result of its purchase of loans made by Western Sky to consumers located around the country (but not in South Dakota). As the Affidavit of Dan Baren (attached hereto as Exhibit E) makes clear, CashCall: (a) has no physical presence in the state of South Dakota; (b) has never offered consumer installment loans in the state of South Dakota; (c) has never serviced consumer installment loans made to consumers who reside in South Dakota; and (d) no communications sent to Plaintiffs from CashCall emanate from the state of South Dakota or were sent by CashCall *into* the state of South Dakota.

Second, concerning the "quantity of such contacts," the vast majority of communications relating to CashCall's business relationship with Western Sky are conducted over the phone and email. CashCall has no ongoing presence in South Dakota.

Third, regarding "the relation of the cause of action to the contacts," Plaintiffs claims have no connection to CashCall's contacts with *South Dakota*. Plaintiffs are residents of Minnesota, Texas, and Virginia, not South Dakota. Plaintiffs do not claim (because it would be patently false) that any of CashCall's servicing functions took place in the state. CashCall is a California corporation with its principal place of business in that state. Baren Aff. ¶ 4. CashCall's consumer installment loan servicing operations are located in California. *Id*. WS Funding, the

CashCall subsidiary who purchases the loan (Baren Aff. 13) is a Delaware corporation with its principal place of business in California. *Id.*

Each of Plaintiffs' allegations is tied inextricably to a loan contract made (on the Cheyenne River Indian Reservation) between Plaintiffs and Western Sky. It is that contract that forms the nexus of Plaintiffs' allegations here. And while the Loan Agreements were formed on the Cheyenne River Indian Reservation, CashCall's servicing took place elsewhere, namely California. Plaintiffs allege that CashCall purchased the loans shortly after they were made. But CashCall does not maintain a call center in South Dakota, and performs no servicing functions in the state. So, Plaintiffs' claims do not relate to CashCall's meager contacts with South Dakota. *See Global Polymer Indus., Inc. v. C&A Plus, Inc.*, No. 05-4081, 2006 WL 3743845 (D.S.D. Dec. 14, 2006).

> **2.    Both The Secondary Factors And The Totality Of The Circumstances Weigh Heavily Against Exercising Personal Jurisdiction Over Defendant CashCall.**

While the final two factors, the interest of South Dakota in providing a forum for its residents and the convenience of the parties, are of secondary concern, a court must nonetheless consider their impact on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). Here, there is none.

The fourth factor evaluates the interest of South Dakota in providing a forum for its residents. None of the parties in this case are residents of South Dakota. Heldt is a resident of Minnesota; Jones and Curtis are residents of Texas; Martin is a resident of Virginia. CashCall, for its part, is a California corporation with no physical presence whatsoever in the state of South Dakota. Western Sky and Payday Financial are located entirely within the exterior borders of the Cheyenne River Indian Reservation, and Mr. Webb resides on the Reservation as well. Thus,

South Dakota's interest here is negligible.

The final factor considers the convenience of the parties. South Dakota no more convenient for the named Plaintiffs, the putative national class and sub-classes, and CashCall than would be Cheyenne River Sioux Tribal Court. As stated above, none of the named Plaintiffs reside in South Dakota. And the putative national class would include *no* South Dakota residents. CashCall does not service any consumer installment loans made to residents of the state, and as is apparent from the Western Sky website screen shot produced in paragraph 11 of the Complaint, "Western Sky loans are not available to consumers in . . . South Dakota[.]" Further, the three putative sub-classes—Virginia, Minnesota, and Texas—would necessarily contain no South Dakota residents. Indeed, as Plaintiffs correctly note, "the Lending Defendants refuse to offer loans to . . . residents of South Dakota[.]" ¶ 34. So, it is difficult to imagine why South Dakota federal court would be a more convenient venue for this dispute than Cheyenne River Sioux Tribal Court.

It is apparent then, that taking into consideration the five factors analyzed by Eighth Circuit courts along with the totality of the circumstances, this Court lacks personal jurisdiction over Defendant CashCall, and Plaintiffs' allegations against CashCall should be dismissed pursuant to Rule 12(b)(2).

**D.  Counts II, III, IV, V, and VI Must Be Dismissed Because Plaintiffs Cannot State A Claim Arising Under Texas, Minnesota, California, Or Virginia Law.**

Counts II-VI set forth allegations arising under specific Texas, Minnesota, California, and Virginia statutes and constitutional provisions. These claims must fail for two distinct reasons. First, as acknowledged in the Complaint, the Loan Agreements contain a "Governing Law" provision that specifies the sole application of the laws of the Cheyenne River Sioux Tribe. Thus,

claims arising under other state statutes or constitutional provisions are invalid as a matter of course. Second, Western Sky, as an entity wholly owned by an enrolled member of the Cheyenne River Sioux Tribe doing business exclusively on the Reservation, is free from the regulatory authority and jurisdiction of state governments. Hence, the laws and constitutions of Minnesota, Texas, Virginia, and California have no influence over Western Sky's business, and the claims arising under those statutes must be dismissed.

