**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| CHAD MARTIN HELDT, CHRISTI W. JONES, SONJA CURTIS, and CHERYL A. MARTIN, individually and on behalf of all similarly situated individuals | * * * * * | |
| | * | Case No. 3:13-cv-3023-RAL |
| Plaintiffs, | * * | |
| | * | Hon. Roberto A. Lange |
| v. | * * | |
| PAYDAY FINANCIAL, LLC, d/b/a Lakota Cash and Big Sky Cash; WESTERN SKY FINANCIAL, LLC, d/b/a Western Sky Funding, Western Sky, and Westernsky.com; MARTIN A. ("Butch") WEBB; CASHCALL, INC; and WS FUNDING, LLC | * * * * * * * * | |
| Defendants. | * | |

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**
**AND MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants Payday Financial, LLC, Western Sky Financial, LLC, Martin A. Webb, CashCall, Inc., and WS Funding, LLC (together, "Defendants") submit this Motion to Dismiss the  Amended Complaint and Memorandum of Points and Authorities, and respectfully request that this Court enter an Order dismissing the Amended Class Action Complaint ("Amended Complaint," Dkt. No. 30) filed by Plaintiffs Chad Martin Heldt, Christi W. Jones, Sonja Curtis, and Cheryl Martin (together, "Plaintiffs").

## I.      Introduction

Plaintiffs bring this putative class action against their consumer installment lender Western Sky Financial, LLC ("Western Sky"); its owner Martin A. Webb ("Webb"); the loan

1

assignee and servicer CashCall, Inc. ("CashCall"); its wholly owned subsidiary WS Funding, LLC ("WS Funding"); and Payday Financial, LLC ("Payday Financial"), whose only link to this lawsuit is that it is also owned by Webb. Plaintiffs applied for, and received, installment loans from Western Sky and now seek to recover damages for receiving exactly what they bargained for.[1] And despite each loan contract's plain notice that it was subject to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Plaintiffs brought their case here contending that various and sundry Minnesota, Texas, Virginia, and California laws and constitutional provisions entitle Plaintiffs to actual and punitive damages, declaratory relief, restitution, attorneys' fees, and other undefined relief.

As demonstrated below, the Amended Complaint should be dismissed for four independent reasons: (1) it was filed in an improper venue; (2) the tribal exhaustion doctrine requires the Cheyenne River Sioux Tribal Court to determine the scope of its own jurisdiction;[2] (3) this Court lacks personal jurisdiction over Defendants CashCall and WS Funding, and (4) Plaintiffs' allegations fail to state a claim on which relief can be granted.

## II.    Procedural History And Summary Of Plaintiffs' Allegations

On July 11, 2013, Plaintiffs filed a Complaint, and on September 9, 2013, filed an Amended Complaint requesting certification of a nationwide consumer class, a Minnesota sub-class, a Texas sub-class, and a Virginia sub-class, asserting six claims for relief: (1) civil conspiracy on behalf of all Plaintiffs and the putative national class; (2) usury in violation of

---

[1] Each loan agreement at issue has an explicit class action waiver. Defendants intend to make this argument in full in a future submission to the Court.

[2] Should the Court find venue to be proper (which it is not) and the tribal exhaustion doctrine inapplicable, Defendants' respectfully request that the Court reserve ruling on the two other grounds until it rules on Defendants' Motion to Stay and Compel (Dkt. No. 23).

Minnesota, Texas, and Virginia state statutes and the California Constitution on behalf of all Plaintiffs and the putative national class; (3) a violation of Minnesota's Regulated Loan Act on behalf of Heldt and the putative Minnesota sub-class; (4) false advertising in violation of Minn. Stat. §§ 325F.67 *et seq* on behalf of Heldt and the putative Minnesota sub-class; (5) a violation of the Virginia Consumer Protection Act on behalf of Martin and the putative Virginia sub-class; and (6) a violation of the Texas Deceptive Trade Practices Act on behalf of Jones, Curtis and the putative Texas sub-class. [3]

Plaintiffs attempt to support these claims by alleging that the "lenders conspired to charge illegal interest rates and defraud consumers by stating that the lenders and collectors are exempt from United States laws because of an affiliation with the Cheyenne River Sioux Tribe ('Tribe')." Am. Compl. ¶ 1.[4] Plaintiffs allege that they each obtained loans from Western Sky. Despite clear choice of law provisions in Plaintiffs' loan agreements (the "Loan Agreements"), Plaintiffs allege that "[a]ll Defendants knew or should have known that the loans they made to Plaintiffs and the class contained interest rates that are unenforceable because they violate Minnesota, Texas, and Virginia usury statutes." ¶ 55. Each Loan Agreement, however, unambiguously states that Western Sky is owned and operated by an enrolled tribal member, and provides that it is governed by the laws of the Tribe. *See* ¶ 59; *see also* Heldt Loan Agreement, attached as Ex. A at 1; Jones (*née* Trusevich) Loan Agreement, attached as Ex. B at 1; Curtis Loan Agreement, attached as Exhibit C at 1; Martin Loan Agreement, attached as Exhibit D at

---

[3] Defendants expressly reserve the right to seek arbitration of these claims. *See* p.2 n.1, *supra*.

[4] All references in this Brief preceded by a paragraph symbol are citations to the Amended Complaint (Docket No. 30).

1.[5] Along with providing comprehensive arbitration clauses, the Loan Agreements unequivocally specify that Cheyenne River Sioux Tribal Court ("Tribal Court") must be the exclusive venue for any court proceedings.[6] *See id.* Plaintiffs' claims arise solely from their Loan Agreements with Western Sky.

### III.    Argument

**A.    Plaintiffs' Amended Complaint Was Filed In An Improper Venue.**

Federal Rule of Civil Procedure 12(b)(3) warrants dismissal of the Amended Complaint because Plaintiffs filed this lawsuit in an improper venue. Plaintiffs explicitly agreed to express contract provisions (the "Forum Selection Clauses") which provide that, to the extent Plaintiffs' claims cannot be arbitrated, the Tribal Courts are the exclusive forum in which Plaintiffs may assert claims arising from their Loan Agreements. At the outset, it must be noted that the Eighth Circuit has not definitively decided whether state or federal law applies in determining the enforceability of a forum selection clause. *See Servewell Plumbing, LLC v. Federal Ins. Co.*, 439 F.3d 786, 789 (8th Cir. 2006). This question will not impact the analysis here, however, because South Dakota follows the federal standard announced by the Supreme Court in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). *See Bell Inc. v. Drent Goebel USA, Inc.*, No. 08-4192, 2009 WL 2634036, at *2 (D.S.D. Aug. 24, 2009) (citing *Baldwin v. Heinhold Commodities*, 363

---

[5] Though "matters outside the pleading" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint" are not matters outside the pleading. *Enervations, Inc. v. Minnesota Mining and Mft. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (citations omitted). Because the Loan Agreements are "necessarily embraced by the pleadings" and "incorporated by reference," they can be considered on a Rule 12 Motion to Dismiss without converting it to a Motion for Summary Judgment. *See id.; Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

[6] Each Loan Agreement refers to the venue of Cheyenne River Sioux Tribal Courts in the first paragraph of the Loan Agreement. In addition, Tribal Court venue is also mentioned in paragraphs entitled: (a) Applicable Law and Judicial Review; and (b) Small Claims Exception.

N.W.2d 191, 195 (S.D. 1985)).

Under *Bremen*, "[f]orum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching." *M.B. Restaurants, Inc. v. CKE Restaurants, Inc.*, 183 F.3d 750, 752 (8th Cir. 1999) (citing *Bremen*, 407 U.S. at 15)). Further, "[t]hey are enforceable unless they would actually deprive the opposing party of his fair day in court," *id.* (citations omitted), or unless "enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision." *Bremen*, 407 U.S. at 15. To overcome the presumption of validity, Plaintiffs must make a "strong showing" that the Forum Selection Clauses are unreasonable. *Id.* "A party resisting consideration and enforcement of a forum selection clause bears the burden of demonstrating unreasonableness or overreaching." *Bell Inc.*, 2009 WL 2634036, at *2.

Plaintiffs' Loan Agreements contain clear and undeniable Forum Selection Clauses that are not unjust, unreasonable, or otherwise invalid. Rather, the Clauses simply specify *which* court must hear Plaintiffs' claims. The Loan Agreements provide:

> **This Loan Contract is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or its interpretation.

