

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | | |
|---|---|---|
| CHAD MARTIN HELDT, | * | CIV 13-3023-RAL |
| CHRISTI W. JONES, | * | |
| SONJA CURTIS, | * | |
| and CHERYL A. MARTIN, | * | |
| Individually and on behalf of all | * | |
| similarly situated individuals, | * | |
| | * | |
| Plaintiffs, | * | OPINION AND ORDER |
| | * | ON PENDING MOTIONS |
| | * | |
| vs. | * | |
| | * | |
| PAYDAY FINANCIAL, LLC, d/b/a | * | |
| Lakota Cash and Big Sky Cash; | * | |
| WESTERN SKY FINANCIAL, LLC, | * | |
| d/b/a Western Sky Funding and Western | * | |
| Sky and Westernsky.com; MARTIN A. | * | |
| WEBB, a/k/a "Butch," and CASHCALL, | * | |
| INC., | * | |
| | * | |
| Defendants. | * | |

There are three pending motions in this case—Defendants' Motion to Stay Proceedings

and Compel Arbitration, Doc. 23; Plaintiffs' Motion to Stay Defendants' Motion to Compel

Arbitration and to Take Discovery on Arbitration Issues, Doc. 26; and Defendants' Motion to

Dismiss Amended Complaint, Doc. 34. Those three pending motions present issues of tribal

court exhaustion, tribal court jurisdiction over non-Indians, enforceability of an arbitration clause

when the arbitration forum allegedly fails to exist, and personal jurisdiction. This Court has

written extensively and recently on many of these topics. See, e.g., FTC v. PayDay Fin. LLC

("PayDay I"), 935 F. Supp. 2d 926 (D.S.D. 2013) (addressing tribal court jurisdiction over non-

Indians and commenting on arbitration clause similar to ones at issue here); Plains Commerce

Bank v. Long Family Land & Cattle, 910 F. Supp. 2d 1188 (D.S.D. 2012) (addressing tribal court

exhaustion and jurisdiction over non-Indians in tribal court); Dakota Foundry, Inc. v. Tromley Indust. Holdings, Inc., 891 F. Supp. 2d 1088 (D.S.D. 2012) (addressing factual issue regarding enforceability of arbitration clause); Colombe v. Rosebud Sioux Tribe, 835 F. Supp. 2d 736 (D.S.D. 2011) (discussing tribal court exhaustion); Jones v. GGNSC Pierre LLC, 684 F. Supp. 2d 1161 (D.S.D. 2010) (discussing situation where arbitration forum designated no longer exists). Moreover, the parties raise these issues in the context of a subprime lending business with which this Court is familiar based on another case resulting in two lengthy opinions on related issues. FTC v. PayDay Fin. LLC ("PayDay II"), No. CIV 11-3017-RAL, 2013 WL 5442387 (D.S.D. Sept. 30, 2013); PayDay I, 935 F. Supp. 2d 926. This Court's rulings on the pending motions are designed to allow tribal court exhaustion to occur within the boundaries and under the principles discussed herein.

## I.    Facts Relevant to Pending Motions

Defendants initially filed a Motion to Dismiss Amended Complaint, Doc. 34, under Rule 12(b)(3) of the Federal Rules of Civil Procedure. As explained more fully herein, Defendants have since asked this Court to construe their motion to dismiss as one under the doctrine of *forum non conveniens*. Doc. 56 at 4-5. Defendants have also filed a motion to compel arbitration. Doc. 23. The Court thus takes the facts from the well-pleaded allegations of the Amended Complaint, as well as from materials attached thereto or referenced therein. Where appropriate, this Court draws additional facts from affidavits, items accompanying those motions, and facts that appear to be not subject to dispute. See Martinez v. Bloomberg LP, 740 F.3d 211, 216-17 (2nd Cir. 2014) (explaining that a district court considering a motion to dismiss for *forum non conveniens* or a motion to dismiss based on a forum selection clause generally relies on the pleadings and affidavits); Ireland v. Lear Capital, Civil No. 12-2467 (RHK/TNL), 2012 WL 6021551, at * 1 n.3 (D. Minn. Dec. 4, 2012) ("Motions to stay pending arbitration, like

2

motions to compel arbitration, are treated as motions to dismiss for lack of subject-matter jurisdiction, and hence the Court may consider matters beyond the pleadings in resolving such motions.") (citation omitted).

Plaintiffs Chad Martin Heldt, Christi W. Jones, Sonja Curtis, and Cheryl A. Martin (collectively Plaintiffs) have brought an amended class action complaint invoking jurisdiction under 28 U.S.C. § 1332(d), asserting that the vast majority of class members are citizens of states different than the home state of the Defendants, and alleging that the amount in controversy exceeds $5 million. Doc. 30 at ¶ 41. Plaintiff Heldt is a resident of Minnesota, Plaintiffs Jones and Curtis are residents of Texas, and Plaintiff Martin is a resident of Virginia. Doc. 30 at ¶¶ 7-10. Plaintiffs seek to have a national class certified with three subclasses consisting of a Minnesota subclass, a Texas subclass, and a Virginia subclass. Doc. 30 at ¶ 44.

Each of the four named Plaintiffs obtained high-interest loans, with annual interest rates ranging from 89.68 percent to 233.91 percent from Defendant Western Sky Financial LLC. Doc. 30 at ¶¶ 7-10. Western Sky Financial LLC is a South Dakota limited liability corporation with its principal place of business in Timber Lake, South Dakota, within the exterior boundaries of the Cheyenne River Sioux Tribe Reservation. Doc. 30 at ¶ 12; PayDay I, 935 F. Supp. 2d at 929-30. Western Sky Financial LLC has a license from the Cheyenne River Sioux Tribe to do business. PayDay I, 935 F. Supp. 2d at 929. Western Sky Financial LLC uses various trade names to advertise and offer loans by television and through the internet to consumers outside of South Dakota. Doc. 30 at ¶ 12; PayDay II, 2013 WL 5442387, at *3.

Defendant PayDay Financial LLC likewise is a South Dakota limited liability corporation with its principal place of business in Timber Lake, South Dakota. Doc. 30 at ¶ 11; PayDay I, 935 F. Supp. 2d at 929-30. PayDay Financial LLC was the entity that incorporated Western Sky Financial LLC. Doc. 30 at ¶ 11; PayDay II, 2013 WL 5442387, at *3. PayDay Financial LLC

has a license to do business from the Cheyenne River Sioux Tribe. PayDay I, 935 F. Supp. 2d at 929. Defendant Martin A. "Butch" Webb (Webb) is a South Dakota resident, is the registered agent for PayDay Financial LLC and Western Sky Financial LLC, and is the owner and president of PayDay Financial LLC. Doc. 30 at ¶ 13; PayDay II, 2013 WL 5442387, at *5. Webb is an enrolled member of the Cheyenne River Sioux Tribe. PayDay II, 2013 WL 5442387, at *2.

Defendant CashCall, Inc., is a California corporation with its principal place of business in Anaheim, California. Doc. 30 at ¶ 14. According to the Complaint, CashCall, Inc. has arranged with Western Sky Financial LLC and PayDay Financial LLC (or affiliates of those entities) to process the loans from their inception, to purchase the loans shortly after they are made, and/or to receive the loans for collecting and servicing. Doc. 30 at ¶ 14. CashCall, Inc. allegedly is aware of the terms of the loan agreements, approved those terms, and owns and operates the web servers used by Western Sky Financial LLC and PayDay Financial LLC to operate their lending business. Doc. 30 at ¶ 14.

