

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

**FILED**

JAN 0 8 2016

CLERK

| | |
|---|---|
| CHAD MARTIN HELDT, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED INDIVIDUALS; CHRISTI W. JONES, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED INDIVIDUALS; SONJA CURTIS, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED INDIVIDUALS; AND CHERYL A. MARTIN, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED INDIVIDUALS, <br><br> Plaintiffs, <br><br> vs. <br><br> PAYDAY FINANCIAL, LLC, d/b/a LAKOTA CASH d/b/a BIG SKY CASH; WESTERN SKY FINANCIAL, LLC, d/b/a WESTERN SKY FUNDING, d/b/a WESTERN SKY, d/b/a WESTERNSKY.COM; CASHCALL, INC., A CALIFORNIA CORPORATION; AND WS FUNDING, LLC, A WHOLLY OWNED SUBSIDIARY OF CASHCALL, INC., <br><br> Defendants. <br><br> and <br><br> THOMAS BROWN, MONICA JOHNSON, MELINDA LONG, RENEE HOLMES, KEVIN HAYES, LESLIE JON LYDON, ELIZABETH JACKSON, ABRAHAM INETIANBOR, JAMES BINKOWSKI, JEFFREY MOORE, LISA WALKER, DEBERA GRANT, AND JAMES HAYES, <br><br> Intervenors. | 3:13-CV-03023-RAL <br><br><br><br><br><br> OPINION AND ORDER LIFTING STAY AND DENYING WITHOUT PREJUDICE MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT |

1

The above-named Plaintiffs and Defendants (jointly "the Parties"), on November 4, 2015, have filed a Joint Motion to Lift Stay and for Preliminary Approval of Class Settlement. Doc. 64. At the Parties' request, this Court originally set a hearing to occur on November 20, 2015. Doc. 69. A number of governmental and private parties objected to the proposed class certification and requested that this Court delay consideration of the motion. Docs. 73, 74, 75, 76, 77, 82. This Court postponed the hearing and reset the hearing for December 18, 2015, in an effort to accommodate the Parties, objectors, and intervenors and to allow for fair consideration of the pending motion. Docs. 79, 88. Three days before the December 18 hearing, one of the named Plaintiffs—Christi W. Jones—filed her own objection to Preliminary Approval of Class Settlement through separate counsel and a supporting declaration. Docs. 96, 96-1. Also on December 15, the Parties filed a Notice of Amendments to Stipulation and Agreement of Settlement with two addenda altering the settlement terms in a manner designed to address misgivings that prompted objections from the Federal Trade Commission (FTC) and certain state officials. Docs. 97, 97-1.

On December 18, 2015, this Court conducted a lengthy hearing to consider argument from counsel for Plaintiffs Heldt, Curtis, and Martin; separate counsel for Jones; Defendants' counsel; and counsel for the Intervenors. Doc. 113. This Court lifted the stay it had entered, questioned each counsel to probe factual and legal issues, and ultimately provided some of its thoughts to counsel about the need for additional information to justify any possible order approving a national class and preliminary settlement. Doc. 113. Both before the December 18 hearing and afterwards, this Court has given considerable thought to the pending motion and believes it best to rule on the pending motion as a means of providing written guidance as to

what might be necessary to justify grant of class certification and preliminary approval of any settlement.

## I.     Procedural History

Plaintiffs filed a Class Action Complaint in this case on July 11, 2013, seeking declaratory, injunctive, and monetary relief against the Defendants. Doc. 1. Plaintiffs alleged that Defendants had charged illegal and usurious interest rates and used deceptive and misleading marketing and loan documents as part of a program to make fast and low-barrier loans to financially weak and desperate people. Doc. 1. Plaintiffs alleged that Defendants charged effective annual percentage rates of between 89.68% and 342.86%. Doc. 1. The four named Plaintiffs—two of whom are from Texas, with the other two from Minnesota and Virginia—alleged a civil conspiracy, violation of usury laws of their home states, and violations of certain of their home state consumer protection laws. Doc. 1. The Plaintiffs sought certification of a national class and subclasses for the three states in which they reside. Doc. 1. Through an Amended Class Action Complaint, Plaintiffs added as a Defendant WS Funding, LLC, a wholly owned subsidiary of CashCall, Inc. Doc. 30.