**1.      The Loan Agreements Specify That They Are Governed Exclusively By The Laws Of The Cheyenne Rivers Sioux Tribe; Accordingly, Plaintiffs' State-Specific Claims Must Fail.**

The Plaintiffs' state-law-specific claims should be dismissed in their entirety because the parties agreed that their contract would be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," and that "no other state or federal law or regulation" would apply.[8] Contrary to that choice of law, the Plaintiffs now assert claims under Minnesota, Texas, and Virginia statutes and the California constitution. But there is no basis to set aside the parties' contractual choice of law. Because the Plaintiffs are not entitled to relief under any law other than that of the Cheyenne River Sioux Tribe, and the allegations in Counts II-VI of the Complaint would not entitle the Plaintiffs to relief under the Cheyenne River Sioux law, those claims should be dismissed. *See Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 n.4 (8th Cir. 1997) (applying Minnesota law to dismiss claims arising under Texas Deceptive Trade Practices Act and other claims not arising under Minnesota law); *Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1104-10 (D. Minn. 2010)

---

[8] As explained in Section III.B. *supra*, Plaintiffs' Complaint clearly implicates Cheyenne River Sioux Tribal Court Jurisdiction, and thus, the tribal exhaustion doctrine warrants that the tribal court be given the first opportunity to determine the scope of its own jurisdiction. *See Nat'l Farmers*, 471 U.S. at 856.

(dismissing Minnesota a statutory claim because the parties agreed to an enforceable choice-of-law provision specifying Mississippi law).

> **a.    The Parties' Choice Of Law Would Be Enforced By The South Dakota Courts, And Must Therefore Be Enforced By This Court.**

"Federal courts sitting in diversity are required to look to the choice-of-law principles of the forum state . . . and then apply the same law to the case as the forum state would." *PVI, Inc. v. Ratiopharm GmbH*, 253 F.3d 320, 329 (8th Cir. 2001) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496-98 (1941)). Because the court is sitting in diversity, it must therefore apply the choice-of-law principles of South Dakota. The South Dakota Supreme Court has "generally recognized that parties may agree to be bound by the law of a particular state." *Butler Mach. Co. v. Morris Constr. Co.*, 682 N.W.2d 773, 776 (S.D. 2004) (quoting *Dunes Hospitality, L.L.C. v. Country Kitchen Intern., Inc.*, 623 N.W.2d 484, 488 (S.D. 2001)); *accord, e.g.*, *Sioux Falls Pizza Co. v. Little Caesar Enters.*, 858 F.Supp.2d 1053, 1060 (D.S.D. 2012); *Bell, Inc. v. IFS Indus.*, 742 F.Supp.2d 1049, 1052 (D.S.D. 2010). In this case, the parties agreed that their contract would be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," and that "no other state or federal law or regulation" would apply. Because the South Dakota courts would enforce the parties' "agree[ment] to be bound by the law of a particular state," this court should apply the law of the Cheyenne River Sioux Tribe to this case, and not the laws of Minnesota, Texas, Virginia, or California.

To be sure, the South Dakota courts will "not give effect to laws of other jurisdictions if they are contrary to the public policy of South Dakota." *Butler Mach.*, 682 N.W.2d at 776 (*citing Dunes Hospitality*, 623 N.W.2d at 488). The "primary sources for declarations of the South Dakota public policy in areas such as the one presently under consideration are the constitution,

statutory law and judicial decisions," *Meierhenry*, 277 N.W.2d at 300, and the current South Dakota law regulating creditor-debtor relations, enacted in 1994, provides that "there is no maximum interest rate or charge, or usury rate restriction between or among persons, corporations, limited liability companies, estates, fiduciaries, associations, or any other entities if they establish the interest rate or charge by written agreement." S.D. Codified Laws 54-3-1.1. Since the Cheyenne River Sioux Tribe, like South Dakota, does not cap interest rates established by contract, there is no barrier to enforcing the parties' choice-of-law clause in this case. Indeed, it is the Plaintiffs' proposal—requiring this Court, sitting in diversity, to apply the usury laws of four other states that *do* cap interest rates established by contract—that would contradict the public policy of South Dakota. That result is squarely at odds with South Dakota choice-of-law principles, and should therefore be rejected.