¶ 59 (bold in original). Because Plaintiffs cannot make a strong showing that this Forum Selection Clause is unreasonable, this action should be dismissed for improper venue.

### 1.    The Forum Provisions Are Valid And Enforceable.

The Forum Selection Clauses should be enforced because Plaintiffs cannot show that they

are "invalid for reasons such as fraud or overreaching." *M.B. Restaurants*, 183 F.3d at 752 (citing *Bremen*, 407 U.S. at 15). It is insufficient to allege merely that the *contract* was procured by fraud; rather, Plaintiffs must show that "the forum selection clause was *itself* a product of fraud." *M.B. Restaurants*, 183 F.3d at 752 (emphasis added). Although Plaintiffs—conveniently ignoring that they expressly agreed to the Forum Selection Clauses—proffer vague arguments suggesting that the contract was a fraud (or a least that a conspiracy existed to commit fraud), Plaintiffs do not—and cannot—allege that the Forum Selection Clauses themselves unmistakably delineated in the Loan Agreements' first paragraph (and reiterated in two other places), were procured by fraud or overreaching. *See* ¶ 59; *see also Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 595 (1991) (forum selection clause was not fraudulent or overreaching when it selected Carnival's principal place of business and consumers seeking to avoid the clause had notice of it and "presumably retained the option of rejecting the contract with impunity").

Absent evidence of fraud or overreaching, forum selection clauses are enforceable even when they have not been specifically bargained for or "negotiated." *See Carnival Cruise Lines*, 499 U.S. at 595. Defendants did not force Plaintiffs to borrow. Rather, Plaintiffs sought out, applied for, and signed Western Sky Loan Agreements containing clear venue clauses. *See* ¶ 59. Plaintiffs, like those in *Carnival Cruise Lines*, could walk away at any time. Instead, they voluntarily entered into Agreements containing valid and enforceable Forum Selection Clauses.

Moreover, because there is a close relationship between substance and procedure in forum selection clause analysis and enforcement, consideration must be given to the public policy of the forum state. *See Union Elec. Co. v. Energy Ins. Mutual Ltd.*, 689 F.3d 968, 974 (8th Cir. 2012). Forum selection clauses will be enforced unless enforcement would "contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial

decision." *Bremen*, 407 U.S. at 15.

In fact, South Dakota's public policy is not implicated here at all. No Plaintiffs are South Dakota residents, and none of the alleged wrongful conduct takes place in South Dakota. Even assuming that South Dakota has an interest in applying its own laws, that consideration is not applicable here. First, the Loan Agreements contain a presumptively valid "Governing Law" provision that specifies application of tribal law. Second, Counts II-VI specifically allege violations of *other states'* laws, namely Virginia, Minnesota, Texas, and California. Consequently, South Dakota has no cognizable interest in this case, and the state's public policy is not involved or impugned. This factor weighs heavily in favor of enforcing the Forum Selection Clauses.

Moreover, Plaintiffs' consent to Tribal Court jurisdiction was not undone by the contracts' Arbitration Agreements. As a general matter, arbitration agreements do not deprive a court of subject matter jurisdiction. *See The Anaconda v. Am. Sugar Ref. Co.*, 322 U.S. 42, 44 (1944). In *Payday Financial*, this Court raised the question of whether the inclusion of a binding arbitration clause in similar loan contracts to the ones here made it unforeseeable that borrowers consented to Tribal Court jurisdiction. *See FTC v. Payday Fin., LLC*, No. 11-3017, 2013 WL 1309437, at *14 (D.S.D. Mar. 28, 2013).[7] It did not. For at least two reasons, tribal court jurisdiction was reasonably foreseeable and therefore consented to. First, Plaintiffs' Loan Agreements specifically provided for judicial enforcement of any arbitration award. Second,

---

[7] It is worth noting that in *Payday Financial*, this Court was concerned with a situation where borrowers *had already been sued* in Tribal Court by a lending company, prior to arbitration. *See Payday Fin.*, 2013 WL 1309437, at *4. This is not the case here; Plaintiffs initiated this action in Federal Court. It is also worth mentioning that *Payday Financial* did not involve any allegations that Western Sky (Plaintiffs' lender here) had ever sued a borrower in Tribal Court.

even if Plaintiffs' expectations that they would arbitrate before arriving in Tribal Court were jurisdictional, such expectations did not render a Tribal Court action unforeseeable. A contractual right to arbitrate is waived if not enforced. *See Hooper v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 589 F.3d 917, 920 (8th Cir. 2009). Here, Plaintiffs clearly did not "expect" arbitration, as they initiated this action in Court. Thus, the Arbitration Agreements did not render Tribal Court jurisdiction unenforceable.

Under the *Bremen* analysis, and considering the facts relevant to this assessment, Plaintiffs cannot possibly make a strong showing that the Forum Selection Clauses are unreasonable. *See Bremen*, 407 U.S. at 15. Rule 12(b)(3) requires dismissal.

## 2. The Forum Provisions Should Be Enforced Because They Are Reasonable Under the Circumstances.

Mere "inconvenience to a party is an insufficient basis to defeat an otherwise enforceable forum selection clause," *M.B. Restaurants*, 183 F.3d at 753 (citations omitted), and absent a showing "that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court . . . there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." *Bremen*, 407 U.S. at 17-18; *see M.B. Restaurants*, 183 F.3d at 752 (citing *Carnival Cruise Lines*, 499 U.S. at 590-95). Plaintiffs do not allege that the Forum Selection Clauses would deprive them of their day in court. Rather, they baldly conclude that the Forum Selection Clauses and Arbitration Agreements operate as "belt and suspenders approach to depriving consumers of their state law rights." ¶ 60. Plaintiffs do not explain, however, why the Tribal Court forum *itself* would deprive them of their rights. The South Dakota Supreme Court, citing U.S. Supreme Court doctrine, reiterated this concept in plain terms: "Personal dissatisfaction with using a tribal court as the

jurisdiction of legal dispute has been rejected as a valid basis to proceed in another court system." *Risse v. Meeks*, 585 S.D. 875, 879 (1998) (citing *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18-19 (1987)).

This unsupported criticism of the Tribal Court is insufficient to demonstrate that litigation there would be so gravely expensive or inconvenient as to prevent Plaintiffs from having a fair adjudication, especially where the Tribal Court is on a reservation in the same state as this court. *See Servewell*, 439 F.3d at 790 (alleged "great expense" of litigation "falls well short of depriving [plaintiff] of its day in court"). Even the expense of litigating in a foreign country does not invalidate a forum selection clause. *See Sun World Lines v. March Shipping Corp,* 801 F.2d 1066, 1068 (8th Cir. 1986) *receded from on other grounds by Farmland Indus., Inc. v. Frazier-Parrott Commodities, Inc*, 806 F.2d 848 (8th Cir. 1986) (Missouri entity required to litigate in Germany); *compare McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 345-46 (8th Cir. 1985) (chaotic post-revolutionary conditions in Iran, including an ongoing war with Iraq, excused enforcement of forum selection clause requiring litigation in Iran) *with M.B. Restaurants*, 183 F.3d at 753 (enforcing forum selection clause specifying Utah over plaintiff's objection that he could not afford to litigate in that state). Here, the Forum Selection Clauses only require Plaintiffs to litigate in Dewey County instead of Hughes County. And contrary to Plaintiffs' insinuations, the Tribal Courts exist and provide Plaintiffs a viable forum to assert their claims. *See, e.g., Plains Commerce Bank v. Long Family Land & Cattle Co*. (*Plains Commerce I*), 554 U.S. 316 (2008) (deciding an appeal from the Tribal Courts in a lawsuit involving consumer claims). Indeed, as this Court explained in *Payday Financial*, "[i]t would be paradoxical if courts would be more inclined to enforce a forum selection clause specifying a foreign nation's courts than to enforce a forum selection clause specifying tribal court

jurisdiction." *See Payday Fin.,* 2013 WL 1309437, at *10. Thus, Plaintiffs can have their day in court—the Cheyenne River Sioux Tribal Court.