Defendant WS Funding LLC is a wholly-owned subsidiary of CashCall, Inc. Doc. 30 at ¶ 15. According to the Complaint, CashCall, Inc. uses WS Funding LLC as the entity to provide money to PayDay Financial LLC and Western Sky Financial LLC that in turn is used for the consumer loans. Doc. 30 at ¶ 14. An agreement exists between Western Sky Financial LLC and WS Funding LLC, under which CashCall, Inc. allegedly provides website hosting and support services for Western Sky Financial LLC, reimburses Western Sky Financial LLC for all costs associated with the server, reimburses Western Sky Financial LLC for operating expenses, provides an array of marketing services to Western Sky Financial LLC and reviews applications for Western Sky Financial LLC loans applying underwriting requirements. Doc. 30 at ¶¶ 19-23. If a loan is approved, Western Sky Financial LLC executes a promissory note and debits a "reserve account" to fund the loan. Doc. 30 at ¶ 24. The reserve account allegedly was set up,

funded and maintained by CashCall, Inc.  Doc. 30 at ¶ 26.  CashCall, Inc. then purchases the promissory note from Western Sky Financial LLC, such that CashCall, Inc.—and not Western Sky Financial LLC—accepts payment from consumers.  Doc. 30 at ¶¶ 28, 31.  According to the Complaint, CashCall, Inc. pays Western Sky Financial LLC 5.145 percent of the face value of each approved and executed loan or renewal of loan.  Doc. 30 at ¶ 33.  CashCall, Inc. allegedly has agreed to indemnify Western Sky Financial LLC for all costs arising or resulting from any and all civil, criminal, or administrative claims or actions.  Doc. 30 at ¶ 35.  The Complaint further alleges that the Defendants have taken substantial steps to conceal this business scheme from consumers and regulators.  Doc. 30 at ¶ 37.

The Agreement for Assignment and Purchase of Promissory Notes between Western Sky Financial LLC and WS Financial LLC, a subsidiary of CashCall, Inc., was filed in the record. Doc. 51-1.  That agreement has a "Law Governing" provision stating:

> This Agreement shall be construed in accordance with and governed solely by the laws and jurisdiction of the Cheyenne River Sioux Tribe, and by executing this Agreement, all parties consent to the sole jurisdiction of the courts of the Cheyenne River Sioux Tribe exclusively.

Doc. 51-1 at 6.

As concerns the Defendants' motion to dismiss for lack of personal jurisdiction over CashCall, Inc. and WS Funding LLC (collectively "the California Defendants"), those Defendants aver that neither entity has a physical presence in the state of South Dakota, neither has ever offered consumer installment loans in the state of South Dakota, and neither has serviced consumer installment loans made to consumers who reside in South Dakota.  The California Defendants maintain that no communications from the Plaintiffs to the California Defendants emanate from the state of South Dakota or were sent into the state of South Dakota.

5

Doc. 34-5. Plaintiffs do not contest these matters, but claim in essence that the California

Defendants use the South Dakota Defendants as their surrogates and agents as part of a civil

conspiracy to avert usury laws, among other things.

The loan agreements entered into between the named Plaintiffs and Western Sky

Financial LLC contain the following provision:

> **This Loan Contract is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation**. By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or its interpretation.

Doc. 30 at ¶ 59; Doc. 23-1; Doc. 23-2; Doc. 23-3; Doc. 23-4. The loan agreements between the

Plaintiffs and Western Sky Financial LLC also contain an arbitration clause and a "Governing

Law" section, each specifying that the law of the Cheyenne River Sioux Tribe governs the

agreement.

All of the Plaintiffs' loan agreements have an "Agreement to Arbitrate" specifying

arbitration "conducted by the Cheyenne River Sioux Tribal Nation by an authorized

representative in accordance with its consumer dispute rules[.]" Doc. 23-1 at 5; Doc. 23-2 at 5;

Doc. 23-3 at 5; Doc. 23-4 at 5. According to the Complaint, there is no such thing as arbitration

in the Cheyenne River Sioux Tribe judicial system, and there are no Cheyenne River Sioux Tribe

consumer dispute rules. Doc. 30 at ¶ 61.

Plaintiff Heldt's loan agreement differs from the other Plaintiffs' loan agreements in the section concerning "Choice of Arbitrator." The other three Plaintiffs' loan agreements, entered into in 2011, state:

> Arbitration shall be conducted in the Cheyenne River Sioux Tribal Nation by a panel of three Tribal Elders and shall be conducted in accordance with the Cheyenne River Sioux Tribal Nation's consumer rules and the terms of this Agreement.

Doc. 23-2 at 5; Doc. 23-3 at 5; Doc. 23-4 at 5. Plaintiff Heldt's loan agreement entered into in 2013, states:

> Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association . . . JAMS . . . or an arbitration organization agreed upon by you and the other parties to the Dispute . . . . Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.

Doc. 23-1 at 5.

The Plaintiffs make claims in the Amended Complaint against all Defendants for civil conspiracy and usury in violation of state laws. Doc. 30 at ¶¶ 63-82. Plaintiffs' Amended Complaint anticipates that the law of each borrower's state should be applicable and thus alleges in the remaining counts of the Amended Complaint violations of Minnesota, Texas, and Virginia law. Doc. 30 at ¶¶ 83-109.

Defendants' Motion to Dismiss Amended Complaint, Doc. 34, raises the following arguments for dismissal: 1) the Amended Complaint was filed in the improper venue as there is a forum selection clause specifying Cheyenne River Sioux Tribal Court; 2) the tribal exhaustion doctrine requires the tribal court to first determine its own jurisdiction; 3) the exercise of personal jurisdiction over the California Defendants violates due process; 4) the state law claims fail because tribal law only governs under the language of the agreements; and 5) several of the causes of action allegedly fail to state claims upon which relief may be granted. Defendants' Motion to Stay Proceedings and Compel Arbitration, Doc. 23, and the competing Plaintiffs' Motion to Stay Defendants' Motion to Compel Arbitration and Take Discovery on Arbitration Issues, Doc. 26, frame issues regarding the enforceability of the arbitration language in the loan agreements. This Court first will address questions of venue, tribal court exhaustion, and tribal jurisdiction. The Court then will address the enforceability of the arbitration clauses, before turning briefly to the challenge to personal jurisdiction over the California Defendants.

## II.   Discussion

### A.   Effect of Venue Selection Clause

Defendants initially argue that Rule 12(b)(3) warrants dismissal of the Amended Complaint because the Plaintiffs have filed this case in an improper venue. Defendants base this argument on the forum-selection clause in the loan agreements between the Plaintiffs and Western Sky Financial LLC. Doc. 34 at 4. The loan agreements entered into between the Plaintiffs and Western Sky Financial LLC contained clauses by which the borrowers consented "to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court[.]" Doc. 30 at ¶ 59; Doc. 23-1 at 2; Doc. 23-2 at 2; Doc. 23-3 at 2; Doc. 23-4 at 2.

8

After Defendants filed their Motion to Dismiss Amended Complaint but before the Defendants filed their reply brief, the Supreme Court of the United States issued an opinion concerning forum-selection clause enforceability in <u>Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas</u>,134 S. Ct. 568 (2013). In their reply brief, Defendants cite <u>Atlantic Marine</u> and recast their argument as one based on the doctrine of *forum non-conveniens*. Doc. 56 at 4-5. The Plaintiffs' counter argument is that federal courts have the authority to determine whether a tribal court has jurisdiction over a non-Indian, there is no tribal court jurisdiction under the circumstances and thus the venue selection clauses have no force and should be ignored. Doc. 51 at 8-16.

Rule 12(b)(3), the grounds upon which Defendants initially based this part of their motion to dismiss, allows a party to move to dismiss a case for "improper venue." Fed. R. Civ. P. 12(b)(3). The Supreme Court in <u>Atlantic Marine</u> made clear that Rule 12(b)(3) is an appropriate ground for dismissal only when venue is "wrong" or "improper" in the forum in which the case was brought. <u>Atl. Marine</u>, 134 S. Ct. at 577. Thus, the first question is whether venue is wrong or improper in the District of South Dakota based on 28 U.S.C. § 1391. Section 1391(b) provides that a civil action in federal district court:

> may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

The Supreme Court in <u>Atlantic Marine</u> made clear that "[w]hether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." <u>Atl. Marine</u>, 134 S. Ct. at 577. Here, Defendants PayDay Financial LLC, Western Sky Financial LLC, and Webb are all residents of South Dakota where this Court is located. Moreover, a substantial part of the events giving rise to the Plaintiffs' claims occurred in South Dakota. The District of South Dakota is not an improper venue and thus dismissal under Rule 12(b)(3) is not warranted.