This is not the first case before this Court involving the Defendants' subprime lending programs. This Court previously has authored two lengthy opinions in a case brought by the FTC against certain of these Defendants and other related parties. FTC v. Payday Fin., LLC (Payday I), 935 F. Supp. 2d 926 (D.S.D. 2013); FTC v. Payday Fin., LLC (Payday II), 989 F. Supp. 2d 799 (D.S.D. 2013). In Payday II, this Court, among other things, held that certain loan agreements violated the Electronic Funds Transfer Act, that certain wage assignments violated the Credit Practices Rule although other assignments did not, that certain wage garnishment packets were deceptive, and that disgorgement of interest, finance charges, and fees was an

3

appropriate remedy under the FTC Act. 989 F. Supp. 2d at 799–822. Although this Court became very familiar with the loan program operated by Defendant Payday Financial, LLC through the FTC litigation, that case did not involve the role of CashCall, Inc. or WS Funding, LLC, or the effect of state usury laws.

This also is not the first time that this Court has considered legal and factual issues in this case. On March 31, 2014, this Court issued a lengthy Opinion and Order on Pending Motions, which discussed at length the venue selection provision in Plaintiffs' loan agreements selecting Cheyenne River Sioux Tribal Court, the issues of tribal court exhaustion and jurisdiction, and the varying arbitration provisions in the loan agreements. Heldt v. Payday Fin., LLC, 12 F . Supp. 3d 1170 (D.S.D. 2014). Although expressing skepticism about the existence of any tribal court jurisdiction over non-Indian borrowers and about the enforceability of certain arbitration provisions, this Court determined that the tribal court exhaustion doctrine justified allowing the tribal court to rule first. Id. at 1180–93. Accordingly, this Court denied Defendants' motion to dismiss, refused to compel arbitration at that time, stayed this case, and directed the Defendants to file a tribal court action within thirty days. Id. at 1193–94. This Court also ordered "that the parties keep this Court advised of proceedings in the Cheyenne River Sioux Tribal Court by filing upon the conclusion of any tribal court proceedings and/or appeals, all pleadings filed by any party and all rulings by the tribal court as an attachment to an affidavit or stipulation." Id. The parties have not filed any such pleadings, but have provided information on what has occurred since this Court entered a stay in this case.

4

## II.    Summary of Settlement Agreement Terms and Related Facts[1]

Defendants initiated a suit in the Cheyenne River Sioux Tribal Court to seek a declaratory judgment on whether there was tribal court jurisdiction over non-Indian borrowers like the Plaintiffs.   The parties engaged in discovery, "during which [P]laintiffs have taken various depositions and received nearly 12,000 pages of documents."   Doc. 64 at 5.   The parties participated in two mediation sessions, one on June 9, and the other on July 14, 2015.   Doc. 64 at 5.    The parties then reached a Stipulation and Agreement of Settlement ("Settlement Agreement"), which called for dismissal of the tribal court action and the filing of the motion now under consideration.   Doc. 64 at 5.

The Settlement Agreement contemplated certification of a national class consisting of:

All individuals who obtained a loan from Western Sky that was subsequently purchased by WS Funding at any time between February 10, 2010, and September 8, 2013.

Doc. 64 at 14; Doc. 64-3 at 10.   The proposed national class would include approximately 348,000 individuals from 47 states and the District of Columbia.   Doc. 64 at 15–16; Doc. 64-3 at 10.   The primary benefits that class members would receive under the proposed Settlement Agreement are:

1.  "Modification of interest rate on outstanding loans to 18%"[2] automatically for "Settlement Class Members with outstanding loan(s) at interest rates above 18%," which is estimated to be a $32 million benefit to such individuals. Doc. 64 at 2, 6; Doc. 64-3 at 11–12.

2.  Automatic "[c]redit history repair" for all Settlement Class Members.   Doc. 64 at 2; Doc. 64-3 at 11.

---

[1]This Opinion and Order incorporates as "related facts" certain representations made by various counsel.  Many of these "facts" have not been placed into the record by affidavit or other sworn testimony and by no means reflect judicial findings of fact.

[2]The December 15, 2015 addenda lowers this rate to the state's usury cap for those borrowers in states where the usury rate is below 18%.  Doc. 97 at 2; Doc. 97-1.

3. Cash awards from a $7 million settlement fund established by CashCall, Inc. "tied to how much money the Settlement Class Member paid on her or his loan above 18% [interest], with a minimum payment of $15.00" on a claims made basis. Doc. 64 at 2; Doc. 64-3 at 12–13.

Given the nature of subprime lending and the Defendants' lending program, many of the loans made by the Defendants proved to be altogether uncollectible. During the hearing, the Parties revealed that approximately 170,000[3] individuals could qualify for a cash award from the $7 million settlement fund and that the Defendants had collected approximately $64 million in interest payments above 18% as of August of 2015 from those borrowers. Thus, at least 178,000 class members did not pay interest above the 18% level. CashCall, Inc. was funding the loans, has been described as the "deep pocket," and apparently is the only remaining Defendant with assets of significance. Despite being described "deep pocket," CashCall, Inc. itself apparently was paying interest at 18% on money it borrowed to fund the program, presumably because of risks inherent in subprime lending.