> **b.** **The South Dakota Courts Would Apply The Laws Of The Cheyenne River Sioux Tribe To This Dispute Even If The Parties Had Not So Agreed.**

Seeking to evade the contractual choice-of-law provision, the Plaintiffs assert (without elaboration or support) that "[t]here is a reasonable question of whether a consumer sees the entire term of the loan or arbitration clause before they accept the loan." ¶ 35. Such a conclusory assertion does not provide a basis for setting aside the terms of the contracts in dispute, particularly given the presumption in favor of enforcing contractual choice-of-law clauses. *See, e.g.*, *Butler Mach. Co.*, 682 N.W.2d at 776. Moreover, Plaintiffs' not only is choice of law articulated in the first paragraph of the first page of the Loan Agreements, *see* Exs. A-D at 1 (respectively), but Plaintiffs were required to warrant that "YOU HAVE READ AND UNDERSTAND THE ARBITRATION SECTION OF THIS NOTE AND AGREE TO BE

BOUND BY THE TERMS AND CONDITIONS OF THAT SECTION." Exs. A-D, at 5 (respectively) (emphasis in originals).

Even had Plaintiffs not seen the choice-of-law provision, which they did, that would not provide a basis for applying the laws invoked by the Plaintiffs. South Dakota courts would interpret the contracts in dispute in accordance with the laws of the Cheyenne River Sioux Tribe even if the contracts did not contain a choice-of-law clause.

Under such circumstances, the task of this Court would remain the same: "[L]ook to the choice-of-law principles of the forum state . . . and then apply the same law to the case as the forum state would." *PVI, Inc.*, 253 F.3d at 329. "South Dakota law provides that '[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.'" *Great West Cas. Co. v. Hovaldt*, 603 N.W.2d 198, 201 (S.D. 1999) (quoting SDCL 53-1-4). Here, as in another case involving the same Defendants, "the Defendants make their lending decisions on the Reservation, the loan contract forms on the Reservation, money is transferred from a bank on the Reservation, and the contract specified tribal jurisdiction . . . ." *FTC v. Payday Financial, LLC, et al.*, ___ F. Supp.2d ____, 2013 WL 1309437, at *10 (D.S.D. 2013). The contracts in this case, like the contracts in *Payday Financial*, were "formed on the Reservation in South Dakota" because "the last act necessary to contract formation" was "done on the Reservation by a Lending Company." *Id.* Applying the ordinary South Dakota choice-of-law rule would therefore require the same result—the application of Cheyenne River Sioux tribal law—even if the parties had not agreed to apply that law.

      **c.**      **Counts II-VI Must Be Dismissed Because They Do Not Seek Relief On Any Basis Recognized Under The Laws Of The Cheyenne River Sioux Tribe.**

The Complaint must be dismissed because it does not state any claim for which relief could be granted. The Complaint includes five counts arising under at least seven state statutes and the California constitution, all of which involve allegations that the interest rates on the plaintiffs' loan were impermissibly high. *See* ¶¶ 42-57 (alleging usury in violation of Minn. Stat. § 334.01 *et seq.*, Tex. Fin. Code § 342.001 *et seq.*, Va. Code § 6.2-306 *et seq.*, and Calif. Const. Art. 15); ¶¶ 58-64 (alleging violations of the Minnesota Regulated Loan Act, Minn. Stat. § 56.0001 *et seq.*); ¶¶ 65-71 (alleging false advertising in violation of Minn. Stat. § 325F.67 *et seq.*); ¶¶ 72-78 (alleging violations of the Virginia Consumer Protection Act, § 59.1-200(A)(5)); ¶¶ 79-84 (alleging violations of the Texas Deceptive Trades Practices Act, Tex. Bus. & Com. Code § 17.46 *et seq.*). None of those counts asserts a claim for relief under the laws of the Cheyenne River Sioux Tribe.

This Court must apply the law of the Cheyenne River Sioux Tribe to resolve claims arising out of the contracts in dispute, both because the parties agreed that that law would apply and because, in any event, that is the law South Dakota courts would apply. The Complaint does not purport to state a claim for relief under the laws of the Tribe, and the factual allegations would not support such a claim. Because Plaintiffs have not alleged any violations of applicable law, they are not entitled to any relief, and Counts II-VI must be dismissed under Rule 12(b)(6).

2.      **Tribal Member Immunity And Federal Preemption Prohibit Plaintiffs From Applying Minnesota, Texas, Virginia, or California Law To And Asserting Regulatory Authority Over Loans Issued By Western Sky.**

a.      **The States Have No Regulatory Authority Or Jurisdiction Over Western Sky's On-Reservation Business Activities.**

A threshold issue in this action is whether the states (here Minnesota, Virginia, Texas, and California) have regulatory authority or jurisdiction over Western Sky's on-reservation business activities, and by extension, over the loans it makes. They do not. To this end, and unlike state sovereignty, the Tribe's sovereignty is achieved (and protected) through two separate but related immunities: (1) the sovereign immunity of the Tribe, its arms, and its officers, which has no territorial bounds, and (2) the general derivative immunity of the Tribe's members from being forced to live by non-tribal state law while present on the Reservation. This case is about the latter. Western Sky is a business solely owned by an enrolled tribal member advancing the Congressionally-recognized purpose of promoting the Tribe's sovereignty and self-sufficiency through economic development on the Reservation. The Tribe has sole regulatory authority over Western Sky's on-reservation business activities and any disputes related to it, including any raised by Minnesota, Texas, or Virginia consumers entering into consensual loan transactions with Western Sky. Importantly, Plaintiffs do not allege that they were coerced or otherwise forced into their Loan Agreements, *i.e.*, Western Sky's contractual relationships with consumers are consensual. These facts support application of both tribal immunity and federal preemption.