**B.      The Tribal Exhaustion Doctrine Requires That The Tribal Court Must First Determine Its Own Jurisdiction Before This Court Can Hear This Case.**

The U.S. Supreme Court requires that when an action implicates tribal court jurisdiction, the first jurisdictional examination must take place in the tribal court. *See Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985). This is known as the tribal exhaustion doctrine. *See id.* "Allowing tribal courts to make an initial evaluation of jurisdictional questions serves several important functions, such as assisting in the orderly administration of justice, providing federal courts with the benefit of tribal expertise, and clarifying the factual and legal issues that are under dispute and relevant for jurisdictional evaluation." *DISH Network Service LLC v. Laducer*, __ F.3d __, No. 12-2871, 2013 WL 3970245, at *4 (8th Cir. Aug. 5, 2013) (citing *Nat'l Farmers Union*, 471 U.S. at 856-57). The purpose of the exhaustion of tribal remedies is to vindicate the congressional "policy of supporting tribal self-government and self-determination," which "favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge."[8] *Nat'l Farmers Union*, 471 U.S. at 856.

"By requiring parties to exhaust their tribal court remedies before seeking relief in federal court, the tribal exhaustion rule allows tribal courts to assert authority over reservation affairs without having to 'compete' against federal courts for the right to do so." *Colombe v. Rosebud Sioux Tribe*, 835 F. Supp. 2d 736, 747 (D.S.D. 2011). Although tribal exhaustion is technically

---

[8] The doctrine supports the belief that tribal courts are vital to tribal self-government and recognizes that a tribal court's authority is diminished by a federal court's exercise of jurisdiction over reservation affairs. *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.3d 803, 813 (7th Cir. 1993) (citing *Iowa Mutual Ins. Co.*, 480 U.S. at 14-17; *Nat'l Farmers Union*, 471 U.S at 856.).

prudential rather than jurisdictional, "[e]xhaustion is mandatory . . . when a case fits within the policy." *Gaming World Int'l v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 849 (8th Cir. 2003). This is true even when there is no pending concurrent tribal action. *See Sharber v. Spirit Mountain Gaming Inc.*, 343 F.3d 974, 976 (9th Cir. 2003) ("The absence of any ongoing litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement."); *United States v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996). The fact that an action is subject to arbitration is similarly of little import. *Bank One, N.A. v. Shumake*, 281 F.3d 507, 510-14, 515 (5th Cir. 2002).

In this case, there is no question that Plaintiffs have specifically implicated tribal court jurisdiction by filing suit against entities wholly owned by a member of the Tribe and against their owner Webb. [9] *See* ¶¶ 11-13. Plaintiffs are non-Indians borrowing from an entity (Western Sky) that is wholly owned by an enrolled member of the Tribe, and all of Plaintiffs' claims arise from Loan Agreements with that entity. *See* ¶ 7-10; 12-13. It is well settled that tribal courts may exercise jurisdiction over non-Indians who enter into consensual relationships with tribal members through contracts. *See Montana v. United States*, 450 U.S. 544, 565 (1981) (citations omitted) ("[A] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."). Regulation through "other means" includes adjudication of disputes in tribal courts. *See Iowa Mut. Ins. Co.*, 480 U.S. at 18 ("Civil jurisdiction over such activities [of non-Native Americans on reservation lands]

---

[9] Plaintiffs' allegations against Webb raise particular concerns. Webb is an enrolled member of the Tribe, and his companies Western Sky and Payday Financial are located within the exterior boundaries of the Reservation. *See* ¶¶ 11-13; *see also* Exs. A-D. Plaintiffs' claims against Webb plainly implicate tribal court jurisdiction.

presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."). Even off-reservation activity is subject to tribal exhaustion if, "at a bare minimum," it impacts directly upon tribal affairs.[10] *Ninigret*, 207 F.3d at 32 (citations omitted); *see also Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.* (*Plains Commerce II*), 910 F. Supp. 2d 1188, 1198 (D.S.D. 2012) (concluding that Tribal Court had jurisdiction to determine validity of its judgment and appellate bond in dispute between enrolled tribal members and non-Indian bank).

The Tribal Court has subject matter jurisdiction over Plaintiffs' claims; thus, the tribal exhaustion doctrine compels this Court to stay or dismiss the action. This is especially true where, as here, Plaintiffs directly attack tribal court jurisdiction without first bringing the claim in the tribal court itself. S*ee Altheimer*, 983 F.2d at 814 (favoring application of tribal exhaustion doctrine when there is a direct attack on a tribal court's jurisdiction). As Plaintiffs acknowledge, Western Sky is owned wholly by a member of the Tribe, s*ee* ¶¶ 6, 13, and the Loan Agreements specify that they are "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." ¶ 59. And recently, this Court concluded that nearly identical contracts appear to have been made on the Tribe's Reservation. *Payday Fin.,* 2013 WL 1309437, at *10; *see also Bruce H. Lein v. Three Affiliated Tribes*, 93 F.3d 1412, at 1419 (8th Cir. 1996) ("[C]ivil jurisdiction over the activities of non-Indians on reservations lands presumptively lies in tribal courts, unless affirmatively limited by a specific treaty provision or federal statute.") (citations omitted).

Because Tribal Court jurisdiction is clearly implicated in Plaintiffs' Amended Complaint,

---

[10] But as discussed below, this Court has already concluded that nearly identical contracts appear to have been made on the Tribe's Reservation. *Payday Fin.,* 2013 WL 1309437, at *10

the Tribal Court must be given "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction. *Nat'l Farmers Union*, 471 U.S. at 856.

**C.    The Exercise Of Personal Jurisdiction Over CashCall And WS Funding Violates Due Process.**

Rule 12(b)(2) mandates dismissal where a court lacks personal jurisdiction over a defendant. "To allege personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within the state." *Wells Dairy, Inc. v. Food Movers Int'l Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). Personal jurisdiction can be specific or general: "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's action within the forum state . . . ," *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citations and quotation omitted), whereas general jurisdiction "refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose," requires examination of whether the defendant's contacts with the forum are "continuous and systematic." *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996). Because CashCall is a California corporation without any physical presence in South Dakota, and WS Funding is a Delaware corporation without any physical presence in South Dakota, this Court's inquiry extends only to specific jurisdiction. *See* Ex. E, Baren Dec. ¶¶ 21-22.

Specific jurisdiction can only be exercised by a federal court sitting in diversity if (a) authorized by the forum state's long-arm statute; and (b) permitted by the Due Process Clause of the Fourteenth Amendment. *Id.* South Dakota construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the Due Process Clause, and thus the analysis collapses into one step: the due process analysis. *Dakota Indus. v. Ever Best Ltd.,* 28 F.3d 910, 915 (8th Cir. 1994).

To comport with Due Process, the exercise of personal jurisdiction requires "sufficient contacts or ties with the state of the forum to make [bringing suit] reasonable and just, according to our traditional conception of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). Further, there must be some showing that a defendant personally availed himself of the privilege of conducting activities in a forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The Eighth Circuit applies a five-factor test to evaluate personal jurisdiction: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of the defendant's contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 746 n.4 (8th Cir. 2011). The first three factors are primary and the remaining two are secondary, but all five and the totality of the circumstances determine whether personal jurisdiction exists. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592-93 (8th Cir. 2011).

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within the state. Once jurisdiction has been controverted or denied, the plaintiff has the burden of proving such facts." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070 (8th Cir. 2004) (internal quotations and citations omitted). Because Plaintiffs cannot show that the Court has personal jurisdiction over CashCall or WS Funding, the Due Process Clause mandates dismissal of all claims against those Defendants.

**1.    Each Of The First Three Primary Factors Considered By Eighth Circuit Courts Weighs Against Exercising Personal Jurisdiction Over CashCall And WS Funding.**

CashCall, and its wholly-owned subsidiary, WS Funding, have minimal contacts, if any,

to the state of South Dakota, and could not reasonably foresee being hauled into South Dakota federal court to litigate Plaintiffs' claims. Because the first three factors analyzed by Eighth Circuit courts are closely interrelated, a court may consider them together. *Larson Manufacturing Co. of South Dakota v. Connecticut Greenstar, Inc.*, ___ F. Supp. 2d ___, No. 12-4011, 2013 WL 842518, at *4 (D.S.D. Mar. 6, 2013) (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983)). "Where the Court considers whether it has specific jurisdiction over nonresident defendants, due process is satisfied if the defendants purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Kooima v. Zacklift Int'l, Inc.*, No. 01-4078, 2001 WL 34458064, at *5 (D.S.D. Aug. 22, 2002). Plaintiffs' claims do not arise out of any contacts CashCall or WS Funding directed at residents of South Dakota; neither CashCall or WS Funding makes or services consumer installment loans to South Dakota residents; nor does Western Sky make loans to South Dakota residents. *See* ¶ 57. Notably, none of the Plaintiffs are South Dakota residents. *See* ¶¶ 7-10. In fact, CashCall's and WS Funding's contacts with respect to Western Sky occur on the Cheyenne River Indian Reservation ("Reservation"), and not in South Dakota proper. For these reasons and the reasons stated below, specific jurisdiction over CashCall and WS Funding does not exist.