The Supreme Court in <u>Atlantic Marine</u> was dealing with a forum-selection provision that required litigation of disputes "in the Circuit Court for the City of Norfolk, Virginia, or the United States District Court for the Eastern District of Virginia, Norfolk Division." 134 S. Ct. at 575. The Supreme Court in <u>Atlantic Marine</u> thus turned to 28 U.S.C. § 1404(a) as a grounds to enforce such a forum-selection clause by the mechanism of transfer of the civil action to the district specified in that forum-selection clause. Section 1404(a) allows a district court to transfer "any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Here, the forum-selection provisions in the loan agreements do not specify any other federal district court and instead seek to make the jurisdiction of the Cheyenne River Sioux Tribe exclusive. Thus, transfer under § 1404(a) to another federal district court is improper here.

Helpfully, albeit in what may be considered dicta, the Supreme Court in <u>Atlantic Marine</u> addressed what occurs when a forum-selection provision calls for a state or foreign forum. The Supreme Court determined that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non-conveniens*." <u>Atl. Marine</u>,134

10

S. Ct. at 580. The discussion of the Supreme Court in <u>Atlantic Marine</u> presupposed that the parties had a contractually valid forum-selection clause. <u>Id.</u> at 581 n.5. When such a valid forum-selection clause exists, the plaintiff's choice of forum merits no weight and the plaintiff has the burden of establishing that enforcement of the clause is unwarranted. <u>Id.</u> at 581. Rather than giving attention to any private party's interest, a court considering enforcement of a forum-selection clause is to focus on "public-interest factors only." <u>Id.</u> at 582. These "public-interest factors" may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." <u>Id.</u> at 581 n.6 (citation and internal marks omitted). In determining if public-interest factors overcome the usual result of enforcing a forum-selection clause, a court is to consider principally the law of the forum selected, rather than the law of the state in which the court sits. <u>Id.</u> at 582-83.

For the <u>Atlantic Marine</u> analysis to apply here, the forum-selection clauses in the Plaintiffs' loan agreements must be contractually valid and enforceable. <u>See</u> <u>Haughton v. Plan Adm'r of Xerox Corp.</u>, Civil Action No. 13-2664, 2014 WL 888407, at *2 (W.D. La. Mar. 6, 2014) (determining whether forum selection clause was enforceable before applying <u>Atlantic Marine</u>); <u>Mendoza v. Microsoft, Inc.</u>, CV No. 5:13-CV-378-DAE, 2014 WL 842929, at *5 (W.D. Tex. Mar. 5, 2014) ("But before addressing the <u>Atlantic Marine</u> decision, the Court must first determine whether the forum-selection clause [in the contract] is a contractually valid forum-selection clause."). Forum-selection clauses "are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching." <u>M.B. Rests., Inc. v. CKE Rests., Inc.</u>, 183 F.3d 750, 752 (8th Cir. 1999) (citing <u>M/S Bremen v. Zapata</u>

11

Off-Shore Co.,407 U.S. 1, 15 (1972)).  That is, forum-selection clauses "are enforceable unless they would actually deprive the opposing party of his fair day in court[,]" Id., or unless "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision[,]" Bremen, 407 U.S. at 15.

Here, the Plaintiffs entered into contracts of adhesion that, they contend, were procured through a civil conspiracy designed to evade state usury law.  Doc. 30; Doc. 51.  To avoid enforcement of a forum-selection clause based on fraud, a plaintiff must do more than merely allege that the contract was procured by fraud; a plaintiff must show that "the forum selection clause was itself a product of fraud." M.B. Rests., 183 F.3d at 752.  Moreover, the fact that the forum-selection language is part of a contract of adhesion does not by itself justify disregarding the forum-selection provision.  See Carnival Cruise Lines, Inc. v Shute, 499 U.S. 585, 595 (1991) (forum-selection clause in contract of adhesion between passenger and cruise line not fraudulent or overreaching in selecting cruise line's principal place of business for litigating disputes because consumers "presumably retained the option of rejecting the contract with impunity").

The only legitimate argument here for refusal to honor the forum-selection provision would be if the forum selected—the Cheyenne River Sioux Tribal Court—lacked jurisdiction, because it would be contrary to public interest to enforce a venue selection provision that selects a venue lacking jurisdiction.  "[T]he determination of the existence and extent of tribal court jurisdiction must be made with reference to federal law, not with reference to forum-selection provisions that may be contained within the four corners of an underlying contract." Ninigret Dev. Co. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 33 (1st Cir. 2000). Thus,

the effect of the forum-selection clause turns on whether tribal court jurisdiction exists under federal law, which is addressed in a later part of this Opinion and Order.

### B. Tribal Court Exhaustion

Defendants next argue that this Court should apply the tribal court exhaustion doctrine to defer to the Cheyenne River Sioux Tribal Court for its determination of whether it has jurisdiction. The Plaintiffs counter that tribal court exhaustion ought not to be required because there is no tribal court jurisdiction over the Plaintiffs.

The issue of whether a tribal court has jurisdiction over non-members such as the Plaintiffs here is a federal question. Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 324 (2008); see also Ninigret Dev. Co., 207 F.3d at 33. However, "the federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction" under certain circumstances. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 16 (1987) (citation omitted); see also Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845 (1985). The United States Court of Appeals for the Eighth Circuit has stated that "Supreme Court precedent and this court's pronouncements based thereon require exhaustion of tribal court remedies in matters related to reservation affairs." Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1420 (8th Cir. 1996). Requiring parties to exhaust their tribal remedies before seeking relief in federal court allows tribal courts to assert authority over reservation affairs without having to compete against federal courts for the right to do so. Plains Commerce Bank, 910 F. Supp. 2d at 1192; Iowa Mut. Ins. Co., 480 U.S. at 16 ("Unconditional access to the federal forum would place [federal courts] in direct competition with the tribal courts, thereby impairing the latter's authority over

13

reservation affairs."); <u>Duncan Energy Co. v. Three Affiliated Tribes</u>, 27 F.3d 1294, 1299 (8th Cir. 1994). The Eighth Circuit also has observed that "[b]ecause a federal court's exercise of jurisdiction over matters relating to reservation affairs can impair the authority of tribal courts . . . the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself." <u>Duncan Energy Co.</u>, 27 F.3d at 1299.

Here, there is no pending tribal court action between Plaintiffs and Defendants to which this Court may defer. However, the doctrine of tribal court exhaustion applies even when there is no pending concurrent tribal action. <u>See</u> <u>Sharber v. Spirit Mountain Gaming, Inc.</u>, 343 F.3d 974, 976 (9th Cir. 2003) (per curiam) ("The absence of any ongoing litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement."); <u>United States v. Tsosie</u>, 92 F.3d 1037, 1041 (10th Cir. 1996) ("[T]he exhaustion rule does not require an action to be pending in tribal court.").

There are exceptions to the tribal court exhaustion doctrine, however. Tribal court exhaustion is not necessary where: "(1) an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) the action is patently violative of express jurisdictional prohibitions; or (3) exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." <u>Bruce H. Lien</u>, 93 F.3d at 1420 n.14 (citing <u>Nat'l Farmers</u>, 471 U.S. at 856 n.21); <u>Plains Commerce Bank</u>, 910 F. Supp. 2d at 1193; <u>see also</u> <u>Nevada v. Hicks</u>, 533 U.S. 353, 369 (2001) (explaining that exhaustion is unnecessary where it is "plain" that tribal jurisdiction does not exist and the exhaustion requirement would serve no purpose other than delay); <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191 (1978) (finding lack of jurisdiction in criminal case against non-Indian without requiring tribal court exhaustion).

14

Plaintiffs seem to argue under the second exception that there is no tribal court jurisdiction over them. Doc. 51. In short, both the effect of the forum-selection provision and the question of application of the tribal court exhaustion doctrine turn on whether assertion of jurisdiction by the Cheyenne River Sioux Tribe would be "patently violative of express jurisdictional prohibitions[.]" Nat'l Farmers Union, 471 U.S. 856 n.21; Bruce H. Lien, 93 F.3d at 1420 n.14. This Court will return to consider whether this exception to tribal court exhaustion applies after discussing when tribal court civil jurisdiction may exist over non-Indians.