The Settlement Agreement's 18% interest rate reduction on remaining loans[4] and for calculation of the cash awards, according to what counsel for the parties said at the hearing, came from the fact that the usury cap in several states is 18% interest and that is the rate CashCall, Inc. paid on certain monies it borrowed to fund the program. The Intervenors pointed out that the Cheyenne River Sioux Tribe's Law and Order Code made it unlawful to charge more than 18% interest on any loan for more than $100. The loan agreements selected Cheyenne River Sioux Tribal law to govern; ironically Payday Financial, LLC originated these loans from Timber Lake, South Dakota and is a South Dakota limited liability corporation, yet did not choose South

---

[3]The 348,000 borrowers took out some 384,278 loans. Doc. 64 at 15–16. This Court is unclear if there are 170,000 loans on which interest over 18% was collected or 170,000 borrowers who paid interest above 18%. Either way, the analysis remains similar.

[4]The interest rate would be lower for borrowers in states with lower usury rates or where state litigation has resulted in Defendants agreeing to a lesser rate. Doc. 97 at 2; Doc. 97-1.

Dakota law—where there is no usury restriction at all—to govern. Thus, Defendants appear to have little argument to support charging an interest rate greater than 18% on the loans at any rate.

The Settlement Agreement called for each of the four Plaintiffs to receive a $5,000 payment for their time and trouble in participating in the litigation, subject to this Court's approval. Doc. 64-3 at 13. Plaintiffs' lawyers would receive up to $3.5 million under the Settlement Agreement, subject to this Court's approval. Doc. 64-3 at 13.

The Settlement Agreement had a broad release provision extending to all claims of class members "whether arising under local, state, federal or Indian tribal law, whether by statute, regulation, contract, common law, equity or otherwise, whether known or unknown . . . ." Doc. 64-3 at 14. After objections from the FTC and some state officials, an addendum modified the Settlement Agreement clarifying that the release is not intended to "affect any right of any Settlement Class Member to obtain any benefit in connection with any action by or with a federal or state entity." Doc. 97-1 at 5.

The Settlement Agreement naturally gives class members an opportunity to opt out of the settlement upon providing timely notice of an intent to do so, and Defendants preserved a right to withdraw from the Settlement Agreement for "excessive Opt Outs" under an "Opt-Out Limit" undefined by the Settlement Agreement but apparently negotiated between counsel for the parties. Doc. 64-3 at 21–22. For a borrower to opt out of the proposed settlement class is cumbersome:

> Requests for Exclusion. Prospective Settlement Class Members shall be given the opportunity to opt out of the Settlement Class. All requests by Settlement Class Members to be excluded must be in writing and mailed to the Claims Administrator, postmarked no later than one hundred five (105) days after entry of the Preliminary Approval Order. An appropriate written request for exclusion must be personally signed by the Settlement Class Member and must include: (i) the Settlement Class Member's name, address, telephone number; (ii) the account number(s) of the Settlement Class Member's extension of credit; (iii) an

7

affirmation that he or she is a Settlement Class Member; and (iv) the following statement: "I request to be excluded from the class settlement in this case." No Settlement Class Member, or any person acting on behalf of or in concert or participation with that Settlement Class Member, may exclude any other Settlement Class Member from the Settlement Class.

Doc. 64-3 at 20–21. For a borrower to object to the proposed settlement is even more cumbersome:

> Right to Object. Any Settlement Class Member who has not previously opted out in accordance with the terms of this Settlement may appear at the Final Fairness Hearing to argue that the proposed settlement should not be approved and/or to oppose the application of Class Counsel for an award of attorneys' fees and costs and the service awards to Plaintiffs. Any Settlement Class Member who wishes to object to the Settlement must file a written objection with the District Court no later than the date specified by subsection b of this section. The Parties will have the same right to seek discovery from any objecting Settlement Class Member as they would if they objector was a party in the Action, including the right to take the objector's deposition. Such discovery will be conducted on an expedited basis, and the objecting Settlement Class Member is required to respond and must appear for deposition within 14 days, if a deposition is noticed. Settlement Class Members who fail to timely file and serve written objections, or fail to respond to discovery demands or make themselves available for deposition, shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to this Settlement.

Doc. 64-3 at 22–23.