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991). As sovereign nations, Indian tribes "retain considerable control over non-member conduct on tribal land." *Id.*; *see also Montana v. United States*, 450 U.S. 543,

544 (1981) (stating that with respect to on-reservation conduct a tribe may regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"). "Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation." *Williams v. Lee*, 358 U.S. 217, 220 (1959). Thus, "absent governing Acts of Congress, the question has always been" whether a particular action by a state "infringe[s] on the right of reservation Indians to make their own laws and be ruled by them." *Id.*

In *Williams*, a non-tribal member American who operated a general store on the Navajo Reservation filed suit against Navajo tribe members (Mr. and Mrs. Williams) in an Arizona state court to recover for goods sold in the store on credit. Judgment was entered against Mr. and Mrs. Williams in the state trial court, and the Supreme Court of Arizona affirmed the judgment. The United States Supreme Court reversed, holding that, unless Congress expressly grants power to a state,[9] the state has no authority to govern the affairs of enrolled tribal members on a reservation. *Id*. at 220-223. The *Williams* court concluded its opinion by stating:

> There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent [*i.e.*, the store owner bringing suit] is not an Indian.

*Id*. at 223; *see also Puyallup Tribe, Inc. v. Washington Game Dep't*, 433 U.S. 165, 172-73 (1977). This is because "in the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 891 (1986).

---

[9] Defendants are not aware of any such authority granted by Congress to the Minnesota, Virginia, Texas, or California and the Complaint alleges none.

The Supreme Court reaffirmed the *Williams* holding in *Montana v. United States*, 450 U.S. 544 (1981), where it further emphasized that state law *does not* govern contracts between tribal members and non-tribal members:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter *consensual relationships with the tribe or its members, through commercial dealing, contracts*, leases, or other arrangements.

*Id.* at 565 (emphasis added). The holdings in *Williams* and *Montana* are dispositive here because Western Sky's loans are made on the Reservation. *See* Exs. A-D at 1. This was confirmed in a recent decision handed down by this Court analyzing nearly identical loans: "Here, the contract between the Borrowers and Lending Companies appears to be formed on the Reservation in South Dakota." *See Federal Trade Commission v. Payday Financial, LLC*, __ F. Supp. 2d __, 2013 WL 1309437, at *10 (D.S.D. Mar. 28, 2013). The Court went on, concluding that the "Joint Stipulation of Material Facts indicates that the last act necessary to contract formation appears to be one done on the Reservation by a Lending Company[.]" *Id.* And even if some activity took place off of the Reservation, tribal jurisdiction would still exist if a claim "arises out of or is intimately related to" a contract that "relates to activities on tribal land." *Laducer*, __ F.3d __, 2013 WL 3970245, at *6; *see also Plains Commerce II*, 910 F. Supp. 2d at 1198.

Further, the protections of tribal immunity apply to Webb (as a member of the Tribe), Western Sky (as an entity wholly owned by Webb), and Payday Financial (same). *See ¶* 10-12; *see generally* Exs. A-D. Webb, the sole owner and operator of Western Sky, is a member of the Tribe. The Supreme Court has held that its decisions and federal law confer rights on *individual tribal members*, as well as tribes:

> [W]hen Congress has legislated on Indian matters, it has, most often, dealt with the tribes as collective entities. ***But those entities are, after all, composed of individual Indians, and the legislation confers individual rights***. This Court has therefore held that 'the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.'"

*McClanahan*, 411 U.S. at 181 (*quoting Williams*, 358 U.S. at 220) (emphasis added).[10]

Likewise, there is no requirement that an entity be owned by a tribe or be incorporated under tribal law in order for its activities to be governed by tribal law. Federal courts have explicitly recognized that a corporation may acquire the racial attributes of its owner and may invoke the race-based protections provided to others under federal law. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.,* 295 F.3d 1065, 1072 n.2 (10th Cir. 2002) (holding that a corporation had standing to sue under civil rights statutes where it suffered harm as a result of discrimination against an owner and employee); *Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565 (D.C. Cir.1991), *vacated on other grounds,* 502 U.S. 1068 (1992); *Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702, 706 (2d Cir. 1982); *Howard Sec. Services v. Johns Hopkins Hosp.,* 516 F. Supp. 508 (D. Md. 1981). In *Oti Kaga, Inc. v. South Dakota Hous. Dev. Auth.,* the Eighth Circuit allowed a corporation to invoke and vindicate the federal civil rights protections of its tribal member owners, explaining that it was important to effect the purpose of the federal laws at issue. 342 F.3d 871, 880-82 (8th Cir. 2003).