Plaintiffs' Amended Complaint alleges only minimal contacts between CashCall and South Dakota. Plaintiffs state only the following paltry activities by CashCall, notably without placing any of the activities in South Dakota:

- "CashCall has arranged with the Lending Defendants (or entities affiliated with them) to process the loans from their inception or otherwise purchase loans shortly after they are made, or to receive the loans for collection or servicing." ¶ 14.

- "CashCall owns or operates the webservers used by the Lending Defendants to market and form the loan agreements." ¶ 14.

- "CashCall operates and/or funds WS Funding, which is the entity that provides the money the Lending Defendants use to fund consumer loans." ¶ 14.[11]

Along with these supposed contacts (none of which are alleged to occur in South Dakota), Plaintiffs provide a litany of "facts" transcribed from a New Hampshire Banking Department action, which allegedly detail the contractual relationship between CashCall and Western Sky. *See* ¶¶ 17-36; 53. And WS Funding's only alleged contacts with South Dakota are that it is a wholly-owned subsidiary of CashCall (¶ 15), and that it has a contract with Western Sky. *See* ¶¶ 19, 26, 29, 35. Again, Plaintiffs fail to mention how this activity is directed at residents of South Dakota.

Stated plainly, the only *possible* contacts between CashCall or WS Funding and South Dakota arise out of CashCall's and WS Funding's contractual relationship with *Western Sky*, not *Plaintiffs*. Yet this contractual relationship is between CashCall and WS Funding in California, and Western Sky on the Reservation. These allegations are completely insufficient to establish personal jurisdiction over CashCall or WS Funding.

*First*, concerning "the nature and quality of contacts with the forum state," the only connection between CashCall or WS Funding and South Dakota is a result of its purchase of loans made by Western Sky to consumers in several states (but not South Dakota). As the Declaration of Dan Baren (attached hereto as Exhibit E) makes clear, neither CashCall nor WS Funding: (a) have a physical presence in the state of South Dakota; (b) have ever offered

---

[11] As explained in the Baren Declaration, attached as Exhibit E, Plaintiffs are wrong on the alleged contacts they *do* cite. *See* Ex. E ¶¶ 21-22. Neither CashCall nor WS Funding own the servers, operate the servers, or fund the Western Sky loans. *Id.*

consumer installment loans in the state of South Dakota; (c) have ever serviced consumer installment loans made to consumers who reside in South Dakota; and (d) no communications sent to Plaintiffs by WS Funding or CashCall emanate from the state of South Dakota or were sent by CashCall or WS Funding *into* the state of South Dakota.

*Second*, concerning the "quantity of such contacts," the vast majority of communications relating to CashCall's and WS Funding's business relationship with Western Sky are conducted telephonically and by email. CashCall and WS Funding have no ongoing presence in South Dakota.

*Third*, regarding "the relation of the cause of action to the contacts," Plaintiffs' claims have no connection to either CashCall's or WS Funding's contacts with *South Dakota*. Plaintiffs are residents of Minnesota, Texas, and Virginia, not South Dakota. Plaintiffs do not claim that any of CashCall's or WS Funding's activities took place in the state. CashCall is a California corporation with its principal place of business there. Baren Dec. ¶ 5. CashCall's consumer installment loan servicing operations are located in California. *Id*. WS Funding, the CashCall subsidiary that purchases the loans (Baren Dec. ¶ 14), is a Delaware corporation with its principal place of business in California. *Id.*

Each of Plaintiffs' allegations is tied inextricably to a loan contract made on the Reservation between Plaintiffs and Western Sky. It is that contract that forms the nexus of Plaintiffs' allegations here. And while the Loan Agreements were formed on the Reservation, CashCall's servicing took place elsewhere, namely California. CashCall does not maintain a call center in South Dakota, and performs no servicing functions in the state. So, Plaintiffs' claims do not relate to CashCall's meager contacts with South Dakota. *See Global Polymer Indus., Inc. v. C&A Plus, Inc.*, No. 05-4081, 2006 WL 3743845 (D.S.D. Dec. 14, 2006).

> **2.** **Both The Secondary Factors And The Totality Of The Circumstances Weigh Heavily Against Exercising Personal Jurisdiction Over Defendants CashCall And WS Funding.**

While the final two factors, the interest of South Dakota in providing a forum for its residents and the convenience of the parties, are of secondary concern, a court must nonetheless consider their impact on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). Here, there is none.

The fourth factor evaluates the interest of South Dakota in providing a forum for its residents. None of the Plaintiffs in this case are residents of South Dakota. Heldt is a resident of Minnesota; Jones and Curtis are residents of Texas; Martin is a resident of Virginia. CashCall, for its part, is a California corporation with no physical presence in South Dakota, and WS Funding is a Delaware corporation with no South Dakota presence. Western Sky and Payday Financial's operations are located entirely within the exterior borders of the Reservation, and Webb resides there as well. Thus, South Dakota's interest here is negligible.

The final factor considers the convenience of the parties. South Dakota is no more convenient for the named Plaintiffs, the putative national class and sub-classes, WS Funding, and CashCall than would be Tribal Court. As stated above, named Plaintiffs do not reside in South Dakota. And the putative national class includes *no* South Dakota residents. As is apparent from the Western Sky website screen shot produced in paragraph 12 of the Amended Complaint, "Western Sky loans are not available to consumers in . . . South Dakota[.]" Further, the three putative sub-classes—Virginia, Minnesota, and Texas—would necessarily contain no South Dakota residents. Indeed, as Plaintiffs correctly note, "the Lending Defendants refuse to offer loans to . . . residents of South Dakota[.]" ¶ 57. So, it is difficult to imagine why South Dakota federal court would be a more convenient venue for this dispute than Tribal Court.

It is apparent then, that taking into consideration the five factors analyzed by Eighth Circuit courts along with the totality of the circumstances, this Court lacks personal jurisdiction over Defendants CashCall and WS Funding, and Plaintiffs' allegations against those Defendants should be dismissed pursuant to Rule 12(b)(2).

**D.      Counts II, III, IV, V, and VI Must Be Dismissed Because Plaintiffs Cannot State A Claim Arising Under Texas, Minnesota, California, Or Virginia Law.**

Counts II-VI set forth allegations arising under specific Texas, Minnesota, California, and Virginia statutes and constitutional provisions. These claims must fail for two distinct reasons. First, as acknowledged in the Amended Complaint, the Loan Agreements contain a "Governing Law" provision that specifies the sole application of the laws of the Tribe. Thus, claims arising under other state statutes or constitutional provisions must fail. Second, Western Sky, as an entity wholly owned by an enrolled member of the Tribe doing business exclusively on the Reservation, is free from state regulatory authority and jurisdiction. Hence, the laws of Minnesota, Texas, and Virginia, and the California Constitution have no authority over Western Sky's business, and the state-specific claims alleged must be dismissed.

**1.      The Loan Agreements Specify That They Are Governed Exclusively By The Laws Of The Tribe; Accordingly, Plaintiffs' State-Specific Claims Must Fail.**

The Plaintiffs' state-law-specific claims should be dismissed because the parties agreed that their contract would be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," and that "no other state or federal law or regulation" would apply.[12] Contrary to that choice of law, the Plaintiffs now assert claims under Minnesota, Texas,

---

[12] As explained in Section III.B. *supra*, Plaintiffs' Amended Complaint clearly implicates Tribal Court Jurisdiction, and thus, the tribal exhaustion doctrine warrants that the Tribal Court be given the first opportunity to determine the scope of its jurisdiction. *See Nat'l Farmers*, 471 U.S. at 856.

and Virginia statutes and the California Constitution. But there is no basis to set aside the parties' contractual choice of law. Because the Plaintiffs are not entitled to relief under any law other than that of the Tribe, Counts II-VI of the Amended Complaint should be dismissed. *See Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 n.4 (8th Cir. 1997) (applying Minnesota law to dismiss claims arising under Texas Deceptive Trade Practices Act and other claims not arising under Minnesota law); *Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1104-10 (D. Minn. 2010) (dismissing Minnesota statutory claim because of choice-of-law provision specified Mississippi law).