C.   **Tribal Court Jurisdiction**

Indian tribes are "distinct, independent political communities," Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55 (1978) (citation omitted), that retain a sovereignty of a "unique and limited character[,]" United States v. Wheeler, 435 U.S. 313, 323 (1978). "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." McClanahan v. Ariz. State Tax Comm'n, 411 U.S. 164, 172 (1973); PayDay I, 935 F. Supp. 2d at 932. Tribes retain certain inherent sovereign powers, including, but not limited to, self-governance over tribal members within the boundaries of the tribes' reservation lands. United States v. Mazurie, 419 U.S. 544, 557 (1975); PayDay I, 935 F. Supp. 2d at 932.

Indian tribes, however, generally lack legal authority over people who are not tribal members. Plains Commerce Bank, 554 U.S. at 328. The "pathmarking" decision of the Supreme Court defining tribal legal authority over non-Indians is Montana v. United States, 450 U.S. 544 (1981). See Strate v. A-1 Contractors, 520 U.S. 438, 445 (1997) (describing Montana as "pathmarking" and applying Montana to evaluate tribal court jurisdiction over non-Indians). In

Montana, the Supreme Court determined that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. The Supreme Court in Montana then recognized two exceptions to this general principle under which tribes may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id. at 565-66. Because Montana involved a question of the extent of tribal regulatory authority, the Supreme Court in Montana phrased those two exceptions as follows:

> A tribe may regulate, through taxation, licensing or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

Id. at 565-66 (internal citations omitted). The Supreme Court subsequently extended the principles in Montana to a determination of tribal court jurisdiction in a civil case over non-Indians. Strate, 520 U.S. at 453; see also Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe, 609 F.3d 927, 938 (8th Cir. 2010); PayDay I, 935 F. Supp. 2d at 933.

The most recent occasion when the Supreme Court has considered the issue of tribal court jurisdiction over non-Indians is Plains Commerce Bank, 554 U.S. 316, which involved a case that originated in the Cheyenne River Sioux Tribe and came through this Court both before and after the Supreme Court decision. See Plains Commerce Bank, 910 F. Supp. 2d 1188 (D.S.D. 2012). In PayDay I, this Court wrote at length about how Plains Commerce Bank affects the Montana analysis. PayDay I, 935 F. Supp. 2d at 933-36. Ultimately, this Court determined that "[f]ederal court decisions post-dating Plains Commerce Bank generally apply the same

analysis under <u>Montana</u>, suggestive that <u>Plains Commerce Bank</u> has not been taken as a narrowing of the <u>Montana</u> exceptions." <u>Id.</u> at 936; <u>see also</u> <u>Dish Network Serv. L.L.C. v. Laducer</u>, 725 F.3d 877, 884-85 (8th Cir. 2013) (applying <u>Montana</u> in determining whether a tribal court plainly lacked jurisdiction over off-reservation business that entered into contractual relationship with tribal member to provide services in Indian country).   After the <u>Plains Commerce Bank</u> decision, the Eighth Circuit harkened back to an observation by Justice Souter that tribal authority over nonmembers remains "ill defined[,]" <u>Attorney's Process</u>, 609 F.3d at 934 (quoting <u>Hicks</u>, 533 U.S. at 376 (Souter, J., concurring)), and then observed:

> The controlling principles [of tribal civil authority over non-members] are broad and abstract and must be carefully applied to the myriad disparate factual scenarios they govern. Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitutional order, careful study of precedent, and ultimately a "proper balancing" of the conflicting interests of the tribes and nonmembers.

<u>Attorney's Process</u>, 609 F.3d at 934 (quoting <u>Hicks</u>, 533 U.S. at 374).

   This Court has considered tribal court jurisdiction in the context of lending agreements from some of these Defendants previously.   The Federal Trade Commission (FTC) brought an action in this Court against Defendants PayDay Financial LLC, Western Sky Financial LLC, Webb, and certain other entities related to those Defendants. <u>PayDay I</u>, 935 F. Supp. 2d at 929; <u>PayDay II</u>, 2013 WL 5442387, at *1-5.   The FTC alleged in that litigation that the lending practices had violated the Credit Practices Rule, the Electronic Funds Transfer Act and implementing Regulation E, and Section V of the Federal Trade Commission Act. Defendants CashCall, Inc. and WS Funding LLC were not part of that litigation.   In <u>PayDay I</u>, this Court

17

considered the Defendants' Motion for Partial Summary Judgment on the FTC's claim that the Defendants engaged in unfair and deceptive trade practice by suing consumers in the Cheyenne River Sioux Tribal Court. PayDay I, 935 F. Supp. 2d at 929. After discussing the Montana exception allowing tribal civil jurisdiction when a non-member enters into certain "consensual relationships with the tribe or its members," this Court denied partial summary judgment to the Defendants on their argument that there was tribal court jurisdiction over borrowers because: "(1) This Court's record lacks information establishing that the Defendants are in fact 'members' of the tribe for purposes of the first Montana exception; and (2) an ambiguity in the contract exists as to under what circumstances the non-Indian is consenting to tribal court jurisdiction in addition to binding arbitration." PayDay I, 935 F. Supp. 2d at 929. PayDay I is a lengthy opinion and much of the reasoning applies to the question at hand. In PayDay I and PayDay II, this Court was considering multiple loan agreements with varying language from not only some of the Defendants in this case but other lending companies affiliated with Webb but not named in the present case. At the time of the PayDay I decision, this Court was presented with an array of loan agreements and indeed at that time did not have in the record all of the loan agreements on which to determine whether exercise of tribal court jurisdiction over non-Indian borrowers was lawful. See PayDay I, 935 F. Supp. 2d 926. This case presents a different circumstance where loan agreements entered into by each of the Plaintiffs are in the record.

Applying the analysis under Montana to the circumstances here, this Court deems the second Montana exception—based on the inherent power of a tribe to exercise civil authority over the conduct of non-Indians on fee lands within the reservation "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare

18

of the tribe"—not to support tribal jurisdiction here. If there is tribal jurisdiction over non-Indian

borrowers obtaining loans from a private business not directly or indirectly owned by a tribe,

tribal jurisdiction would have to be based on the first <u>Montana</u> exception, under which a tribal

court would have jurisdiction based on "the activities of non-members who enter consensual

relationships with the tribe or its members, through commercial dealing, contracts, leases, or

other arrangements." <u>Montana</u>, 450 U.S. at 565; <u>PayDay I</u>, 935 F. Supp. 2d at 936.

The problem in applying this <u>Montana</u> exception to the Plaintiffs is twofold.  First, the

<u>Montana</u> exception at issue concerns consensual relationships "with the tribe or its members."

<u>Montana</u>, 450 U.S. at 565; <u>PayDay I</u>, 935 F. Supp. 2d at 936.  Defendant Webb is a member of

the Cheyenne River Sioux Tribe, but none of the Plaintiffs entered into a contract with him.  The

entity with which Plaintiffs entered into contracts for high-interest loans was Western Sky

Financial LLC, which is a South Dakota limited liability corporation with a license from the

Cheyenne River Sioux Tribe to do business and with its principal place of business on the

Cheyenne River Indian Reservation.  Neither of the other two Defendants—CashCall, Inc. or WS

Funding LLC—appear to have any connection with the Cheyenne River Sioux Tribe, other than

through consenting to tribal court jurisdiction in a contract with Western Sky Financial LLC.

The Plaintiffs did not enter into any contract with CashCall, Inc. or WS Funding LLC.  As noted

in <u>PayDay I</u>, PayDay Financial LLC and Western Sky Financial LLC, for purposes of diversity

jurisdiction, would be deemed citizens of the state of South Dakota.  <u>PayDay I</u>, 935 F. Supp. 2d

at 936-37 (citing 28 U.S.C. § 1332(c)(1)); <u>Lincoln Prop. Co. v. Roche</u>, 546 U.S. 81, 88-89

(2005).  South Dakota limited liability companies are considered distinct from their owner.

<u>PayDay I</u>, 935 F. Supp. 2d at 937 (citing <u>Brevet Int'l, Inc. v. Great Plains Luggage Co.</u>, 604

19

N.W.2d 268, 273 (S.D. 2000); and Kansas Gas & Elec. Co. v. Ross, 521 N.W.2d 107, 111 (S.D. 1994)). In deciding not to reach the question of whether tribal court jurisdiction over non-Indian borrowers existed based on loan agreements with lending companies including PayDay Financial LLC and Western Sky Financial LLC, this Court in PayDay I observed that the "record is devoid at this time of information as to what it means for a business to be 'licensed' by the Cheyenne River Sioux Tribe." PayDay I, 935 F. Supp. 2d at 937. This Court considered that point important in deciding if the lending companies conceivably could be considered "tribal members" under the Montana exception. Id.