The Settlement Agreement set forth direct mail notice to proposed class members with a Claim Form that each class member must return to qualify for a cash award. Doc. 64-3 at 16–18. If a notice is returned within twenty days of the postmark date with a forwarding address, then the notice would be re-mailed to the new address. Doc. 64-3 at 16. Otherwise Defendants have no responsibility to seek out addresses of proposed class members whose notices are returned undeliverable. Doc. 64-3 at 16. Defendants presumably have records to identify those borrowers who have paid interest on loans above the 18% rate and how much each has paid above that level. Those who do not return claims forms and do not opt out sacrifice any ability to recoup interest paid above 18%, unless through state entity litigation, although they may

8

benefit from clearing of adverse credit report and reformation of their existing loan to an 18% interest rate, if there is an unpaid balance.

The proposed Legal Notice to proposed class members, whether intentionally or unintentionally, has aspects that may stifle cash claims. The boldface capital letters on the first page of the Legal Notice advises: **"IF YOU OBTAINED A LOAN FROM WESTERN SKY[5] THAT WAS SUBSEQUENTLY PURCHASED BY WS FUNDING, YOUR RIGHTS COULD BE AFFECTED BY A CLASS ACTION SETTLEMENT."** Doc. 64-3 at 54, 57. First, many who obtained loans from Western Sky may be unaware that their loan subsequently was purchased by WS Funding and thus may discard the notice. Second, there is no notification in boldface or capital letters of the possibility of a cash payment contingent upon return of a claim form[6] for those who had paid interest above the 18% level. The Defendants, of course, have records of those who paid interest above the 18% level, but there is no contemplation of any additional or distinct notice to alert them directly of their eligibility for a cash recovery contingent upon responding.

The long-form notice provision provides an estimate "that settlement payments will be between $15 and $100, but could be more . . . ." Doc. 64-3 at 66. Class members have a greater incentive to respond if the reward for responding appears greater. The minimum interest refund is set to be $15, which is a curious number as it would take 466,666 claimants to receive $15 to

---

[5]Western Sky was a trade name used by Payday Financial, LLC for most of its loans.
[6]This Court was concerned about confusion over how to make a claim and access of class members to their individual loan numbers to use to fill out the form. Portions of the long-form notice indicate that the proposed class members may submit the claim form by mail or internet, but other portions do not reference the fact that the proposed class members may simply return the claim form enclosed with the notice as opposed to taking an extra step of going to the website to print it. Doc. 64-3 at 65–66. Defendants advised the Court that the individual loan numbers—something proposed class members are unlikely to know—will be on the individual notice forms.

9

equal $7 million, and there reportedly are just 170,000 or so class members who paid interest in excess of 18% on the loans.[7] From a $7 million fund, 70,000 potential class members could each receive $100. From what was said at the hearing, a participation rate of eligible borrowers returning cash recovery claims forms of 50% would be unexpectedly high. The New York Attorney General implemented a process that resulted in the highest number of Defendants' loan customers in that state—some 50 to 60%—obtaining refunds of interest, while other state attorneys general either achieved lower response rates or simply chose to retain monies for their states rather than provide refunds to consumers. If every one of the 170,000 borrowers eligible for payment under the Settlement Agreement returned their cash payment claim form (which is unrealistic as some likely cannot be located at this time and inevitably many will discard the Legal Notice without reading it) the average payout would be about $41.25. If half of those borrowers returned the cash payment claim form (which would be a surprisingly high number) the average payout should be about $82.50. The apparent underestimation of payout is not explained, but the incentive to read the notice and return the form changes if the possible benefit reads to be something as low as $15, as opposed to something that looks to average at least $82.50. If there are funds remaining from the $7 million pool, the Parties can petition the Court "for appropriate distributions of such residual funds." Doc. 64-3 at 18.

Of course, the reasonableness of the $7 million amount of the cash payment fund for interest over 18% for a program in which Defendants collected $64 million of interest over 18% hinges on the solvency of the Defendants. The Parties explained that many of the Defendants now are defunct and that the remaining Defendant CashCall, Inc. has depleted resources through settlements with state attorneys general and may well not survive this year as a consequence of

---

[7]Conceivably some claimants may have paid less than $15 of interest above 18%, but that has to be a very small number of the approximately 170,000.

ongoing litigation including an enforcement action brought by the Consumer Protection Safety Bureau. However, no financial information on the Defendants has been filed.

The proposed order that the Parties desire to be entered would enjoin all parallel litigation. Doc. 64-5 at 8–9. The Intervenors report that there are class action suits pending in at least Florida, Georgia, North Carolina, Kentucky, Illinois, and Wisconsin, although none seek certification of a nationwide class. The nature and extent of all parallel actions is not clear in this record.