Similarly, in *Pourier v. South Dakota Dept. of Revenue,* 658 N.W.2d 395 (S.D. 2003), *aff'd in part and vacated in part on other grounds,* 674 N.W.2d 314 (2004), *cert. denied,* 541 U.S. 1064 (2004), the South Dakota Supreme Court relied on some of the foregoing authority to

---

[10] *Williams* and *Montana* involved individual Indians. *McClanahan* expressly recognizes that ***individual*** Indians are free of unwarranted state jurisdiction.

hold that a corporation incorporated under South Dakota law, rather than tribal law, was an enrolled member of the tribe for purposes of tax immunity because it was owned by an enrolled member of the tribe and operated on the reservation. *Id*. at 403-405; *see also Giedosh v. Little Wound Sch. Bd*., 995 F. Supp. 1052, 1059 (D.S.D. 1997) (fact that school board was incorporated under South Dakota law did "not affect its status as an 'Indian tribe'").  As explained by the *Pourier* court:

> Congress' primary objective in Indian law for several decades has been to encourage tribal economic independence and development.  By finding that incorporation under state law deprives a business of its Indian identity, we would force economic developers on reservations to forgo the benefits of incorporation in order to maintain their guaranteed protections under federal Indian law. This could hinder economic development.

658 N.W.2d at 405 (also factoring the poverty level of Pine Ridge Reservation).

Congress has further recognized the special nature of tribal member-owned corporations, regardless of where they are incorporated, by enacting the Indian Business Development Program to "establish and expand profit-making Indian-owned economic enterprises." 25 U.S.C. § 1521 (2006). The regulations promulgated under that statute permit participation by "Indians, Indian Tribes, Indian Partnerships, corporations, or cooperative associations authorized to do business under State, Federal or Tribal Law." 25 C.F.R. § 286.3. Western Sky's business falls squarely within Congress's legislative initiative to establish and expand profitable enrolled tribal member owned businesses. Thus, under the doctrine of federal preemption, state laws should not interfere with Western Sky's efforts to realize Congress's expressly stated goal of expanding business opportunities for enrolled tribal members, when these opportunities are located solely on a reservation. *Cf. California v. Cabazon Band of Indians*, 480 U.S. 202, 217-20, 22 (1987) (applying the doctrine of federal preemption and holding that the State of California's interest in

regulating tribal bingo operations does not outweigh the compelling federal and tribal interest in supporting them).

Thus, under the doctrines of tribal immunity and federal preemption, Virginia, Texas, Minnesota, and California lack the regulatory authority and jurisdiction to apply its statutory construct to loans issued by Western Sky from the Reservation.

> **b.** **Western Sky's On-Reservation Business Activities Are Substantial And Promote Tribal Welfare, Sovereignty And Independence And The Tribe's Comprehensive Governmental System Regulates The Western Sky's On-Reservation Activities.**

The Tribe, with its own governmental system, falls squarely within the category of domestic dependent nations who retain sovereign authority over their members and territory. While tribal nations and their members are subject to nondiscriminatory application of state and federal criminal laws for their conduct off reservation, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 149-49 (1973), they cannot be forced in state courts to respond to civil suits, and enforcement actions are civil suits. *Oklahoma Tax Comm'n¸* 498 U.S. at 510-11.

The Tribe has enacted a comprehensive set of laws and regulations to govern the Reservation and all manner of on-Reservation activity. Accordingly, the Cheyenne River Sioux Tribal Code asserts territorial jurisdiction over the entire Reservation. CRST Code §§ 1-4-1, 1-4-3. Additionally, the Tribal Constitution and Tribe By-Laws endow Tribal courts with jurisdiction over claims and disputes arising on the Reservation. *See* Art. 5, CRST By-Laws. The Tribal Code similarly provides that unless there is federal law to the contrary, the Tribe has jurisdiction over all actions where the persons are present or residing within the boundaries of the Reservation, including corporate entities transacting business or possessing property on the Reservation. CRST Code at §§ 1-4-1, 1-4-3. To that end, the Tribal Code has jurisdiction over a

29

number of specifically-mentioned civil claims arising on the Reservation as well as other common law causes of action in such areas as contract and tort law that are recognized even if not specifically enumerated. *Id*. The Tribe thus provides for the regulation and adjudication of all lending transactions that are consummated on the Reservation.