### a. The Parties' Choice Of Law Would Be Enforced By The South Dakota Courts, And Must Therefore Be Enforced By This Court.

"Federal courts sitting in diversity are required to look to the choice-of-law principles of the forum state . . . and then apply the same law to the case as the forum state would." *PVI, Inc. v. Ratiopharm GmbH*, 253 F.3d 320, 329 (8th Cir. 2001). Because this Court is sitting in diversity, it must therefore apply the choice-of-law principles of South Dakota. The South Dakota Supreme Court has "generally recognized that parties may agree to be bound by the law of a particular state." *Butler Mach. Co. v. Morris Constr. Co.*, 682 N.W.2d 773, 776 (S.D. 2004) (quotation omitted); *accord, e.g.*, *Sioux Falls Pizza Co. v. Little Caesar Enters.*, 858 F. Supp. 2d 1053, 1060 (D.S.D. 2012). In this case, the parties agreed that their contract would be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," and that "no other state or federal law or regulation" would apply. South Dakota courts would enforce the parties' "agree[ment] to be bound by the law of a particular state;" hence, this Court should apply the law of the Tribe to this case, and not the laws of Minnesota, Texas, Virginia, or California. *See* Exs. A-D at 1 (respectively).

To be sure, the South Dakota courts will "not give effect to laws of other jurisdictions if they are contrary to the public policy of South Dakota." *Butler Mach.*, 682 N.W.2d at 776 (citation omitted). The "primary sources for declarations of the South Dakota public policy in areas such as the one presently under consideration are the constitution, statutory law and judicial decisions," *Meierhenry*, 277 N.W.2d at 300, and the current South Dakota law regulating creditor-debtor relations, enacted in 1994, provides that "there is no maximum interest rate or charge, or usury rate restriction between or among persons, corporations, limited liability companies, estates, fiduciaries, associations, or any other entities if they establish the interest rate or charge by written agreement." S.D. Codified Laws 54-3-1.1. Indeed, it is the Plaintiffs' proposal—requiring this Court, sitting in diversity, to apply the usury laws of four other states that *do* cap interest rates established by contract—that would contradict the public policy of South Dakota. This result is squarely at odds with South Dakota choice-of-law principles, and should therefore be rejected.

      **b.**     **The South Dakota Courts Would Apply The Laws Of The Tribe To This Dispute Even If The Parties Had Not So Agreed.**

Seeking to evade the contractual choice-of-law provision, the Plaintiffs assert (without elaboration or support) that "[t]here is a reasonable question of whether a consumer sees the entire term of the loan or arbitration clause before they accept the loan." ¶ 35. Such a conclusory assertion does not provide a basis for setting aside the terms of the contracts in dispute, particularly given the presumption in favor of enforcing contractual choice-of-law clauses. *See, e.g.*, *Butler Mach. Co.*, 682 N.W.2d at 776. Moreover, not only is the choice of law articulated in the first paragraph of the first page of the Loan Agreements and also in the contracts' Arbitration Agreements, *see* Exs. A-D at 1, 5 (respectively), but Plaintiffs were required to warrant that

"YOU HAVE READ AND UNDERSTAND THE ARBITRATION SECTION OF THIS NOTE AND AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THAT SECTION." Exs. A-D, at 5 (respectively) (emphasis in originals).

Even if Plaintiffs had not seen the choice-of-law provision, that would not provide a basis for applying the laws invoked by the Plaintiffs. South Dakota courts are required to interpret the contracts in dispute in accordance with the laws of the Tribe even if the contracts did not contain a choice-of-law clause.

Under such circumstances, the task of this Court would remain the same: "[L]ook to the choice-of-law principles of the forum state . . . and then apply the same law to the case as the forum state would." *PVI, Inc.*, 253 F.3d at 329. "South Dakota law provides that '[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.'" *Great West Cas. Co. v. Hovaldt*, 603 N.W.2d 198, 201 (S.D. 1999) (quoting S.D. Codified Laws 53-1-4). In a case involving similar contracts, this Court concluded the loan agreements at issue appear to have been formed on the Reservation." *Payday Fin.*, 2013 WL 1309437, at *10. Applying the ordinary South Dakota choice-of-law rule would therefore require the same result here—the application of Tribal law—even if the parties had not agreed to apply that law.

### c. Counts II-VI Must Be Dismissed Because They Do Not Seek Relief On Any Basis Recognized Under The Laws Of The Tribe.

The Amended Complaint must be dismissed because it does not state any claim for which relief could be granted. The Amended Complaint includes five counts arising under at least seven state statutes and the California constitution, all of which involve allegations that the

interest rates on the plaintiffs' loan were impermissibly high. *See* ¶¶ 67-82 (alleging usury in violation of Minn. Stat. § 334.01 *et seq.*, Tex. Fin. Code § 342.001 *et seq.*, Va. Code § 6.2-306 *et seq.*, and Calif. Const. Art. 15); ¶¶ 83-89 (alleging violations of the Minnesota Regulated Loan Act, Minn. Stat. § 56.0001 *et seq.*); ¶¶ 90-96 (alleging false advertising in violation of Minn. Stat. § 325F.67 *et seq.*); ¶¶ 97-103 (alleging violations of the Virginia Consumer Protection Act, § 59.1-200(A)(5)); ¶¶ 104-109 (alleging violations of the Texas Deceptive Trades Practices Act, Tex. Bus. & Com. Code § 17.46 *et seq.*). None of those counts asserts a claim for relief under the laws of the Tribe, but rather, assert state-specific statutory claims.

This Court must apply the law of the Tribe to resolve claims arising out of the contracts in dispute, both because the parties agreed that that law would apply and because, in any event, that is the law South Dakota courts would apply. The Amended Complaint does not purport to state a claim for relief under the laws of the Tribe, and the factual allegations would not support such a claim. Because Plaintiffs have not alleged any violations of applicable law, they are not entitled to such relief, and Counts II-VI must be dismissed under Rule 12(b)(6).

### 2. Tribal Sovereignty And Federal Preemption Prohibit Plaintiffs From Applying Minnesota, Texas, Virginia, or California Law To Loans Issued By Western Sky.

A threshold issue in this action is whether the states (here Minnesota, Virginia, Texas, and California) have regulatory authority or jurisdiction over Western Sky's on-reservation business activities, and by extension, over the loans it makes. They do not. Western Sky's transactions constitute on-reservation activity by a tribal member, and as such, state law cannot be applied.

### a.   Webb, Western Sky, And Payday Financial Are Tribal Members, And Their Activities Are Only Subject To Congressional Regulation.

Webb, Western Sky, and Payday Financial are all tribal members entitled to be judged by tribal courts. Webb is an enrolled member of a federally-recognized Tribe; by extension, so are Western Sky and Payday Financial. Courts have consistently recognized that, as a result of sharing their owners' identities, Native American-owned companies also enjoy the privileges of tribal membership. For example, in *Pourier v. South Dakota Department of Revenue*, the South Dakota Supreme Court concluded that a Native American-owned corporation incorporated under state law was an enrolled member of the tribe for purposes of tax immunity. 658 N.W.2d 395, 403-06 (S.D. 2003), *vacated in part on other grounds*, 674 N.W.2d 314 (2004), *cert. denied*, 541 U.S. 1064 (2004); *see also Sage v. Sicangu Oyate Ho, Inc.*, 473 N.W.2d 480, 483-84 (S.D. 1991) (state courts lacked subject matter jurisdiction because non-profit corporate defendant qualified as a tribal member). As explained by the *Pourier* court:

> Congress' primary objective in Indian law for several decades has been to encourage tribal economic independence and development. By finding that incorporation under state law deprives a business of its Indian identity, we would force economic developers on reservations to forgo the benefits of incorporation in order to maintain their guaranteed protections under federal Indian law. This could hinder economic development.

658 N.W.2d at 405 (also considering the poverty level of Pine Ridge Reservation).

This proposition is not a novel one; the Eighth Circuit and other courts have repeatedly recognized that corporations can be imbued with the attributes of their owners and beneficiaries. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880-82 (8th Cir. 2003) (corporation could invoke and vindicate the federal civil rights protections of its Native American owners); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 & n.2 (10th Cir. 2002) (corporation had standing to sue under civil rights statutes where it suffered harm as a result of

racial discrimination against an owner and employee); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706-07 (2d Cir. 1982).