Thereafter, the FTC and the defendants in that case filed pleadings making additional arguments regarding jurisdiction. In PayDay II, this Court was "skeptical that South Dakota limited liability companies merely licensed with the Cheyenne River Sioux Tribe become tribal members and thereby can invoke tribal court jurisdiction over the consumers under the language of the consumer loan agreements." PayDay II, 2013 WL 5442387, at *15. However, this Court referred back to another of its cases—J.L. Ward Associates, Inc. v. Great Plains Tribal Chairman's Health Board, 842 F. Supp. 2d 1163, 1171-77 (D.S.D. 2012)—that evaluated circumstances under which an entity created under state law by various tribes could in fact be considered a tribal entity. Similarly, the Defendants in the present case cite a trio of cases from either the Supreme Court of South Dakota or this Court under which South Dakota corporations were treated as if tribal members. Two of those cases—Giedosh v. Little Wound School Board, Inc., 995 F. Supp. 1052 (D.S.D. 1997), and Sage v. Sicangu Oyate Ho, Inc., 473 N.W.2d 480 (S.D. 1991)—involved not-for-profit South Dakota companies established by tribes or tribal members to operate schools funded through contracts with federal government agencies for the

education of Indian students in Indian country. The entity at issue in J.L. Ward similarly was a not-for-profit corporation established by a group of tribes to work with the federal government in providing for health care needs of tribal members. J.L. Ward, 842 F. Supp. 2d at 1164-65. Although J.L. Ward, Geidosh and Sage stand for the proposition that a corporate entity could be considered to have rights of a tribal member, the involvement of the tribes and federal government in entities established by tribes to serve tribal members has much closer parallel to functions of a tribe than does the subprime for-profit business of PayDay Financial LLC and Western Sky Financial LLC, neither of which were making loans to Cheyenne River Sioux Tribe members or in South Dakota at all.

The third case cited by the Defendants for the proposition that a corporation may be characterized as having rights of a tribal member—Pourier v. South Dakota Department of Revenue, 658 N.W.2d 395 (S.D. 2003), vacated in part on other grounds, 674 N.W.2d 314—is more difficult to distinguish. In Pourier, the Supreme Court of South Dakota concluded that a South Dakota corporation whose sole shareholder was a member of the Pine Ridge Indian Reservation and who, having been licensed by the Oglala Sioux Tribe, conducted a bulk fuel business on the reservation for the benefit of tribal members was "an enrolled member for the purpose of protecting tax immunity." 658 N.W.2d at 404. In reaching that conclusion, the Supreme Court of South Dakota recognized that it was reaching a holding contrary to Baraga Products, Inc. v. Commissioner of Revenue, 971 F. Supp. 294, 296-97 (W.D. Mich. 1997). Pourier is a state court decision, from a court much respected by this Court, concerning a state tax question. Determination of tribal court jurisdiction are federal, and not state, law questions. Plains Commerce Bank, 554 U.S. at 324. On questions of who or what is and is not a tribal

21

member, deference to a tribal court is proper. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 n.32 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."). Thus, given the uncertainty as to whether lending companies licensed by the Cheyenne River Sioux Tribe and located on the reservation could be considered somehow a "member" of the tribe within the meaning of the first Montana exception, this Court, despite its skepticism expressed in PayDay II, left it open for the parties to present testimony to this Court on whether any Defendant other than Webb somehow qualified as a member. PayDay II, 2013 WL 5442387, at *15.

As noted in PayDay I, there is a second problem with the exercise of tribal court jurisdiction over the Plaintiffs and those whom the Plaintiffs wish to represent in this class action suit. That is, the Supreme Court in Montana prefaced both Montana exceptions with the statement that "tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations*, even on non-Indian fee lands." Montana, 450 U.S. at 565 (emphasis added). Language from the Supreme Court decision in Plains Commerce Bank appeared to emphasize that "Montana and its progeny permit tribal regulation of *nonmember conduct inside the reservation* that implicates the tribe's sovereign interests." Plains Commerce Bank, 554 U.S. at 332 (emphasis added). The Supreme Court in Plains Commerce Bank noted that the first Montana exception involved "regulation of non-Indian activities *on the reservation* that had a discernable effect on the tribe or its members." Id. (emphasis added); see also Hornell Brewing Co. v. Rosebud Sioux Tribal Court, 133 F.3d 1087, 1091 (8th Cir. 1998) (holding that "[n]either Montana nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservation*.").

22

The "starting point" for an analysis of whether tribal jurisdiction over a nonmember under Montana exists is "to examine the specific conduct the . . . claims seek to regulate." Attorney's Process, 609 F.3d at 937; PayDay I, 935 F. Supp. 2d at 938. "The Montana exceptions focus on 'the *activities* of non-members' or 'the *conduct* of non-Indians.'" Attorney's Process, 609 F.3d at 937 (quoting Plains Commerce Bank, 554 U.S. at 329-30). Ultimately, to sustain tribal court jurisdiction, the tribe or tribal member must show that the activities or conduct sought to be regulated through adjudication occurred "inside the reservation." PayDay I, 935 F. Supp. 2d at 938 (quoting Attorney's Process, 609 F.3d at 940).

This Court in PayDay I observed that another federal court in Colorado v. Western Sky Financial LLC, 845 F. Supp. 2d 1178 (D.Colo. 2011), refused to enforce the provision in the loan agreement that subjected the contract "solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation[,]" because the non-member did not engage in on-reservation activity. PayDay I, 935 F. Supp. 2d at 941. The District of Colorado, however, had looked exclusively at the transaction only in the light most favorable to the borrower in reasoning:

> The borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing defendants' website. They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts. The impact of the allegedly excessive charges was felt in Colorado. Defendants have not denied that they were doing business in Colorado for jurisdictional purposes, nor does it appear that they could.

Western Sky Financial LLC, 845 F. Supp. 2d at 1181.  Seeking to consider the entirety of the

transaction in PayDay I, this Court summarized the side of the transaction overlooked by the

Colorado district court as follows:

> The Lending Companies do not leave their reservation in South
> Dakota as a part of the transaction.  Rather, the Borrower applies
> online to Lending Companies by electronically transmitting [his
> or her] application to the reservation in South Dakota.  The
> Lending Companies assess on the reservation in South Dakota
> whether the Borrowers should receive a loan.  The contract
> apparently forms on the reservation in South Dakota when the
> Lending Companies accept a Borrower's application.  The
> Lending Companies advance funds from the bank on the
> reservation in South Dakota and any funds are transferred
> electronically from there.  The impact of any default by the
> borrower is felt on the reservation in South Dakota.  The
> Borrower enters into a contract that contains a consent to
> resolution of any dispute on the reservation and selects the
> application of tribal law to govern any dispute.

PayDay I, 935 F. Supp. 2d at 941.  The circumstances of the lending companies' side of the

transaction may be a bit different than set forth above, especially in considering the agreement

that exists with WS Funding LLC, a subsidiary of CashCall, Inc.  The focus must be upon "the

activities of the non-members," that is, "the conduct of the non-Indians" on the reservation.  See

Plains Commerce Bank, 534 U.S. at 329-30; Attorney's Process, 609 F.3d at 937; Hornell

Brewing Co., 133 F.3d at 1091.  The borrower certainly does not enter onto a reservation, but

in today's modern world of business transactions through internet or telephone, requiring physical

entry on the reservation particularly in a case of a business transaction with a consent to

jurisdiction clause, seems to be requiring too much.  See PayDay I, 935 F. Supp. 2d at 939-40.

Ultimately, this Court returns to its conclusion in PayDay II on the subject of tribal court

jurisdiction over the borrowers, which was:

24

> This Court is skeptical that South Dakota limited liability companies merely licensed with the Cheyenne River Sioux Tribe become tribal members and thereby can invoke tribal court jurisdiction over the consumers under the language of the consumer loan agreements . . . . The parties can present testimony on whether any defendant other than Webb somehow is a "member" of a tribe within the meaning of the first <u>Montana</u> exception.