## III.   Preliminary Approval of a Proposed Settlement

Under Rule 23(e), the settlement of a class action requires court approval, which may issue "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Review of a proposed class action settlement generally proceeds in two stages. Fed. Jud. Ctr., Manual for Complex Litigation § 21.632 (Judge Stanley Marcus et al. eds., 4th ed. 2004). At the first stage, the court makes a "preliminary fairness evaluation" of the proposed settlement, "approves the means of notice to class members, and sets the date for that final hearing." Shoenbaum v. E.I. DuPont de Nemours & Co., 2009 WL 4782082, at *2, *4 n.4 (E.D. Mo. Dec. 8, 2009).

"At the preliminary approval stage, the 'fair, reasonable, and adequate' standard is lowered, with emphasis only on whether the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." Id. at *3; see also William B. Rubenstein, Newberg on Class Actions § 13:13 (5th ed. 2011) ("[T]he standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase."). With respect to the procedural deficiencies of a proposed settlement, courts are most concerned with the character of the settlement negotiations and the absence of

collusion.   Rubenstein, supra, § 13:14 ("The primary procedural factor courts consider in determining whether to preliminarily approve a proposed settlement is whether the agreement arose out of arms-length, noncollusive negotiations.").   Courts are less likely to find collusion when a settlement agreement was preceded by a significant period of litigation or negotiations were conducted by a third-party mediator.  Id.  "In all but very rare circumstances," a proposed settlement should not trigger judicial action against parallel litigation.  Id. § 13.19 (noting that the presence of a provision enjoining parallel litigation "is evidence that the parties are settling the present case precisely to enjoin collateral litigation, a practice that raises a red flag about whether the present settlement is a collusive suit aimed at foreclosing a stronger suit in the collateral forum").   Rubenstein's treatise explains that "the single situation that raises the strongest argument in favor of an antisuit injunction at the preliminary approval stage concerns actions in federal court—particularly those consolidated by the Judicial Panel on Multidistrict Litigation into a single [multidistrict litigation] proceeding—that are robustly litigated and aim to settle a large, complex matter without significant imposition by strategically filed parallel state cases."  Id. (emphasis omitted) (footnote omitted).

The question of whether a settlement agreement is substantively deficient focuses on the terms of the agreement itself.  "The starting place for understanding the substantive requirements for preliminary approval is in reviewing the substantive requirements for *final* approval." Id. § 13:15.  The Eighth Circuit has laid out four factors for courts to consider when making a final determination that a settlement is fair, reasonable, and adequate: "(1) the merits of the plaintiff's case[] weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement."  In re Uponor, 716 F.3d 1057, 1063 (8th Cir. 2013) (alteration in original)

(internal quotation marks omitted) (quoting <u>Van Horn v. Trickey</u>, 840 F.2d 604, 609 (8th Cir. 1988)).  The first of these factors is the most important.  <u>Marshall v. Nat'l Football League</u>, 787 F.3d 502, 508 (8th Cir. 2015) (quoting <u>Van Horn</u>, 840 F.3d at 607), <u>petition for cert. filed</u>, (U.S. Nov. 16, 2015) (No. 15-645).

Preliminarily, it appears that the class Plaintiffs have a strong case against the Defendants for charging a usurious interest rate and that the Defendants ought to be capped at an 18% interest rate.  Defendants wrote in their own loan agreements that Cheyenne River Sioux Tribe law governed and the Tribe's Law and Order Code reportedly has an 18% cap on loans above $100.  Tribal law likely does not apply to non-Indian borrowers in a program like this anyway, which opens the way for argument to apply usury caps from the borrowers' home states. However, some 62% of the potential class members confront arbitration clauses that thus far courts have enforced, while the remaining approximately 38% of the proposed class members have loan agreements with arbitration clauses that likely cannot be enforced for reasons this Court addressed in a prior Opinion and Order.  <u>See</u> <u>Heldt</u>, 12 F. Supp. 3d at 1187–93.

This Court cannot fully evaluate Defendants' financial conditions.  The complexity and expense of further litigation appears great and reportedly could exhaust what remains of the assets of the possibly only remaining solvent Defendant, CashCall, Inc.  The amount of opposition to the settlement at this point is substantial including one of the four named Plaintiffs, although the addenda eliminated the opposition of the FTC and at least some state officials to the Settlement Agreement.  More information is necessary to better evaluate these factors.

## IV.    Legal Analysis on Certification of Settlement Class

Parties seeking to certify a class action under the Federal Rules of Civil Procedure must meet two sets of requirements.  First, the parties must satisfy the four threshold requirements set

forth in Rule 23(a).  Fed. R. Civ. P. 23.  Second, the parties must demonstrate that the case fits

within one of the categories of Rule 23(b).  Id.; Amchem Prods., Inc. v. Windsor, 521 U.S. 591,

614 (1997).