The Tribal Business Ordinance further states that the Tribe "retains the inherent, sovereign power to regulate, through taxes, licensing and other means, the business activities of members and non-members who transact business on the Reservation or who enter consensual business relationships with the Tribe." CRST Bus. Ord. § 1(c). As such, the Ordinance provides for administrative hearings and other procedures whenever civil remedies or license revocations are sought. *Id.* § 10. Litigants may avail themselves of such procedures, but they may not bring suit in non-Tribal Courts for claims arising out of reservation-based business activities. Only Congress is authorized to supersede the Tribe's exclusive jurisdiction to regulate the Defendants' on-reservation business activity.

It is beyond doubt that the Cheyenne River Sioux Tribe may regulate contractual relationships entered into on its reservation between tribal members and non-tribal members. Therefore, the loans issued by Western Sky to Virginia, Texas, and Minnesota consumers fall under the sole regulation of the Tribe, and are not subject to infringement by state law. Both federal and Tribal law recognizes that the Tribe's exclusive jurisdiction over Western Sky's business activity promotes the Tribe's interest in self-sufficiency and economic development. *Mescalero Apache Tribe*, 411 U.S. at 334-35 ("We have stressed that tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging tribal self-sufficiency and economic development"). In *Williams* and *Montana*, the Supreme Court clearly established the application

of tribal immunity when tribes and tribal members engage in business or entering contracts with non-tribal members on the reservation. Despite the fact that both *Williams* and *Montana* were decided before the advent of the Internet, when many business transactions occurred in person, the underlying policy of promoting tribal sovereignty and economic self-sufficiency remain the same. And to be sure, the Eighth Circuit recently reaffirmed that Indian law protections should not be eroded by the advent of technology. *See generally Laducer*, __ F.3d __, 2013 WL 3970245, at *6. Therefore, Plaintiffs' attempt to enforce Minnesota, Virginia, Texas, and California law against on-reservation business is no less an infringement of Indian rights than the conduct of the Arizona courts in *Williams, McClanahan* or *Cabazon Band of Indians*.

**E.    Several Of Plaintiffs' Causes Of Action Fail To State A Claim Upon Which Any Relief May Be Granted.**

Federal Rule of Civil Procedure 12(b)(6) sanctions dismissal where a claim fails to state a legally sufficient cause of action. *See Carton v. Gen. Motor Acceptance Corp.*, 611 F.3d 451, 454 (8th Cir. 2010). "To survive a motion to dismiss, the complaint must include 'enough facts to state a claim to relief that is plausible on its face' [and] contain 'more than labels and conclusions.'" *Waldner v. N. Am. Truck & Trailer, Inc.*, 277 F.R.D. 401, 405 (D.S.D. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Even if this Court found all of the preceding jurisdictional and choice of law arguments wanting, much of Plaintiffs' Complaint should be dismissed for failure to state a valid claim.

While a complaint need only state a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and the allegations are construed in the light most favorable to the plaintiffs, the complaint must still "contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.'" *Waldner*, 277 F.R.D. at 405 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Further, because Count I alleging civil conspiracy to commit fraud and Count IV alleging false advertisement in violation of Minnesota statute both sound in fraud, Fed. R. Civ. P. 9(b)'s heightened pleading standard applies as well. The Rule requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." So a plaintiff alleging fraud must identify the "time, place, and contents of false representation, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (quotation and citation omitted). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Summerhill v. Terminix*, 637 F.3d 877, 880 (8th Cir. 2011) (quotation and citation omitted); *see also Freitas v. Wells Fargo Home Mortgage*, 703 F.3d 436, 440 (8th Cir. 2013) (referring to Rule 9(b)'s requirements as a "heightened" standard).

Because the Complaint offers only unsupported conclusions without providing the required foundation, several of Plaintiffs' claims should be dismissed for this additional reason.

> **1.     Count I, Alleging Civil Conspiracy, Should Be Dismissed Because It Is Not An Independent Cause Of Action, And The Underlying Tort—Fraud—Was Not Plead With Particularity As Required By Fed. R. Civ. P. 9(b).**

"A civil conspiracy is, fundamentally, an agreement to commit a tort." *Reuben C. Setliff, III, M.D., P.C., v. Stewart*, 694 N.W.2d 859, 867 (S.D. 2005) (citations omitted). To establish a *prima facie* case of civil conspiracy, the plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy. *Id.* at 866-67*; Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008).

However, civil conspiracy is not "an independent cause of action but is sustainable only after an underlying tort has been established." *Kirlin*, 758 N.W.2d at 455 (citations and quotations omitted). "'Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.'" *Selle v. Tozser¸*786 N.W.2d 748, 756 (S.D. 2010) (quoting *Halberstram v. Welch*, 705 F.3d 472, 479 (D.C. Cir. 1983); *see also Beck v. Prupis*, 529 U.S. 494, 503 (2000); *Okun v. Superior Court*, 29 Cal.3d 442, 454 (Cal. 1981).