Congress has further recognized the special nature of tribal member-owned corporations, regardless of where they are incorporated, by enacting the Indian Business Development Program to "establish and expand profit-making Indian-owned economic enterprises." 25 U.S.C. § 1521 (2006). The regulations promulgated under that statute permit participation by "Indians, Indian Tribes, Indian Partnerships, corporations, or cooperative associations authorized to do business under State, Federal or Tribal Law." 25 C.F.R. § 286.3. Western Sky's business falls squarely within Congress's legislative initiative to establish and expand profitable enrolled tribal member owned businesses. State laws should not interfere with Congress's expressly stated goal of expanding business opportunities for enrolled tribal members, when these opportunities are located solely on a reservation. *Cf. California v. Cabazon Band of Indians*, 480 U.S. 202, 217-20, 22 (1987) (applying the doctrine of federal preemption and holding that the State of California's interest in regulating tribal bingo operations did not outweigh the compelling federal and tribal interest in supporting them).

Further, as the assignee of the loans made by Western Sky, WS Funding (and by extension, CashCall) acceded to all the rights and privileges possessed by Western Sky by virtue of the loan agreements and Western Sky's Native American status. It is well-settled that an "assignment places the assignee in the shoes of the assignor, giving the assignee the same legal rights as the assignor's before the assignment." *Bayside Holdings, Ltd. v. Viracon, Inc.*, 709 F.3d 1225 (8th Cir. 2013); *see also In re Estate of Wurster*, 409 N.W.2d 363 (S.D. 1987). This fundamental legal principle holds true whether the rights taken by the assignee were granted pursuant to the terms of the contract itself or exist because of the legal status of the assignor.

*United States ex rel. Rodgers v. Ark.*, 154 F.3d 865, 869 (8th Cir. 1998); *Nangle v. Surratt-States (In re Nangle)*, 288 B.R. 213 (B.A.P. 8th Cir. 2003) ("In any event, the trustee, after assignment of the judgment, steps into the shoes of the" judgment debtor). Here, Western Sky bargained for, received, and as discussed in more detail below, was entitled to the right to have any disputes under the loan agreements judged by the tribal court, and not in any other forum. When the loan agreements were subsequently passed to WS Funding, that right passed along with it.

> **b.** **State Laws May Not Apply To The On-Reservation Activities Of Western Sky, Payday Financial, And Webb.**

With Native American identity comes the right to be subject to Tribal jurisdiction. "Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991). As a general matter, the Tribe's sovereignty is achieved (and protected) through two separate but related immunities: (1) the sovereign immunity of the Tribe, its arms, and its officers, which has no territorial bounds, and (2) the derivative protection of the Tribe's members from being governed or regulated by state law while present on the Reservation. This case is about the latter.

Western Sky is a business solely owned by an enrolled tribal member, and advancing the Congressionally-recognized goal of promoting the Tribe's sovereignty and self-sufficiency through economic development on the Reservation.[13] Furthermore, it is undisputed that the Tribe

---

[13] The Supreme Court has long recognized this "firm federal policy of promoting tribal self-sufficiency and economic development." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980). This policy is manifested in statutes such as the Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 *et seq.*, the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*, the

has asserted regulatory authority over Western Sky's on-reservation business activities and any disputes related to them. *See* CRST Code §§ 1-4-1, 1-4-3 (asserting territorial jurisdiction over the entire Reservation); Art. 5, CRST By-Laws (endowing tribal courts with exclusive jurisdiction over claims and disputes arising on the Reservation). Based on these facts alone, claims raised by Minnesota, Texas, or Virginia can only be heard in tribal court under tribal law. This point was made clear in numerous Supreme Court cases emphasizing that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the State." *Cabazon*, 480 U.S. at 207; *see also Worcester v. Georgia*, 31 U.S. (6 pet. 515, 561 (1832) (declaring "the laws of Georgia can have no force" on a Reservation); *McClanahan v. Ariz. State Tax Comm'n*, 411U.S. 164, 170-71 (1973) ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.").

That non-Native Americans are involved in the conduct at issue here does not change this conclusion. *Iowa Mut. Ins. Co.*, 480 U.S. 18 ("Civil jurisdiction over such activities [of non-Native Americans on reservation lands] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."). As sovereign nations, Indian tribes "retain considerable control over non-member conduct on tribal land." *Id.* Lower courts have routinely upheld tribal jurisdiction over civil disputes between tribal members and non-Native Americans who knowingly and voluntarily engage in commercial transactions with

---

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, and the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. § 4101 *et seq.*. The U.S. Small Business Administration even has a separate Office of Native American Affairs to provide resources and assistance to "American Indians . . . seeking to create, develop and expand small businesses." Office of Native American Affairs, U.S. Small Bus. Admin., http://www.sba.gov/naa/ (last visited Sept. 24, 2013).

tribal members on tribal land. *See Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1206 (9th Cir. 2013); *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1315 (9th Cir. 1990). Indeed, the Eighth Circuit recently opined that a close relationship with a reservation alone can give rise to tribal court jurisdiction, even if the conduct at issue did not occur on tribal land. *Laducer*, __ F.3d __, 2013 WL 3970245, at *6 ("Even if the alleged . . . tort occurred off tribal lands, jurisdiction would not clearly be lacking in the tribal court because the tort claim arises out of and is intimately related to [the non-Native American company's] contract with [a Native American] and that contract relates to activities on tribal land.").

The principle that state law cannot apply to the on-reservation conduct of Native Americans was highlighted in *Williams v. Lee*. 358 U.S. 217, 220 (1959). In *Williams*, a non-tribal member American who operated a general store on the Navajo Reservation filed suit against Navajo tribe members (Mr. and Mrs. Williams) in an Arizona state court to recover for goods sold in the store on credit. Judgment was entered against Mr. and Mrs. Williams in the state trial court, and the Supreme Court of Arizona affirmed the judgment. The United States Supreme Court reversed, holding that, unless Congress expressly grants power to a state,[14] the state has no authority to govern the affairs of enrolled tribal members on a reservation. *Id*. at 220-223. The *Williams* court concluded its opinion by stating:

---

[14] Defendants are not aware of any such authority granted by Congress to Minnesota, Virginia, Texas, or California to regulate conduct on the Reservation or adjudicate disputes involving such conduct. Although Congress has provided California and Minnesota with jurisdiction to adjudicate certain civil disputes involving Native Americans through Public Law 280, the statute explicitly limits its jurisdictional grant to conduct on reservations "*within the State*." Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 (1953) (codified at 18 U.S.C. § 1162, 28 U.S.C. § 1360, and 25 U.S.C. §§ 1321-26) (providing six states with jurisdiction over certain tribes and reservations). Indeed, Congress has never granted *any* state jurisdiction over the Cheyenne River Sioux Tribe or its members.

> There can be no doubt that to allow the exercise of state
> jurisdiction here would undermine the authority of the tribal courts
> over Reservation affairs and hence would infringe on the right of
> the Indians to govern themselves. It is immaterial that [the store
> owner bringing suit] is not an Indian.

*Id*. at 223; *see also Puyallup Tribe, Inc. v. Washington Game Dep't*, 433 U.S. 165, 172-73

(1977). This is because "in the absence of federal authorization, all aspects of tribal sovereignty,

[are] privileged from diminution by the States." *Three Affiliated Tribes of Fort Berthold*

*Reservation v. Wold Eng'g*, 476 U.S. 877, 891 (1986).

    The Supreme Court reaffirmed the *Williams* holding in *Montana v. United States*, 450

U.S. 544 (1981), where it further emphasized that state law *does not* govern contracts between

tribal members and non-tribal members:

> To be sure, Indian tribes retain inherent sovereign power to
> exercise some forms of civil jurisdiction over non-Indians on their
> reservations, even on non-Indian fee lands. A tribe may regulate,
> through taxation, licensing, or other means, the activities of
> nonmembers who enter ***consensual relationships with the tribe or
> its members, through commercial dealing, contracts***, leases, or
> other arrangements.