PayDay II, 2013 WL 5442387, at *15. This Court is equally skeptical that the borrowers' on-reservation conduct is sufficient to justify a <u>Montana</u> exception to the general principle that the tribe lacks legal authority over non-members. <u>See</u> <u>Plains Commerce Bank</u>, 554 U.S. at 328.

Putting the question of tribal jurisdiction in the greater context of this case, this Court must be mindful of the doctrine of tribal court exhaustion. The exception to tribal court exhaustion that the Plaintiffs appear to invoke is that jurisdiction would be "patently violative of express jurisdictional prohibitions." <u>See</u> <u>Bruce H. Lien</u>, 93 F.3d at 1420 n.14 (citing <u>Nat'l Farmers</u>, 471 U.S. at 856 n.21). This exception to the tribal court exhaustion doctrine "refers to specific prohibitions on designated tribal remedies or to prohibitions on a tribal forum's assertion of jurisdiction over a dispute." <u>Reservation Tel. Coop. v. Three Affiliated Tribes</u>, 76 F.3d 181, 185 (8th Cir. 1996); <u>Plains Commerce Bank</u>, 910 F. Supp. 2d at 1197. A party seeking to invoke the express jurisdictional prohibition to the tribal court exhaustion rule bears a responsibility to show its applicability. <u>Plains Commerce Bank</u>, 910 F. Supp. 2d at 1197 (quoting <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d 1498, 1502 (10th Cir. 1997)). "[T]ribal courts rarely lose the first opportunity to determine jurisdiction because of an 'express jurisdictional prohibition.'" <u>Kerr-McGee Corp.</u>, 115 F.3d at 1502. The majority of cases applying the "express jurisdictional prohibition" exception involve statutes that grant the federal government exclusive jurisdiction.

25

See N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty., 991 F.2d 458, 463 (8th Cir. 1993); Blue Legs v. United States Bureau of Indian Affairs, 867 F.2d 1094, 1097-98 (8th Cir. 1989); Deborah F. Buckman, Annotation, Construction and Application of Federal Tribal Exhaustion Doctrine, 186 A.L.R. Fed. 71 § 11 (2003); see also Plains Commerce Bank, 910 F. Supp. 2d at 1197-98.

Here, the Court's skepticism about tribal court jurisdiction is not sufficient to establish that invocation of tribal court jurisdiction is "patently violative of express jurisdictional prohibitions." Thus, under these peculiar circumstances, the Court thinks it best to stay this action and hold it in abeyance with a directive that the Defendants file a tribal court action within thirty (30) days hereof to present for tribal court exhaustion the question of whether tribal court jurisdiction exists over the Plaintiffs. Again, tribal court jurisdiction over non-members ultimately is an issue of federal law. Nat'l Farmers, 471 U.S. at 855-56. With the possibility that this Court will be revisiting this issue, this Court exercises its discretion to stay the case and hold it in abeyance. Id. at 857 (deferring to district court on question of whether dismissal or abeyance of action is proper to allow tribal court exhaustion).

Although no party addressed the issue, the loan agreement and in turn the forum-selection clause and arbitration agreement, exists between only the Plaintiffs and Western Sky Financial LLC. PayDay Financial LLC is the member and founder of Western Sky Financial LLC and both entities are affiliated with tribal member Webb. There seems little reason to parse out the claim against Western Sky Financial LLC only in requiring tribal court exhaustion, particularly where Plaintiffs assert a civil conspiracy involving each of those defendants.

CashCall, Inc. and WS Funding LLC did not enter into loan agreements with the Plaintiffs, and appear to have no legitimate argument to be considered tribal members or in any way affiliated with the Cheyenne River Sioux Tribe. However, the Agreement for Assignment and Purchase of Promissory Notes between Western Sky Financial LLC and WS Funding LLC, a subsidiary of CashCall, Inc., which agreement forms the basis for the Plaintiffs naming those California Defendants in this suit, contains provisions that both make that agreement "governed solely by the laws and jurisdiction of the Cheyenne River Sioux Tribe" and further provides a "consent to the sole jurisdiction of the courts of the Cheyenne River Sioux Tribe exclusively." Doc. 51-1 at 6. Neither CashCall, Inc. nor WS Funding LLC object in their pleadings to having the Cheyenne River Sioux Tribal Court decide its jurisdiction over all claims in this case in the first instance.

### D.    Motions Concerning Arbitration

Defendants filed a Motion to Stay Proceedings and Compel Arbitration, Doc. 23, as an alternative to their Motion to Dismiss. Defendants invoke the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and point to language in each of the Plaintiffs' loan agreements requiring arbitration. Plaintiffs counter with a Motion to Stay Defendants' Motion to Compel Arbitration and to Take Discovery on Arbitration Issues. Doc. 26. Plaintiffs also oppose arbitration, arguing that, based on two other federal district court opinions, the arbitration contemplated by the loan agreements is unavailable and integral to the contract and thus cannot be enforced. Doc. 29; Doc. 31. Defendants respond by arguing to the contrary. Doc. 33; Doc. 46.

This Court in PayDay I touched in passing upon earlier versions of arbitration provisions in certain loan agreements. In PayDay I, this Court observed:

27

> Both the language of the typical loan agreement and the statements of counsel at the hearing left this Court confused as to whether the tribal court actions that Defendants have started against borrowers are supposed to be arbitrations using a tribal court judge or are tribal court suits independent from the arbitration provision of the typical loan agreement.

PayDay I, 935 F. Supp. 2d at 932. Later in the PayDay I opinion and order, this Court continued:

> This lending contract leaves Borrowers lacking the requisite foreseeability that there will be tribal court jurisdiction—as opposed to arbitration on the Reservation—and undercuts the clarity of the consent of the non-Indian Borrowers to tribal court jurisdiction as a part of a consensual arrangement where Borrowers understand that they are entering into a transaction on an Indian reservation to receive a benefit from an Indian reservation and a tribal member.

Id. at 943. The loan agreements that this Court had before it in PayDay I were from 2009 and 2010 and differed from the loan agreements that the Plaintiffs in this case entered into in 2011 and 2013. Compare FTC v. PayDay Financial LLC, et al, CIV 11-3017-RAL, Doc. 10 at 14-16, 57-60, 102-04, 112-17, 134-36, with Heldt v. PayDay Financial LLC, CIV 13-3023-RAL, Doc. 23-1, 23-2, 23-3, 23-4. Some of the language is the same, but the loan agreements into which the Plaintiffs in this case entered reconcile what previously was confusing and inconsistent language regarding arbitration versus tribal court jurisdiction.

Even though the more recent loan agreements contain clearer arbitration terms, there are problems with the language in each of the loan agreements. The loan agreements for each of the Plaintiffs contain the following provision:

> **Applicable Law and Judicial Review.** THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA,

> AND SHALL BE GOVERNED BY THE LAW OF THE
> CHEYENNE RIVER SIOUX TRIBE.

Doc. 23-1 at 6; Doc. 23-2 at 5-6; Doc. 23-3 at 5-6; Doc. 23-4 at 5-6.  The Indian Commerce

Clause is part of the Commerce Clause of the United States Constitution, which states that

Congress shall have the power to "regulate commerce with foreign Nations among the several

States, and with the Indian tribes."  U.S. Const. art I, § 8, cl. 3.  The Indian Commerce Clause,

as this Court has previously decided, does not provide a basis for tribal jurisdiction over non-

Indians.  PayDay I, 935 F. Supp. 2d at 931 n.3.  Rather, the Indian Commerce Clause provides

for federal authority, exclusive of the states, in dealing with Indian tribes.  Id.

      The loan agreements contain a "Governing Law" section providing in part:

> This Agreement is governed by the Indian Commerce Clause of
> the Constitution of the United States of America and the laws of
> the Cheyenne River Sioux Tribe . . . . You also expressly agree
> that this Agreement shall be subject to and construed in
> accordance only with the provisions of the laws of the Cheyenne
> River Sioux Tribe, and that no United States state or federal law
> applies to this Agreement.

Doc. 23-1 at 4; Doc. 23-2 at 4; Doc. 23-3 at 4; Doc. 23-4 at 4.  Thus, the loan agreements seek

to disclaim application of "federal law," presumably including the Federal Arbitration Act itself.