Courts also have recognized two "implicit" requirements that must be satisfied before a

class is certified: the class description must be sufficiently definite and the class representative

must be a member of the class.  Brown v. Wells Fargo & Co., 284 F.R.D. 432, 444–45 (D. Minn.

2012); Rubenstein, supra, § 3.1.

### A. Rule 23(a)

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all members only if:
> > (1) the class is so numerous that joinder of all members is impracticable;
> > (2) there are questions of law or fact common to the class;
> > (3) the claims or defenses of the representative parties are typical of the
> > claims or defenses of the class; and
> > (4) the representative parties will fairly and adequately protect the interests
> > of the class.

Fed. R. Civ. P. 23(a).  The prerequisites of Rule 23(a) are referred to as numerosity,

commonality, typicality, and adequacy of representation.  District courts must undertake a

"rigorous analysis" to ensure that all the requirements of Rule 23(a) have been met.  Wal-Mart

Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks and quotations

omitted).

### 1. Numerosity

Although referred to as the "numerosity" requirement, the central focus of Rule 23(a)(1)

is the impracticability of joinder.  See Rubenstein, supra, § 3:11.  In determining whether the

numerosity requirement is met, courts may consider "the number of persons in a proposed class,

the nature of the action, the size of the individual claims, the inconvenience of trying individual

suits, and any other factor relevant to the practicability of joinder." Emanuel v. Marsh, 828 F.2d

438, 444 (8th Cir. 1987), vacated on other grounds, 487 U.S. 1229 (1988).

Here, the Parties contend that the numerosity requirement is met because the Plaintiffs'

allegations "implicate the approximately 384,278 loans that Western Sky made between 2010

and 2013, and that the proposed nationwide class settlement would encompass each of the

approximately 348,000 borrowers of those loans." Doc. 64 at 15–16. The Intervenors do not

make any argument concerning the numerosity requirement and indeed acknowledge that class

action litigation is appropriate albeit on a state-by-state basis in their view.

### 2. Commonality

Rule 23(a)(2) is satisfied if there are "questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2). For purposes of the Rule, "[e]ven a single [common] question will do."

Dukes, 131 S. Ct. at 2256 (alterations in original) (quotations and internal citations omitted); see

also DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1174 (8th Cir. 1995) ("Commonality is not

required on every question raised in a class action."). The Supreme Court in Dukes explained

that commonality requires "the plaintiff to demonstrate that the class members 'have suffered the

same injury,'" rather than that they merely "suffered a violation of the same provision of law."

131 S. Ct. at 2251 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). In

addition, the question common to the class must be important to the litigation:

> [The class members' claims] must depend upon a common contention . . . That
> common contention, moreover, must be of such a nature that it is capable of
> classwide resolution—which means that determination of its truth or falsity will
> resolve an issue that is central to the validity of each of the claims in one stroke.

Id.; see also DeBoer, 64 F.3d at 1174 ("Rule 23 is satisfied when the legal question 'linking the

class members is substantially related to the resolution of the litigation.'" (quoting Paxton v.

Union Nat'l Bank, 688 F.2d 522, 561 (8th Cir. 1982)).

The Parties assert that Rule 23(a)(2) is satisfied because the members of the class share a common factual circumstance of having obtained loans that were originated, serviced, and collected in a uniform manner according to policy and procedures implemented by defendants on a nationwide basis. Doc. 64 at 16. The Intervenors argue that there is an absence of commonality because the usury caps vary from state-to-state and are difficult to determine in certain states. Doc. 93 at 31. The Intervenors also argue that the fact that some state attorneys general have settled with Defendants separately to benefit borrowers within those states defeats commonality. The Intervenors in short submit that separate classes ought to be certified in state-by-state-by-state litigation, rather than one national class.

Intervenors' arguments, although not without some merit, do not defeat commonality. Usury rates vary among states and may in some states be a challenge to apply, but they are not indeterminable. An addendum to the Settlement Agreement sets the allowable interest rate on existing loans at no more than 18% or at such lesser rate as allowed by the borrower's home state usury rate. The common issues of law—violation of the usury restriction in the Cheyenne River Sioux Tribe's Law and Order Code and of state usury restrictions—unites the class. The common issues of fact of the loan terms and lending methods and program unite the class. Whether to certify a national class or a system of subclasses for those who have received refunds through state attorneys general actions or for those who are in states with usury rates lower than 18% is an issue on which this Court need not presently rule because preliminary certification is being denied for other reasons. However, there is sufficient commonality to support a national class.