Accordingly, Court I must rest on an allegation of an underlying tort, here fraud. As alleged in the Complaint: "As set forth above, the four named defendants engaged in a civil conspiracy to conduct business as an Internet consumer loan lender. They agreed with one another to engage in a fraud that violated state statutory law. That conduct constitutes an agreement to accomplish an unlawful object, which is a conspiracy." ¶ 41. Thus, the civil conspiracy claim will rise or fall based on the alleged fraud, yet Plaintiffs failed to plead any facts to support the underlying tort.

To state a cause of action for fraud, a plaintiff must show: (a) a representation was made as a statement of fact, which was untrue and known to be untrue by the party making is or else recklessly made; (b) that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and (c) that plaintiff did in fact rely on it and was induced thereby to act to his injury or damage. *Masloskie v. Century 21 Am. Real Estate*, 818 N.W.2d 798, 803 n.3 (S.D. 2012) (citing *N. Am. Truck & Trailer v. M.C.I. Commc'n Servs., Inc.*, 751 N.W.2d 710, 713 (S.D. 2008)).

On its face, the Complaint alleges *none* of the elements of fraud, much less the "time, place, and contents of false representation" required under the heightened pleading standard of

Rule 9(b). *See Abels*, 259 F.3d at 920. Plaintiffs attempt to incorporate by reference the broad (and largely irrelevant) factual basis for their allegation in an attempt to fulfill the need to establish the underlying tort of fraud supporting the Civil Conspiracy claim. *See ¶* 40 ("Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs."). This falls far short of the providing the "who, what, when, where, and how" of a fraud claim as required by the Federal Rules and the Eighth Circuit. Hence, because Plaintiffs failed to plead fraud with particularity, the underlying tort supporting an allegation for civil conspiracy fails to state a claim on which relief may be granted, and Count I should be dismissed.

### 2.   Count IV, Alleging False Advertising In Violation Of Minn. Stat. §§ 325F.67 *et seq* Should Be Dismissed Because Plaintiffs Failed To Plead The Claim With Particularity.

Allegations under Minnesota Statutes § 325F.67 fall under the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). *See Thunandor v. Uponor*, 887 F. Supp. 2d 850, 876 (D. Minn. 2012); *see also Abels*, 259 F.3d at 920 (requirements of Rule 9(b)); *Scahll Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (conclusory allegations of fraud and deception are insufficient). Plaintiffs' scant assertions fall far short of meeting this heightened standard.

The elements essential to proving a violation of § 325F.67 are: (1) intent; (2) publication; and (3) a false or misleading advertisement. *See Lenscrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1491 (D. Minn. 1996) (citations omitted); *see also Kronebusch v. MVBA Harvestore Sys.*, 488 N.W.2d 490, 494-95 (Minn. Ct. App. 1992). "In addition, for a civil recovery, there is an implicit requirement of damage to the complaining party." *Lenscrafters*, 943 F. Supp. at 1491 (citations omitted).

Plaintiffs fail to plead the required information with particularity; namely, Plaintiffs do not point to any actual advertisements published in the state of Minnesota. *See Group Health Plan, Inc. v. Philip Morris Inc.*, 68 F. Supp. 2d 1064, (D. Minn. 1999) (dismissing § 325F.67 claim where plaintiffs fail to identify a single statement which amounts to commercial advertising). Plaintiffs allege generally that Defendants Western Sky and Payday Financial maintain websites and that Western Sky "advertises and offers loans to consumers by television advertisement and through a website accessible at www.westernsky.com." ¶ 69. That is all; Plaintiffs do not allege anything further or note any actual and specific advertisements published in Minnesota. Crucially, Plaintiffs do not assert that Defendants CashCall, PayDay Financial, or Webb ever advertised in Minnesota, or that they made any misrepresentation that they intended Minnesota consumers to rely upon. And further, Plaintiffs do not allege how Defendants CashCall, Webb, or Payday Financial could possibly fall under the False Advertising statute, where Plaintiffs do not allege that those Defendants ever even made a *statement* much less an advertisement, and each Loan Agreement was entered into between a Plaintiff and Western Sky.

Rather, Plaintiffs offer only conclusory allegations: "Defendants' misrepresentations, knowing omissions, and use of other sharp business practices include attempting to create a situation where its loan interest rates were not subject to state law, but only Tribal law; and averring that its practices are permitted by the Indian Commerce Clause." ¶ 69. Notably, Plaintiffs do not explain *who* made the misrepresentation, *what* the misrepresentation actually was, *how* Defendants advertised it, *when* the advertisements occurred, or *where* Plaintiffs saw the advertisements. *See Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 1003 (D. Minn. 2006) (dismissing § 325F.67 claim pursuant to Rule 9(b) where plaintiff failed to identify a single advertisement in Minnesota and relied instead on sweeping allegations of fraudulent and

deceptive statements and practices); *Thunander*, 887 F. Supp. 2d at 876 (dismissing consumer protection claim under 9(b)). These failures amount to deficient pleading, and the Count IV under Minn. Stat. § 325.67 must fail.