*Id*. at 565 (emphasis added). The holdings in *Williams* and *Montana* are dispositive here because

Western Sky's loans are made on the Reservation. *See* Exs. A-D at 1 (respectively). This was

confirmed in a recent decision handed down by this Court analyzing nearly identical loans:

"Here, the contract between the Borrowers and Lending Companies appears to be formed on the

Reservation in South Dakota." *See Payday Fin.*, 2013 WL 1309437, at *10. And even if some

activity took place off of the Reservation, tribal jurisdiction stills exist if a claim "arises out of or

is intimately related to" a contract that "relates to activities on tribal land." *Laducer*, __ F.3d __,

2013 WL 3970245, at *6; *see also Plains Commerce II*, 910 F. Supp. 2d at 1198.

Thus, under the core principles of tribal sovereignty and federal preemption, Virginia, Texas, Minnesota, and California may not apply their laws to loans issued by Western Sky from the Reservation, either directly or through private actions.

        c.      **Western Sky's On-Reservation Business Activities Are Substantial And Promote Tribal Welfare, Sovereignty And Independence And The Tribe's Comprehensive Governmental System Regulates Western Sky's On-Reservation Activities.**

The Tribe, with its own governmental system, falls squarely within the category of domestic dependent nations who retain sovereign authority over their members and territory. While tribal nations and their members are subject to nondiscriminatory application of state and federal criminal laws for their conduct off reservation, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 149-49 (1973), they cannot be forced in state courts to respond to civil suits, such as enforcement actions. *Oklahoma Tax Comm'n*¸ 498 U.S. at 510-11.

Even though this case is in federal court, the fact that state courts in Virginia, Texas, Minnesota, and California could not entertain Plaintiffs' claims against Western Sky, Payday Financial, and Webb is dispositive. As discussed above, the Supreme Court has recognized that "[t]ribal courts play a vital role in tribal self-government," and "[a]djudication of [on-reservation matters by any nontribal court . . . infringes on tribal law-making authority." *Iowa Mut. Ins. Co.*, 480 U.S. at 16. Accordingly, where state courts lack jurisdiction over a tribal member, a plaintiff must "exhaust available tribal remedies before instituting suit in federal court." *Id.* at 19; *see* § 3B above.

Protecting tribal sovereignty by barring the enforcement of state law and requiring that Plaintiffs exhaust tribal remedies is especially important in light of the Tribe's established regulatory and judicial systems. The Tribe has enacted a comprehensive set of laws and

regulations to govern the Reservation and all manner of on-Reservation activity. Accordingly, the Cheyenne River Sioux Tribal Code asserts territorial jurisdiction over the entire Reservation. CRST Code §§ 1-4-1, 1-4-3. The Tribal Constitution and Tribe By-Laws further endow Tribal courts with jurisdiction over claims and disputes arising on the Reservation. *See* Art. 5, CRST By-Laws. Likewise, the Tribal Code dictates that unless there is federal law to the contrary, the Tribe has jurisdiction over all actions where the persons are present or residing within the boundaries of the Reservation, including corporate entities transacting business or possessing property on the Reservation. CRST Code at §§ 1-4-1, 1-4-3. To that end, the Tribal Code provides a foundation for numerous civil claims arising on the Reservation as well as other common law causes of action in such areas as contract and tort law that are recognized even if not specifically enumerated. *Id.*

The Tribal Business Ordinance further states that the Tribe "retains the inherent, sovereign power to regulate, through taxes, licensing and other means, the business activities of members and non-members who transact business on the Reservation or who enter consensual business relationships with the Tribe." CRST Bus. Ord. § 1(c). As such, the Ordinance provides for administrative hearings and other procedures whenever civil remedies or license revocations are sought. *Id.* § 10. Litigants may avail themselves of such procedures, or bring an action in the Tribal Court—either way, the Tribe provides forums for resolving commercial disputes arising on the Reservation.

Given the regulatory and adjudicative framework in place on the Reservation, litigants may not bring Suit in this Court for claims arising out of Reservation-based business activities. Only Congress is authorized to supersede the Tribe's exclusive jurisdiction to regulate the Defendants' on-reservation business activities. *Iowa Mut. Ins. Co.*, 480 U.S. at 18. This is

especially true when the Tribe's exclusive jurisdiction promotes tribal interest in self-sufficiency and economic development. *See Mescalero Apache Tribe*, 411 U.S. at 334-35. In *Williams* and *Montana*, the Supreme Court clearly established that tribal courts should resolve disputes when tribal members engage in business or entering contracts with non-Native Americans on a reservation. Despite the fact that both *Williams* and *Montana* were decided before the advent of the Internet, when many business transactions occurred in person, their underlying policies of promoting tribal sovereignty and economic self-sufficiency remain the same. And to be sure, the Eighth Circuit recently reaffirmed that Indian law protections should not be eroded by the advent of technology. *See generally Laducer*, __ F.3d __, 2013 WL 3970245, at *6. In fact, it is only through technology that a member of the Tribe, hours from the nearest major city or population center, could run a profitable business. The importance of Western Sky's activities to the Tribe's industry further supports dismissal of this case.

**E.    Several Of Plaintiffs' Causes Of Action Fail To State A Claim Upon Which Any Relief May Be Granted.**

Federal Rule of Civil Procedure 12(b)(6) sanctions dismissal where a claim fails to state a legally sufficient cause of action. *See Carton v. Gen. Motor Acceptance Corp.*, 611 F.3d 451, 454 (8th Cir. 2010). "To survive a motion to dismiss, the complaint must include 'enough facts to state a claim to relief that is plausible on its face' [and] contain 'more than labels and conclusions.'" *Waldner v. N. Am. Truck & Trailer, Inc.*, 277 F.R.D. 401, 405 (D.S.D. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Even if this Court found all of the preceding jurisdictional and choice of law arguments wanting, much of Plaintiffs' Amended Complaint should be dismissed for failure to state a valid claim.

While a complaint need only state a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and the allegations are construed in the light most favorable to the plaintiffs, the complaint must still "contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Waldner*, 277 F.R.D. at 405 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Further, because Count I alleging civil conspiracy to commit fraud and Count IV alleging false advertisement in violation of Minnesota statute both sound in fraud, Fed. R. Civ. P. 9(b)'s heightened pleading standard applies as well. The Rule requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." So a plaintiff alleging fraud must identify the "time, place, and contents of false representation, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (quotation and citation omitted). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Summerhill v. Terminix*, 637 F.3d 877, 880 (8th Cir. 2011) (quotation and citation omitted); *see also Freitas v. Wells Fargo Home Mortgage*, 703 F.3d 436, 440 (8th Cir. 2013) (referring to Rule 9(b)'s requirements as a "heightened" standard).

Because the Amended Complaint offers only unsupported conclusions without providing the required foundation, several of Plaintiffs' claims should be dismissed for this additional reason.

1.     **Count I, Alleging Civil Conspiracy, Should Be Dismissed Because It Is Not An Independent Cause Of Action, And The Underlying Tort—Fraud—Was Not Plead With Particularity As Required By Fed. R. Civ. P. 9(b).**

"A civil conspiracy is, fundamentally, an agreement to commit a tort." *Reuben C. Setliff, III, M.D., P.C., v. Stewart*, 694 N.W.2d 859, 867 (S.D. 2005) (citations omitted). To establish a *prima facie* case of civil conspiracy, the plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy. *Id.* at 866-67*; Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008).

However, civil conspiracy is not "an independent cause of action but is sustainable only after an underlying tort has been established." *Kirlin*, 758 N.W.2d at 455 (citations and quotations omitted). "'Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.'" *Selle v. Tozser¸*786 N.W.2d 748, 756 (S.D. 2010) (quoting *Halberstram v. Welch*, 705 F.3d 472, 479 (D.C. Cir. 1983); *see also Beck v. Prupis*, 529 U.S. 494, 503 (2000); *Okun v. Superior Court*, 29 Cal.3d 442, 454 (Cal. 1981).

Accordingly, Count I must rest on an allegation of an underlying tort, here fraud. As alleged in the Amended Complaint: "As set forth above, the four named defendants engaged in a civil conspiracy to conduct business as an Internet consumer loan lender. They agreed with one another to engage in a fraud that violated state statutory law." ¶ 64. Thus, the civil conspiracy claim will rise or fall based on the alleged fraud, yet Plaintiffs failed to plead any facts to support the underlying tort.

To state a cause of action for fraud, a plaintiff must show: (a) a representation was made as a statement of fact, which was untrue and known to be untrue by the party making is or else

recklessly made; (b) that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and (c) that plaintiff did in fact rely on it and was induced thereby to act to his injury or damage. *Masloskie v. Century 21 Am. Real Estate*, 818 N.W.2d 798, 803 n.3 (S.D. 2012) (citation omitted).