Even the Defendants do not take the disclaimer of federal law in this provision seriously; the

Defendants argue that the Federal Arbitration Act ought to be followed and cite to and rely upon

multiple federal court decisions in support of compelling arbitration.  Doc. 23; Doc. 33.  The

Federal Arbitration Act ought to apply to the question of arbitrability of the loan agreements.

See 9 U.S.C. § 2; Perry v. Thomas, 482 U.S. 483, 489 (1987).  The Federal Arbitration Act, 9

U.S.C. § 1 *et seq.*, applies to "written arbitration provisions in," or "arbitration agreements in"

any contract "evidencing a transaction involving commerce." Jones, 684 F. Supp. 2d at 1164 (citing 9 U.S.C. § 2). The effect of § 2 of the Federal Arbitration Act "is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). In previous litigation before this Court involving loan agreements with such federal law disclaimers, Defendants PayDay Financial LLC and Western Sky Financial LLC did not contest the applicability of federal law such as the Federal Trade Commission Act, the Fair Credit Reporting Act and the Electronic Fund Transfer Act. See PayDay I, 935 F. Supp. 2d at 931 n.2; PayDay II, 2013 WL 5442387.

The terms of loan agreements and the Defendants' arguments consistently maintain that Cheyenne River Sioux Tribe law applies to the agreement. It is of course for the Cheyenne River Sioux Tribe, its tribal courts, and its tribal council to decide what the Cheyenne River Sioux Tribe's law is. With that reservation being within the District of South Dakota, this Court has seen rulings where the Cheyenne River Sioux Tribal Court applies the typical cannons of contract construction—reading the contract as a whole, giving words used in the contract their plain and ordinary meaning, and construing ambiguities against the drafter of the contract—that this Court is comfortable proceeding further in considering the language of the arbitration agreement, particularly considering that the parties acknowledge the Federal Arbitration Act to apply.

Much of the language of the loan agreement concerns arbitration. To summarize, each of the Plaintiffs' loan agreements allows the borrower sixty days within which to opt out of the arbitration agreement. None of the Plaintiffs opted out of the arbitration agreement within sixty

days.  If the borrower does not opt out, "any dispute you [meaning the borrower] have with

Western Sky or anyone else under this loan agreement will be resolved by binding arbitration."

Doc. 23-1 at 4; Doc. 23-2 at 4; Doc. 23-3 at 4; Doc. 23-4 at 4.  Although ordinarily an arbitration

is to be between the parties to the agreement, the arbitration agreement here covers any dispute

the borrower has "with Western Sky or anyone else under this loan agreement," including "the

holder of the Note."  Under the section entitled "Arbitration Defined," the loan agreements state

in part:

> A "Dispute" is any controversy or claim between you and
> Western Sky or the holder or servicer of the Note.  The term
> Dispute is to be given its broadest possible meaning . . . . For
> purposes of this Arbitration agreement, the term "the holder" shall
> include Western Sky or the then-current note holder's employees,
> officers, directors, attorneys, affiliated companies, predecessors,
> and assigns, as well as any marketing, servicing, and collection
> representatives and agents.

Doc. 23-1 at 5; Doc. 23-2 at 5; Doc. 23-3 at 5; Doc. 23-4 at 5.  Thus, the language of the

arbitration agreement extends not only to Western Sky Financial LLC, but also to PayDay

Financial LLC and Webb as an affiliated company and an officer, and further to the California

Defendants as the alleged current note holder and its affiliated company.  The broad definition

of "Dispute" would encompass claims such as these made in the Amended Complaint.

The mode of arbitration, which Plaintiffs claim is unavailable, is specified in two separate

sections of the loan agreement.  In the "Agreement to Arbitrate" provision, the loan agreements

state:

> You agree that any Dispute, except as provided below [class
> action arbitration is waived and not available and further there is
> an exception for small claims adjudication in the Cheyenne River
> Sioux Tribe small claims court], will be resolved by Arbitration,

31

> which shall be conducted by the Cheyenne River Sioux Tribal
> Nation by an authorized representative in accordance with its
> consumer dispute rules and the terms of this Agreement.

Doc. 23-1 at 5; Doc. 23-2 at 5; Doc. 23-3 at 5; Doc. 23-4 at 5.  By its terms, the arbitration is to

be conducted, therefore, by "the Cheyenne River Sioux Tribal Nation by an authorized

representative in accordance with its consumer dispute rules."  There are two problems here: first,

the Cheyenne River Sioux Tribe does not have "consumer dispute rules;" and, second, at least

with respect to a previous arbitration, the arbitrator chosen was not an "authorized representative"

of the Cheyenne River Sioux Tribal Nation.  See Inetianbor v. CashCall, Inc., 962 F. Supp. 2d

1303, 1307-09 (S.D. Fla. 2013) (deeming arbitration not available because arbitration chosen by

Webb was not authorized tribal representative and no consumer dispute rules exist).  Based on

Inetianbor, another federal district court has concluded that the arbitration contemplated by the

arbitration agreement is not available.  Jackson v. PayDay Financial LLC, 11C9288 (N.D. Ill.

August 28, 2013); Doc. 29-1.

The 2011 version of the loan agreement used by Western Sky Financial into which all

Plaintiffs except Heldt entered contains "Choice of Arbitrator" language stating:

> Arbitration shall be conducted in the Cheyenne River Sioux
> Tribal Nation by a panel of three Tribal Elders and shall be
> conducted in accordance with the Cheyenne River Sioux Tribal
> Nation's consumer rules and the terms of this Agreement.

Doc. 23-2 at 5; Doc. 23-3 at 5; Doc. 23-4 at 5.  The term "tribal elder" is not defined in the loan

agreement.  In the culture of the Lakota Nation of Native Americans of which the Cheyenne River

Sioux Tribe is a part, a "tribal elder" generally means a tribal member of advancing age who

deserves respect.  The 2011 loan agreements thus contain an inconsistency in that the "Agreement

to Arbitrate" provision appear to contemplate a single individual—"an authorized representative"
of the Cheyenne River Sioux Tribal Nation—whereas the "Choice of Arbitrator" provision
specifies "a panel of three Tribal Elders."  Under either provision, the arbitrator or arbitrators is
to apply the Cheyenne River Sioux Tribal Nation's consumer rules, which do not exist.

The 2013 loan agreement into which Plaintiff Heldt entered eliminates the "three Tribal
Elders" panel of arbitrators and substitutes the following provision:

> Regardless of who demands arbitration, you shall have the right
> to select any of the following arbitration organizations to
> administer the arbitration: the American Arbitration Association
> . . . ; JAMS . . . or an arbitration organization agreed upon by you
> and the other parties to the Dispute.  The arbitration will be
> governed by the chosen arbitration organization's rules and
> procedures applicable to consumer disputes, to the extent that
> those rules and procedures do not contradict either the law of the
> Cheyenne River Sioux Tribe or the express terms of this
> Agreement to Arbitrate, including the limitations on the
> Arbitrator below.

Doc. 23-1 at 5.  The language of the Heldt loan agreement leaves a slightly different conundrum.
Under the "Agreement to Arbitrate" provision, the arbitration "shall be conducted by the
Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its
consumer dispute rules and the terms of this Agreement."  Doc. 23-1 at 5.  Yet, the "Choice of
Arbitrator" provision gives Heldt the right to select the American Arbitration Association, JAMS,
or another organization and to have those rules and procedures apply to the extent they do not
contradict the terms of the arbitration agreement or the tribe's laws.  The American Arbitration
Association maintains a national roster of arbitrators and appoints arbitrators therefrom.  JAMS
likewise has a panel of "more than 250 full-time neutrals."  JAMS Arbitration Practice,
www.jamsadr.com/adr-arbitration (last visited Mar. 29, 2014).  No party to this lawsuit presented

33

any information that any "authorized representative" of the Cheyenne River Sioux Tribal Nation

is an arbitrator in the AAA or JAMS system.

The Federal Arbitration Act establishes a "liberal federal policy favoring arbitration

agreements[.]" Moses H. Cone, 460 U.S. at 24. Generally then, arbitration clauses are enforced,

including requiring arbitration in the forum specified. There are instances, however, where the

arbitration forum specified in the arbitration agreement is unavailable. Few courts have addressed

such a situation, but this Court is one of them. Jones, 684 F. Supp. 2d 116; see also Reddam v.