### 3. **Typicality**

Rule 23(a)(3) requires that the "claims or defenses of the representative parties" be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." Paxton, 688 F.2d at 561–62 (internal quotation marks and quotation omitted); see also DeBoer, 64 F.3d at 1174 ("The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff."). The typicality requirement tends to merge with commonality because they both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Dukes, 131 S. Ct. at 2251 n.5.

The Parties contend that they satisfy the typicality requirement because the representative parties were harmed in a manner similar to the proposed class and because the representative parties have not asserted any claims different from or antagonistic to the proposed class. Doc. 64 at 17. The Intervenors disagree, arguing that because the representative parties are raising claims under the laws of only four states—California, Minnesota, Texas, and Virginia—the claims of the representative parties are not typical of the claims of many absent class members. Doc. 93 at 34. According to the Intervenors, they and other absent class members raise claims under other states' usury and consumer protection laws. Doc. 93 at 34. The Intervenors claim that these laws vary widely in their scope and potential remedies. Doc. 93 at 34.

A mere difference between the damages available to the representative parties and the damages available to the class will not defeat typicality. See Rubenstein, supra, § 3:42 ("Courts have conclusively held that variations in the amount of relief sought will not render the proposed class representative's claims atypical." (citations omitted)); 7A Charles Alan Wright et al., Federal Practice and Procedure § 1764 (3d ed. 2011) (explaining that the typicality requirement may be met despite a disparity in the damages claimed by the representative parties and the other class members). Courts may decline to find typicality when there is a significant difference in the type of relief sought, however. Rubenstein, supra, § 3:44. For instance, courts have found an absence of typicality when "the majority of class members sought only declaratory and injunctive relief, but the proposed class representatives sought monetary relief for themselves and a small subset of the class" and when "the organizational plaintiffs who had standing to seek only equitable relief sought to represent a class of members entitled to money damages." Id. (footnotes omitted) (citations omitted).

Intervenors' arguments against typicality parallel their arguments against commonality. The four named Plaintiffs have claims typical of proposed class members. At least one of those Plaintiffs did not pay interest beyond 18%, while others did pay interest beyond 18% on the loans. Surely if other of the Intervenors somehow were included as lead plaintiffs, some of Intervenors' typicality arguments would dissipate. Intervenors' arguments prompt this Court to ponder subclasses as a means to better administer a possible class action and to consider typicality at some greater depth, but the biggest problem with certifying the class is not typicality.

### 4. Adequacy of Representation

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]he purpose of Rule 23(a)(4) is to ensure due process for absent class members . . . ." Rattray v. Woodbury Cty., Iowa, 614 F.3d 831, 835 (8th Cir. 2010). Rule 23(a)(4)'s focus is twofold: "(1) [whether] the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." Paxton, 688 F.2d at 562–63. "The central component of class representative adequacy is the absence of conflicts of interest between the proposed representatives and the class." Rubenstein, supra, § 3:54. Differences in the type of relief sought may affect the adequacy of a class representative. Id. "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a) . . . ." Amchem Prods., 521 U.S. at 626 n.20 (alteration in original) (quoting Gen Tel. Co. of Sw., 457 U.S. at 157 n.13).

The Parties contend that Rule 23(a)(4) is met because the claims of the class representatives do not conflict with the claims of the class and because class counsel has extensive experience in class action litigation and is very familiar with this case. The Intervenors disagree. Doc. 64 at 17–18.

Ruling on adequacy of representation is tricky here because only three of the four named Plaintiffs still support the Settlement Agreement. Christi W. Jones now objects to the Settlement Agreement because she thought loan forgiveness ought to be part of the terms and because she originally was led to believe that it was part of the terms. Doc. 96. She effectively is preemptively opting out, leaving only three named Plaintiffs as potential class representatives.

This Court has misgivings about the reasonableness of the Settlement Agreement. The Parties urge that preliminary approval be granted and that deferral of a determination of reasonableness await responses from class members as part of consideration of final approval. The Parties allude to instances where other judges have preliminarily approved class action settlements containing similar provisions, albeit likely when neither intervenors nor a named plaintiff objected. Both at the hearing on preliminary approval and in this Opinion and Order's recitation of proposed settlement terms and the notice, this Court has signaled its apprehensions about certain aspects of the terms that could suppress monetary claims, of the handling of those borrowers who have received some recoupment of interest through state litigation, and the reasonableness of the amount of the pool for cash claims. Bluntly put, there are signs here that the Plaintiffs' attorneys, who hope to receive a fee of as much as $3.5 million, have not adequately represented the class in the negotiation of the Settlement Agreement or notice form. Indeed, on very short notice, counsel for the Intervenors has presented more detail on litigation against the Defendants and the Defendants' business in what amounts to zealous and highly effective advocacy on behalf of the Intervenors.