### 3. Plaintiffs Fail To State A Valid Claim That Any Defendants Violated California Constitution Article 15, And That Claim Should Be Dismissed.

Count II alleges usury in violation of the state laws of Minnesota, Texas, Virginia, and the California Constitution. However, Plaintiffs do not allege that any resident of California obtained a loan from Western Sky, and conspicuously, none of the named Plaintiffs in this action are residents of the state of California. Accordingly, Count II's alleged violation of California law fails.

Plaintiffs claim, without any factual support, that California Constitution Article 15 imposes restrictions on interests rates, and that it is applicable here because the state is "the place of contract formation of the loan agreements[.]" ¶ 53. The essential elements of a claim of usury are: "(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." *Ghirardo v. Antonioli*, 8 Cal.4th 791, 798 (Cal. 1994). To be sure, California's usury law will only apply where the loan was entered into in the state of California. *Ury v. Jewelers Acceptance Corp.*, 227 Cal.App.2d 11, 16 (Cal. Ct. App. 1964). Here, none of the named Plaintiffs reside in the state of California, and Western Sky—the lender—is a South Dakota LLC with its principal place of business at 612 E Street, Timber Lake, SD. *See* ¶ 5-9; 11. And as the Western Sky screenshot attached to the Complaint attests, Western Sky loans are not available  in the state of California.

*See* ¶ 11. Accordingly, Plaintiffs have not properly plead a claim for violation of the California Constitution Article 15, and the claim should be dismissed.

But even if Plaintiffs had properly plead the claim—which they did not—the claim would fail as to Defendant CashCall because CashCall is expressly exempt from Cal. Const. Art. 15 because it is licensed as a Finance Lender by the California Department of Corporations.[11] *See* Cal. Fin. Code. § 22002; *Moore v. Hill*, 188 Cal.App.4th 1267, 1274-75 (Cal. Ct. App. 2010); *see also* CashCall's Finance Lender License, attached hereto as Exhibit F. Thus, Plaintiffs cannot bring a claim for violations of the California's constitutional usury provision against CashCall. *See id.*

## IV.      Request for Oral Argument

Defendants respectfully request oral argument on their Motion to Dismiss, as permitted by D.S.D. Civ. LR 7.1(C).

## V.      Conclusion

For the foregoing reasons, Defendants respectfully request that this Court dismiss this action.

DATED: August 19, 2013                          Respectfully submitted by,

                                                            /s/ Cheryl Laurenz-Bogue
                                                            Cheryl Laurenz-Bogue
                                                            Bogue & Bogue
                                                            P.O. Box 50
                                                            Faith, SD 57626
                                                            (605) 976-2529

---

[11] CashCall's Consumer Finance Lender license is matter of public record and this Court may take judicial notice and consider it at this time without converting this motion to a motion for summary judgment. *See Stahl v. U.S. Dept. of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003).

Claudia Callaway (applying *pro hac vice*)
John W. Black (applying *pro hac vice*)
Julian Dayal (applying *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
North Tower - Suite 200
Washington, DC  20007
Telephone: (202) 625-3590
Facsimile:   (202) 295-1120
claudia.callaway@kattenlaw.com

Michael J. Lohnes (applying *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone:  (312) 902-5341
Facsimile:  (312) 577-4721
michael.lohnes@kattenlaw.com

*Attorneys for Defendants Western Sky Financial, LLC, PayDay Financial, LLC, CashCall, Inc., and Martin Webb*

**D.S.D Civ. LR 7.1.(B)(1) WORD COUNT COMPLIANCE CERTIFICATE**

I, Cheryl Laurenz-Bogue, certify that Defendants' Motion to Dismiss and Memorandum of Law complies with the word count limitation in D.S.D. LR 7.1.(B)(1) specifying that a court filing shall not be longer than 12,000 words. In preparing this Motion, I used Microsoft Word 2010, and this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count. I certify that this Motion contains 11,622 words.

DATED: August 19, 2013

/s/ Cheryl Laurenz-Bogue
Cheryl Laurenz-Bogue
Bogue & Bogue
P.O. Box 50
Faith, SD 57626
(605) 976-2529

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 19, 2013, I caused a copy of the foregoing Defendants' Memorandum in Support of Their Motion to Dismiss to be served via the Court's electronic filing system upon the following:

Wade L. Fischer
Tieszen Law Office, Prof. Corp.
306 East Capitol, Suite 300
P.O. Box 550
Pierre, SD 57501-0550
(605) 224-1500
office@tieszenlaw.com

Shawn J. Wanta
Christopher D. Jozwiak
222 South Ninth Street, Suite 2955
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571
*Counsel for Plaintiffs*

/s/ Cheryl Laurenz-Bogue
Cheryl Laurenz-Bogue