On its face, the Amended Complaint alleges *none* of the elements of fraud, much less the "time, place, and contents of false representation" required under the heightened pleading standard of Rule 9(b). *See Abels*, 259 F.3d at 920. Plaintiffs attempt to incorporate by reference the broad (and largely irrelevant) factual basis for their allegation in an attempt to fulfill the need to establish the underlying tort of fraud supporting the Civil Conspiracy claim. *See* ¶ 63 ("Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs."). This falls far short of the providing the "who, what, when, where, and how" of a fraud claim as required by the Federal Rules and the Eighth Circuit. Hence, because Plaintiffs failed to plead fraud with particularity, the underlying tort supporting an allegation for civil conspiracy fails to state a claim on which relief may be granted, and Count I should be dismissed.

    **2.**     **Count IV, Alleging False Advertising In Violation Of Minn. Stat. §§ 325F.67 *et seq* Should Be Dismissed Because Plaintiffs Failed To Plead The Claim With Particularity.**

Allegations under Minnesota Statutes § 325F.67 fall under the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). *See Thunandor v. Uponor*, 887 F. Supp. 2d 850, 876 (D. Minn. 2012); *see also Abels*, 259 F.3d at 920 (requirements of Rule 9(b)); *Scahll Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (conclusory allegations of fraud and deception are insufficient). Plaintiffs' scant assertions fall far short of meeting this heightened standard.

The elements essential to proving a violation of § 325F.67 are: (1) intent; (2) publication; and (3) a false or misleading advertisement. *See Lenscrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1491 (D. Minn. 1996) (citations omitted); *see also Kronebusch v. MVBA Harvestore Sys.*, 488 N.W.2d 490, 494-95 (Minn. Ct. App. 1992). "In addition, for a civil recovery, there is an implicit requirement of damage to the complaining party." *Lenscrafters*, 943 F. Supp. at 1491 (citations omitted).

Plaintiffs fail to plead the required information with particularity; namely, Plaintiffs do not point to any actual advertisements published in the state of Minnesota. *See Group Health Plan, Inc. v. Philip Morris Inc.*, 68 F. Supp. 2d 1064, (D. Minn. 1999) (dismissing § 325F.67 claim where plaintiffs fail to identify a single statement amounting to commercial advertising). Plaintiffs allege generally that Defendants Western Sky and Payday Financial maintain websites and that Western Sky "advertises and offers loans to consumers by television advertisement and through a website accessible at www.westernsky.com." ¶¶ 12-13. That is all. Plaintiffs do not allege anything further or note any actual and specific advertisements published in Minnesota. Crucially, Plaintiffs do not assert that Defendants WS Funding, CashCall, Payday Financial, or Webb ever advertised in Minnesota, or that they made any misrepresentation that they intended Minnesota consumers to rely upon. Further, Plaintiffs do not allege how Defendants WS Funding, CashCall, Webb, or Payday Financial could possibly fall under the False Advertising statute, where Plaintiffs do not allege that those Defendants ever even made a direct *statement* much less an advertisement, and each Loan Agreement was entered into between a Plaintiff and Western Sky.

Instead, Plaintiffs offer only conclusory allegations: "Defendants' misrepresentations, knowing omissions, and use of other sharp business practices include attempting to create a

situation where its loan interest rates were not subject to state law, but only Tribal law; and averring that its practices are permitted by the Indian Commerce Clause." ¶ 94. Notably, Plaintiffs do not explain *who* made the misrepresentation, *what* the misrepresentation actually was, *how* Defendants advertised it, *when* the advertisements occurred, or *where* Plaintiffs saw the advertisements. *See Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 1003 (D. Minn. 2006) (dismissing § 325F.67 claim under Rule 9(b) where plaintiff failed to identify a single advertisement in Minnesota and relied instead on sweeping allegations of fraudulent and deceptive statements and practices); *Thunander*, 887 F. Supp. 2d at 876 (dismissing consumer protection claim under 9(b)). These failures amount to deficient pleading, and the Count IV under Minn. Stat. § 325.67 must fail.

### 3.   Plaintiffs Fail To State A Valid Claim That Any Defendants Violated California Constitution Article 15, And That Claim Should Be Dismissed.

Count II alleges usury in violation of the state laws of Minnesota, Texas, Virginia, and the California Constitution. However, Plaintiffs do not allege that any resident of California obtained a loan from Western Sky, and conspicuously, none of the named Plaintiffs in this action are residents of California. Accordingly, Count II's alleged violation of the California constitution fails.

Plaintiffs claim, without any factual support, that California Constitution Article 15 imposes restrictions on interests rates, and that it is applicable here because the state is "the place of contract formation of the loan agreements[.]" ¶ 78. The essential elements of a claim of usury are: "(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." *Ghirardo v.*

*Antonioli*, 8 Cal.4th 791, 798 (Cal. 1994). To be sure, California's usury law will only apply where the loan was entered into in the state of California. *Ury v. Jewelers Acceptance Corp.*, 227 Cal.App.2d 11, 16 (Cal. Ct. App. 1964). Here, none of the named Plaintiffs reside in the state of California, and Western Sky—the lender—is a South Dakota LLC with its principal place of business at 612 E Street, Timber Lake, SD. *See* ¶ 7-10; 12. And as the Western Sky screenshot copied within Amended Complaint attests, Western Sky loans are not available in the state of California. *See* ¶ 12. Accordingly, Plaintiffs have not properly plead a claim for violation of the California Constitution Article 15, and the claim should be dismissed.

But even if Plaintiffs had properly plead the claim—which they did not—the claim would fail as to Defendant CashCall because CashCall is expressly exempt from Cal. Const. Art. 15 because it is licensed as a Finance Lender by the California Department of Corporations.[15] *See* Cal. Fin. Code. § 22002; *Moore v. Hill*, 188 Cal.App.4th 1267, 1274-75 (Cal. Ct. App. 2010); *see also* CashCall's Finance Lender License, attached hereto as Exhibit F. Thus, Plaintiffs cannot bring a claim for violations of the California's constitutional usury provision against CashCall. *See id.*

### IV.    Request for Oral Argument

Defendants respectfully request oral argument on their Motion to Dismiss, as permitted by D.S.D. Civ. LR 7.1(C).

### V.    Conclusion

For the foregoing reasons, Defendants respectfully request that this Court dismiss this action.

---

[15] CashCall's Consumer Finance Lender license is matter of public record and this Court may take judicial notice and consider it at this time without converting this motion to a motion for summary judgment. *See Stahl v. U.S. Dept. of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003).

DATED: September 26, 2013                    Respectfully submitted by,

                                             /s/ Cheryl Laurenz-Bogue
                                             Cheryl Laurenz-Bogue
                                             Bogue & Bogue
                                             P.O. Box 50
                                             Faith, SD 57626
                                             (605) 976-2529

                                             *Attorney for Defendants Western Sky Financial, LLC, PayDay Financial, LLC, CashCall, Inc., WS Funding LLC, and Martin Webb*

### D.S.D Civ. LR 7.1.(B)(1) WORD COUNT COMPLIANCE CERTIFICATE

I, Cheryl Laurenz-Bogue, certify that Defendants' Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities complies with the word count limitation in D.S.D. LR 7.1.(B)(1) specifying that a court filing shall not be longer than 12,000 words. In preparing this Motion, I used Microsoft Word 2010, and this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count. I certify that this Motion contains 11,986 words.

DATED: September 26, 2013

/s/ Cheryl Laurenz-Bogue
Cheryl Laurenz-Bogue
Bogue & Bogue
P.O. Box 50
Faith, SD 57626
(605) 976-2529

**CERTIFICATE OF SERVICE**

      I hereby certify that, on September 26, 2013, I caused a copy of the foregoing Defendants' Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities to be served via the Court's electronic filing system upon the following:

Wade L. Fischer
Tieszen Law Office, Prof. Corp.
306 East Capitol, Suite 300
P.O. Box 550
Pierre, SD 57501-0550
(605) 224-1500

office@tieszenlaw.com

Shawn J. Wanta
Christopher D. Jozwiak
222 South Ninth Street, Suite 2955
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571
*Counsel for Plaintiffs*

                                      /s/ Cheryl Laurenz-Bogue_
                                      Cheryl Laurenz-Bogue