KPMG LLP, 457 F.3d 1054 (9th Cir. 2006), overruled on other grounds by Atl. Nat'l Trust LLC

v. Mt. Hawley Ins. Co., 621 F.3d 931, 940 (9th Cir. 2010); Brown v. ITT Consumer Fin. Corp.,

211 F.3d 1217 (11th Cir. 2000); In re Salomon, Inc. Shareholders' Derivative Litig., 68 F.3d 554

(2nd Cir. 1995). In Jones, this Court chose to follow the approach in Brown and Reddam for what

to do when the forum or means specified for arbitration do not exist. Jones, 684 F. Supp. 2d at

1166. As this Court reasoned in Jones:

> When the reference to arbitration rules or an arbitration forum
> [in the arbitration agreement] is merely "an ancillary or logistical
> concern," the application of Section 5 [of the Federal Arbitration
> Act] to appoint a different arbitrator does not do violence to the
> intentions of the parties. By contrast, when the choice of
> arbitration forum was integral to the agreement, such that the
> parties would not have agreed upon an arbitration absent the
> selected forum, application of Section 5 to appoint a substitute
> arbitrator is more problematical. After all, despite the "liberal
> federal policy favoring arbitration agreements," Moses H. Cone,
> 460 U.S. at 24, the Court must be mindful of the parties'
> intentions as expressed in the terms of an arbitration agreement.
> Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 53-
> 54 (1995) (noting that the "central purpose" of the FAA is "to
> ensure that private agreements to arbitrate are enforced
> according to their terms.")[.]

34

Id. at 1166.

Thus, at this point, the questions for the Court are if the type of arbitration specified in the loan agreements is unavailable, and, if so, whether the forum or procedure specified was "integral" to the agreement between the parties. The Southern District of Florida in Inetianbor concluded both that the arbitration contemplated by the loan agreement in that case was unavailable and that the selection of the tribe was integral to the case. Inetianbor, 962 F. Supp. 2d at 1307-09. The Northern District of Illinois in Jackson deemed arbitration to be unavailable under the agreement, but did not address whether arbitration was integral. Doc. 29-1. This Court presently does not have in the record clarity as to what version of the loan agreement was involved in either Inetianbor or Jackson. There are two separate versions of the arbitration agreement into which these plaintiffs entered, and this Court has seen multiple versions of other loan agreements from two of the existing defendants and from other entities with whom they were affiliated. Moreover, the courts in neither Inetianbor nor Jackson had issues of tribal court exhaustion or tribal court jurisdiction presented. Clarity on what does and does not exist in the Cheyenne River Sioux Tribe would have been helpful to the judge in Inetianbor. Varying information from the Cheyenne River Sioux Tribe about arbitration caused the judge in Inetianbor first to rule that there was no available arbitration forum, then to rule that there was in fact an available arbitration forum, and then to reverse course again to rule that there is not an available arbitration forum within the meaning of whatever loan agreement was involved in Inetianbor.

The question remains whether it should be for the tribal court in the first instance under the doctrine of tribal court exhaustion to rule on the enforceability or lack of enforceability of the arbitration provision. Tribal court exhaustion of questions involving tribal court jurisdiction or

35

the status of South Dakota limited liability corporations as possible tribal members is easier to

justify than tribal court exhaustion regarding the enforceability of an arbitration agreement that

all parties appear to recognize as being governed by the Federal Arbitration Act.  The principles

of tribal court exhaustion as set forth in National Farmers, 471 U.S. 845 apply with greater force

to issues of tribal court jurisdiction which directly impact tribal sovereignty and autonomy than

to issues of enforceability of an arbitration agreement in a private contract.  The purpose of tribal

court exhaustion is to support and respect tribal self-governance.  Id. at 856.  Thus the underlying

rationale of tribal court exhaustion is:

> That policy favors a rule that will provide the forum whose
> jurisdiction is being challenged the first opportunity to evaluate
> the factual and legal bases for the challenge.  Moreover the
> orderly administration of justice in the federal court will be
> served by allowing a full record to be developed in the Tribal
> Court before either the merits or any question concerning
> appropriate relief is addressed.   The risks of the kind of
> "procedural nightmare" that has allegedly developed in this case
> will be minimized if the federal court stays its hand until after
> the Tribal Court has had a full opportunity to determine its own
> jurisdiction and to rectify any errors it might have made.
> Exhaustion of tribal court remedies, moreover, will encourage
> tribal courts to explain to the parties the precise basis for
> accepting jurisdiction, and will also provide other courts with the
> benefit of their expertise in such matters in the event of further
> judicial review.

Id. at 856-57 (footnotes omitted).   Although these principles of tribal court exhaustion

contemplate issues of tribal court jurisdiction and not issues of enforcement of an arbitration

agreement under the Federal Arbitration Act, the unique circumstances of this case could give rise

to the sort of "procedural nightmare" and lack of "orderly administration of justice" that tribal

court exhaustion is supposed to avert.  See id.  This Court has determined that tribal court

exhaustion on the question of the jurisdiction of the Cheyenne River Sioux Tribal Court ought to occur. Questions concerning the enforceability of the arbitration provision, in this Court's opinion, involve certain factual considerations on which this Court would be inclined to conduct an evidentiary hearing, including allowing the parties the opportunity to present, with regard to Heldt's arbitration clause, evidence on whether any member of the Cheyenne River Sioux Tribe is such a JAMS or AAA arbitrator and whether that arbitrator might be considered an "authorized representative of the Cheyenne River Sioux Tribal Nation." There also appears to be fact issues concerning what "an authorized representative of the Cheyenne River Sioux Tribal Nation" is, which arguably is best decided by the Cheyenne River Sioux Tribal Court. Ultimately, questions of enforceability of the arbitration clauses may well be for this Court to decide, but at this time it is prudent to defer ruling on the arbitration clauses until tribal court exhaustion occurs.

### E. Personal Jurisdiction over California Defendants

Part of Defendants' Motion to Dismiss Amended Complaint challenges the existence of personal jurisdiction over the California Defendants in South Dakota. The California Defendants do not raise at this point any argument that the Cheyenne River Sioux Tribal Court lacks jurisdiction over them, join in the argument that the tribal court should consider the case first, and entered into an Agreement for Assignment and Purchase of Promissory Notes consenting to tribal court jurisdiction and venue. Doc. 51-1 at 6. This Court deems it proper to defer ruling on the challenge to personal jurisdiction pending tribal court exhaustion.

### III. Order

For the reasons explained above, it is hereby

37

ORDERED that Defendants' Motion to Dismiss Amended Complaint, Doc. 34, is denied without prejudice, although the Court determines that tribal court exhaustion ought to occur. It is further

ORDERED that Defendants' Motion to Stay Proceedings and Compel Arbitration, Doc. 23, is granted in part in that the Court is going to stay proceedings pending tribal court exhaustion and denied in part in that the Court is not going to compel arbitration at this time. It is further

ORDERED that Plaintiffs' Motion to Stay Defendants' Motion to Compel Arbitration and Take Discovery on Arbitration Issues, Doc. 26, is granted in part in that the case is stayed and a ruling compelling arbitration is not being made at this time, but is otherwise denied without prejudice. It is further

ORDERED that Defendants, as the parties asserting that there is tribal court jurisdiction and that there ought to be tribal court exhaustion, must file within thirty (30) days of the date of this Order a declaratory judgment action in the Cheyenne River Sioux Tribal Court naming the Plaintiffs herein to address to that court the issue of tribal court jurisdiction and if that court concludes it has jurisdiction, and the availability of an arbitration forum as specified in the loan agreements in this case. In such a tribal court action, Plaintiffs of course may contest tribal court jurisdiction and assert their arguments as the unavailability of an arbitration forum as specified in the agreements without waiving their assertion that there is no tribal court jurisdiction. It is finally

ORDERED that the parties keep this Court advised of proceedings in the Cheyenne River Sioux Tribal Court by filing upon the conclusion of any tribal court proceedings and/or appeals,

38

all pleadings filed by any party and all rulings by the tribal court as an attachment to an affidavit or stipulation.

Dated March 31st, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

39