It would be ideal to include the Intervenors and their counsel in another round of negotiation to get broader class representation to evaluate whether $7 million is an appropriate settlement fund given the financial standing of the Defendants, to broaden the named class members to implement some means of dealing with class members who already have benefitted monetarily from state litigation, and to modify the notice and claims procedure to maximize likely responses. However, the Intervenors' unrealistic position that no certification of any sort of a national class is appropriate or other intransigence may render that impossible, as might the Parties' willingness to risk what this Court might do upon resubmission of a modified Settlement

Agreement addressing all or most of the concerns expressed. Further, time might be short as Defendants remaining assets may be depleted. At any rate, there exists an absence of a showing of adequacy of representation, so the Motion for Preliminary Approval of Class Settlement is denied without prejudice to refiling. Because there may be refiling of another such motion, this Court continues with analysis under Rule 23(b).

### B. Rule 23(b)

To be certified, a proposed class must satisfy Rule 23(a) and fit within one of the three types of class actions defined by Rule 23(b). Fed. R. Civ. P. 23. Here, the Parties contend that the proposed class fits within Rule 23(b)(3). A class must meet two requirements to qualify for certification under Rule 23(b): "Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" Amchem Prods., 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3)). Rule 23(b)(3) lists four factors relevant to the so-called "predominance" and "superiority" requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. Pro. 23(b)(3). Because the class in this case is proposed to be certified for settlement purposes, this Court "need not inquire whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)(D). Amchem Prods., 521 U.S. at 620 (citations omitted). The Supreme Court has cautioned, however, that other aspects of Rule 23— "those designed to protect absentees by blocking unwarranted or overbroad class definitions— demand undiluted, even heightened, attention in the settlement context." Id. The "dominant

concern" when certifying a settlement class is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." Id. at 621.

Intervenors' brief focuses mainly on the predominance requirement. Doc. 93 at 18–37. This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. at 623. "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010). Intervenors argue that predominance is lacking in this case because their claims are based on the laws of Florida, North Carolina, Kentucky, Illinois, Virginia, and Wisconsin, whereas the class representatives are only asserting claims based on California, Minnesota, Texas, and Virginia law. Doc. 93 at 9.

It is well-settled that variations in state laws may defeat predominance in a nationwide class action. See Wright et al., supra, § 1780.1 ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states."); id. § 1778 ("[I]n multistate class actions premised on state law, choice-of-law rules requiring the application of multiple and varying state laws may prevent finding that common questions predominate."); Rubenstein, supra, § 4:61 ("Generally speaking, common issues do not predominate in a multi-state class action based on state law when there is significant variation in the laws of the various jurisdictions."); Manual For Complex Litigation, supra, § 21.132 ("In a nationwide or multistate settlement class, counsel should be ready at the class certification hearing to explain the common elements of the substantive law that are applicable to all class members so that choice of law issues will not defeat predominance and the manageability component of superiority."). Before

22

certifying a multistate class action based on state law, courts must consider how choice-of-law issues impact the predominance requirement. See Manual For Complex Litigation, supra, § 21.132 (2004) ("The court must determine whether the variations or conflicts [in state law] defeat commonality, predominance, and superiority and the extent to which the creation of subclasses removes such conflicts so as to permit certification."). The party moving for certification bears the burden of demonstrating that the application of substantive laws from multiple states does not defeat predominance. See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004) ("The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified or compared.").

The general rule that variations in state law destroy predominance in multistate actions is relaxed when the class is being certified for settlement: "Although the Rule 23(b)(3) requirements may be a barrier to certification when the differences in state law are analyzed, one exception to this conclusion is when a settlement class is involved because manageability concerns are not implicated in that setting. Consequently . . . courts have been more receptive to certification of multistate settlement classes." Wright et al., supra, § 1780.1 (footnote omitted); see also Sullivan v. DB Invs. Inc., 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (providing that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class); Rubenstein, supra, § 4:63 ("[I]n settlement class actions, because manageability need not be a concern, predominance—the main focus of manageability—recede in importance as well."). Here, the variations in state usury law might present administrative issues. The fact that some states have settled in a way where certain borrowers have recouped monies presents even greater administrative issues, not addressed in

23

the Settlement Agreement or briefing.  Although the variations in state law and state recoveries may not be an insurmountable obstacle to predominance, the Parties should address this issue if they refile their motion for class certification.

## V.     Conclusion

For the reasons explained herein, it is hereby

ORDERED that the Joint Motion to Lift Stay is granted and that the Joint Motion for Preliminary Approval of Class Settlement, Doc. 64, is denied without prejudice to refiling.

DATED this  _8th_  day of January, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE